## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | NO. 1:13-mc-00405-JEB-DAR |
| GREGORY THORPE, *et al.* | |
| Plaintiffs | |
| vs. | NO. 1:12-cv-11632-RWZ |
| KEITH F. CROSS, *et al.* | Pending in District of Massachusetts |
| Defendants | |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENLARGEMENT OF TIME UNDER RULE 6(b)(1) TO RESPOND TO NON-PARTY PHILLIPS & COHEN LLP'S MOTION TO QUASH

Plaintiffs, Gregory Thorpe and Blair Hamrick, submit this Reply in Support of its Motion for Enlargement of Time Under Rule 6(b)(1) to Respond to the Motion to Quash filed by non-party Phillips and Cohen, LLP ("P & C").

As set forth in their original moving papers, Plaintiffs served their third-party document subpoena on P & C in connection with Plaintiffs' legal malpractice claim against their former lawyers, Keith Cross, Joseph Bennett, and Cross & Bennett L.L.C. (collectively "C & B") filed in the United States District Court for the District of Massachusetts. In their legal malpractice claim, Plaintiffs sued C & B in connection with their representation of Plaintiffs, as whistleblowers, in a whistleblower lawsuit filed against GlaxoSmithKline LLC ("GSK") under the False Claims Act (the "FCA"). Under the FCA, absent some agreement to the contrary, only

the first-filed whistleblower (also referred to as a "relator") is entitled to a relator's share of the government's recovery. 31 U.S.C. § 3730(b)(5).

In their legal malpractice claim, Plaintiffs allege that C & B committed malpractice when, among many other things, C & B failed to question P & C about P & C's suspected use of Greg Thorpe's confidential information, upon learning that P & C, after rejecting Thorpe's prospective whistleblower lawsuit, filed a similar whistleblower lawsuit against GSK with other whistleblower clients. P & C's whistleblower lawsuit competed with Plaintiffs' whistleblower lawsuit for first-filer status. Plaintiffs agreed to a 50/50 sharing agreement with P & C's whistleblower clients to share in the government's recovery against GSK.

Plaintiffs allege in their malpractice claim that C & B would have been able to negotiate a much more favorable sharing agreement for Plaintiffs if P & C failed to properly protect Thorpe's confidential information. In their legal malpractice claim, Plaintiffs must establish that C & B's failure to question P & C as to its handling of Thorpe's confidential information caused harm to the Plaintiffs. This is why Plaintiffs have subpoenaed certain information from P & C.

Given P & C's ethical obligations to Thorpe as a prospective client, Plaintiffs also requested information from P & C pursuant to rule 1.18 of the District of Columbia Rules of Professional Conduct. In P & C's case evaluation questionnaire completed by Thorpe (attached as Exhibit "A"), P & C warranted that "[b]y law, your [Thorpe's] communications with us [P & C] during the evaluation process are regarded as privileged and confidential and will be treated by us accordingly." Despite its ethical obligations, P & C refused to provide the requested information. Attached as Exhibit "B" are Plaintiffs' letters to P & C requesting the rule 1.18 information and P & C's response to Plaintiffs' letters. The only information that P & C produced in response to Plaintiffs' subpoena was the ten-page case evaluation questionnaire.

Since P & C has refused to provide any information beyond the ten-page questionnaire, which clearly shows Thorpe shared confidential information with P & C prior to P & C filing its competing whistleblower lawsuit, Plaintiffs have also reached out to a former employee of P & C, Bonny Harbinger, to ask her for certain non-privileged information that is relevant to proving the harm that C & B caused Plaintiffs by failing to inquire about P & C's suspected use of Thorpe's confidential information. Plaintiffs' letter to Ms. Harbinger is attached as Exhibit "C." After sending this letter, counsel for P & C submitted his sworn testimony in P & C's Motion to Quash, stating that no one other than Ms. Harbinger, a junior associate at the time, was involved in "evaluating" Thorpe's prospective multi-billion dollar whistleblower lawsuit. Tellingly, P & C's counsel did <u>not</u> state that <u>no</u> other P & C attorney was involved in the decision to reject Thorpe's prospective case, or that Ms. Harbinger did <u>not</u> report to a more senior attorney before rejecting Thorpe's prospective case, or that <u>no</u> other employee of P & C had access to Thorpe's confidential information.

It is not plausible that a firm such as P & C would leave the decision to reject a potential multi-billion dollar lawsuit solely to a junior associate. On its case evaluation form, P & C represented that it thoroughly analyzes potential cases. Specifically, P & C stated:

> Our review to determine whether your case is viable and our decision whether to accept it may take considerable time for several reasons. Before we commit ourselves to representing someone, we thoroughly analyze the applicability of the False Claims Act to the potential case. This process may include an investigation of the facts presented and sometimes consultations with experts in the field. … ."

P & C Website Excerpt on June 14, 2002 (attached as Exhibit "D"). Leaving the decision to reject a potential multi-billion dollar lawsuit to an unsupervised, junior associate does not comport with P & C's representations.

Plaintiffs sent Ms. Harbinger the declaration of P & Cs counsel and asked her if she was willing to speak with Plaintiffs. Plaintiffs' email to Ms. Harbinger is attached as Exhibit "E." Plaintiffs have only contacted Ms. Harbinger in writing and disclosed P & C's objection to the subpoena that Plaintiffs served on P & C. This is permissible under D.C. Rules of Professional Conduct, and P & C does not argue otherwise. Ms. Harbinger has never responded to Plaintiffs' written inquiries. Plaintiffs have since sought to serve a deposition subpoena on Ms. Harbinger. Plaintiffs have attempted service multiple times without success. Plaintiffs did not notify P & C because P & C does not represent Ms. Harbinger.

In its letter refusing to answer Plaintiffs' ethical inquiry, P & C made the point that the questioning of a former employee should not go forward without appropriate safeguards. The deposition that Plaintiffs are seeking will do just that; P & C will have the opportunity to attend and to assert objections on the record so that they may be ruled upon by the Court in due course.

When P & C requested that Plaintiffs defer serving their subpoena on Ms. Harbinger pending a ruling on P & C's Motion to Quash in exchange for agreeing to Plaintiffs' request for an extension of time, Plaintiffs stated that it would agree to defer Ms. Harbinger's deposition if P & C would properly amend or supplement its Motion to Quash to add the issue to the record so that the issue could be decided by the Court. P & C refused. Accordingly, it is clear that P & C's strategy is to deprive Plaintiffs of adequate time to respond to P & C's extensive Motion to Quash that it was able to prepare because Plaintiffs consented to P & C's request for an extension of time. P & C is now refusing to provide Plaintiffs with the same courtesy that Plaintiffs provided to P & C.

P & C's arguments concerning the merits of Plaintiffs' malpractice claim are not for this Court, but rather are for the Massachusetts' District Court, where Plaintiffs' malpractice claim is pending.  P & C has not (and cannot) establish that Plaintiffs' malpractice claim is without merit.

As P & C rightly points out, it did not represent Plaintiffs.  Nevertheless, P & C had an ethical obligation to Thorpe as a prospective client.  If discovery in the malpractice case against C & B uncovers ethical violations by P & C, it will be up to Thorpe to decide whether or not to raise those violations with the D.C. Disciplinary Committee.  However, such potential fallout is no reason to preclude discovery of relevant, non-privileged information.

## CONCLUSION

For all the foregoing reasons and for the reasons set forth in Plaintiffs' original moving papers, Plaintiffs respectfully request this Honorable Court enlarge the time for Plaintiffs to respond to Phillips and Cohen, LLP's Motion to Quash by fourteen (14) days.

Respectfully submitted,

**OBERMAYER REBMANN**
**MAXWELL & HIPPEL LLP**

_____/S/_____
Joseph J. McGovern, Esquire
(D.C. Bar No. 936609)
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone:  (215) 665-3000
Fax:  (215) 665-3165

*Attorney for Plaintiffs*
*Gregory Thorpe and Blair Hamrick*

Date: May 14, 2013

**EXHIBIT A**

**EXHIBIT A**

Have a case

Questionnaire

**ATTORNEY NOTES
REDACTED**

If you would like to have Phillips & Cohen evaluate your potential case and
consider representing you in a False Claims Act lawsuit:
1) Carefully read this section.
2) Print out the following questionnaire.
3) Fill it out.
4) Sign the statement at the bottom.
5) Send the signed statement and filled-out questionnaire to us through the
U.S. mail or other delivery service.

If you don't have a printer, please contact us and a staff member will mail or
fax you a questionnaire. You also may e-mail us the filled-out
questionnaire. The e-mail will be encrypted, but total security cannot be
guaranteed.

We ask that you submit information about your potential case in writing so
that we may properly assess the merits of your allegations and the strategic
issues they raise. This will help us make an informed decision about whether
Phillips & Cohen will be able to represent you. Please provide as much detail
and supporting documentation as possible. If you would rather write a
narrative, please address all the issues the questionnaire raises.

The statute of limitations for filing a False Claims Act lawsuit can be as short
as six years and the opportunity for a private individual to bring a false claims
action may be cut off if someone else publicizes the conduct at issue, files a
False Claims Act lawsuit making similar charges or otherwise spurs the
government into action before you file suit. **If you know of any impending
events that might pre-empt your claim, tell us immediately.**

By law, your communications with us during the evaluation process are
regarded as privileged and confidential and will be treated by us accordingly.

Name: GREGORY W. THORPE

Address: 1280 PAINTED ROCKS Rd.

City: Woodland Park State: CO, Zip: 80863

Telephone numbers: 719-687-7675 Home: Work: Same

Which telephone number would you prefer that we call? home

What times are best to reach you? am - pm

Fax number: 719-687-7675 E-mail address: rolling thunder gt @cs.com

Profession/Job title: Senior Executive Sales Rep.

http://www.falseclaims.com/HTML/BODY/form.htm (23½ yrs - GSK.)    4/3/2002

P&C000001

Have a case

Employer:   GLAxoSmitH KLiNe plc.

Company believed to be involved in the fraud:

— Same —

That company's location (city, state):   Research Triangle Park, N.C.

The False Claims Act generally allows whistleblowers to bring qui tam
lawsuits when the government has made payments based on false claims,
paid claims based on false certifications or has not been paid money owed to
it. The law does not apply every time the government makes an unwise
purchasing or management decision. It also does not apply to cases of
mistake or negligence.

1) With this in mind, describe how you believe that the company has violated
the False Claims Act. Please include the following information:
a) What actions or activities do you believe were fraudulent?
b) Who was engaged in the fraud? What are their job titles or positions, and
what role did those people play in the fraud?
c) When and how did you become aware of the fraud?
d) When did the fraud begin? Has it ended? If so, when?
e) What involvement, if any, did you have in the fraud?
f) What documents exist that would help prove the fraud? Do you have any of
these documents? If so, please attach copies of key documents.
g) What witnesses would support your allegations? What evidence can they
provide?

a) GSK has violated the prescription drug marketing act
(PDMA) by paying physicians to lecture on indications
for several products that are not approved by the FDA.
Further, many representatives are detailing (selling) these
uses to physicians, without adequate safety/efficacy/
tolerability data. Specifically the drug Wellbutrin SR is
being promoted actively for ADD/ADHD, weight loss, and
pediatric use. The drug Famvir(?) is being promoted
for Bi-Polar disorders. The drugs Amerge + Imitrex are
being promoted for use in children under 18 (unapproved).
    Most of these physicians are direct medicaid
providers, Tri-care providers, or in fact directly
employed by the govt (ex.) Chief Psychiatrist Evans Army
Hospital, Colorado Springs, Co. They are also targeting
and spending extravagantly on only high prescribing,

physicians). A practice which is also coming under scrutiny by U.S attorneys.

These three drugs alone do about 3-4 Billion Dollars/years — off label promotion has been responsible for an estimated.

off Code {
36% — Wellbutrin SR   ~ $360,000/yr.
20% — Imitrex, Amerge   ~ $500,000/yr.
50% — Lamictal   — $150,000 yr.

Associated acts of Fraud, mktting programs, "Speakers" training, Grants etc are also involved.

Sales Representatives, District Managers, Senior upper mgt., are all aware and have been involved in the Fraud.

I have sales calls notes from several local representatives. Speaker Program mgt approval of (ex.) Amerge for "Pediatric Migraine". Notes that prove District mgrs, Regional mgrs, and product mgrs. were (are) all aware.
* This is nationwide, and could be further proven with adequate Discovery involving E-mails and other Representatives call notes which are entered in their Computers).

I became aware of the Fraud recently, but have gone back about 2 years receiving Sales call notes from various sales representatives.

We recently even had to be "certified" to sell Wellbutrin SR by scoring 90% or better on a "weight loss" study (not an FDA indication). The Fraud involved has gone on for at least the last 5-6 years, encouraged by GSK. I have had no involvement in the Fraud. I reported *some* of what I had to Pharmaceutical Compliance at GSK. I was then offered a "displaced employee" package. Nothing was done to the offenders. I will copy *many if not all* of my proof as documented. It should give you an idea of all I have.

2) Have you discussed your allegations with anyone, including your employer, a local, state or federal government official or someone in the media? If so, please state with whom you discussed the matter, the circumstances and any response.

I discussed the matter with my District Mgr. (2 isolated cases). I was put on a "Verbal Warning" for "lack of Teamwork". I then talked to Pharma Compliance, who "investigated". A huge cover-up, damage control mode went into effect. I am negotiating a "severance pkg". at present. Retaliation for coming forward.

3) If you discussed your allegations and concerns with your employer, was there any change in your employer's practices after the conversation? Did anyone working for your employer threaten to retaliate against you, or was there any retaliation? If so, please describe. No change - ongoing, whatever they can get by with. Retaliation - Verbal warning + Severance pkg,

4) If you lost your job, have you filed or are you considering filing a wrongful termination lawsuit? Please describe any action you have taken in this regard. now or "administrative leave". (See above)

I either work for the criminal District Mgr. or take a "displacement pkg". My 23½ years with Glaxo are over, at any rate. They are too smart to "terminate" me at this point.

5) Have your allegations been the subject of any legal or legislative action?

P&C000004

For example, have they been disclosed in the course of a wrongful
termination action, a products liability case, a congressional hearing or
agency proceeding? If so, please describe.

*No   GSK does 30 Billion
Dollars/year and only I
have concrete evidence of PDMA
Violations, + violations of FDA
law (criminal intent). These involve
payments by the Federal Govt. through
medicaid + military Hosp facilities for off-label
uses of any products that was promoted
actively by the company.*

6) How much, in dollar terms, would you estimate the government has been
damaged by the alleged wrongdoing? (In your calculations, exclude any
penalties.) Describe how you arrived at your estimated damages.

*If we only go back 5 years
the average total off label use
of the products is around 20% minimum.
Over the past 5 years, they have
sold app. $12 Billion in these products alone
So — about (2 Billion, 500 million)
$2,500,000,00 Dollars.*

7) If the company involved in the fraud is not a large corporation, please
describe what you believe to be the financial capability of the company to pay
a large False Claims Act judgment.

*The FDA is just looking for pharmaceutical
Violations. They have recently even posed as physicians
checking sample signature cards, to make sure they
were totally filled out in advance of receiving samples.
This would be much bigger than the
TAP Pharm. settlement of almost 900 million!*

8) Have you ever filed a lawsuit against anyone or any company before?

_yes_

What was the case about?

_Custody matter - family law - nothing like this._

The following information is for our firm's use.
How did you hear about or find Phillips & Cohen?

a. Search engine/portal
b. Another Web site
c. Newsgroup posting
d. Print publication
e. Other, Please specify below

_I would hurry on this one. Please advise ASAP - I know someone will take this. I have the proof and other Reps to testify. I write you as it seems you have the experience._

We appreciate having the opportunity to review your case. Please keep in mind the following:

By providing you these materials and by reviewing the information you send, Phillips & Cohen has *not* agreed to represent you nor have you agreed to retain Phillips & Cohen.

Our review to determine whether your case is viable and our decision whether to accept it may take considerable time for several reasons. Before we commit ourselves to representing someone, we thoroughly analyze the applicability of the False Claims Act to the potential case. This process may include an investigation of the facts presented and sometimes consultations with experts in the field. Our firm has limited human, legal and financial resources available. While we review your potential case, we must continue to work on our existing cases and conduct reviews of other potential lawsuits. You should be aware that the vast majority of the cases we review are not accepted by the firm.

You may inquire about the status of our review of your potential case at any time.

A False Claims Act lawsuit can, and usually does, take a number of years from start to finish. The process of bringing a successful case is a major commitment by us in terms of personnel and other resources, which is why we conduct thorough analyses of potential cases before we accept them. The expense a law firm bears in bringing these lawsuits in both lawyer time and out-of-pocket costs is considerable.

Part of our analysis of your potential case will focus on practical

P&C000006

considerations. Cases may be too small or too unsubstantiated (and therefore too risky) to justify the commitment of our firm's resources.

If our time constraints do not fit your needs, you may wish to discuss your potential case with other counsel. Other law firms may approach the investigation of a potential False Claims Act case differently, such as filing a lawsuit at an earlier date with less substantiation than Phillips & Cohen requires, or may have more time and resources instantly available to investigate a potential case.

As you search for counsel, bear in mind that the statute of limitations can be as short as six years. In addition, any public disclosure of the fraudulent conduct, the filing of another False Claims Act lawsuit making the same charges or government action on the matter before your lawsuit is filed might be grounds for dismissal of a case. (                    ) Please be aware that our thorough and selective approach to case analysis may present added risks that one of these events might occur before we are in a position to decide whether to represent you and file a lawsuit on your behalf.

Given the above considerations, if you would like Phillips & Cohen to review your potential case, please sign below and send us this entire form, including the filled-out questionnaire.

Signature *Gregory W. Thorpe*        *GW Thorpe*

Date   *4/17/02*

*Please send to:*
Phillips & Cohen
2000 Mass. Ave., NW
First floor
Washington, DC 20036

*Please keep my information confidential until I am informed.*

*Greg Thorpe*

### Important notice

**These pages should not be construed to contain legal advice. While we will treat any information provided as privileged and confidential, you should understand that when you provide information about a potential case to Phillips & Cohen, we do not become your attorneys. With your permission, we may use your information to investigate whether we wish to represent you to bring a case. But until we both sign a written agreement, we do not represent you and have not agreed to do so.**

[About the firm]        [What's blowing the whistle]

© 2000 Phillips & Cohen. All rights reserved



"The United States contends that TAP knowingly and willfully offered and paid illegal remuneration to certain physicians, physicians' practices, health maintenance organizations and others in various forms including, for example, grants, free Lupron, debt forgiveness, travel and entertainment, consulting and audit services, administration fees, nominally priced drug, and VCRs and TVs to unlawfully obtain orders to purchase the drug Lupron for treatment of prostate cancer from TAP, which drug TAP knew was paid for by Medicare, Medicaid and TRICARE programs, as well as by private insurers, payers of copays, and copay insurers."

Assistant U.S. Attorney Jim Sheehan (Chief, Civil Div., E.D.Pa.) just spoke on this very topic at the Pennsylvania Bar Institute's Health Law Institute last week.  It seems plain that he is looking for such cases.  One of his interesting points was that the pharmaceutical companies purchase prescribing data (with patient identifiers stripped out) from pharmacy chains, and thus compile databases on the prescribing practices of individual physicians.  And that the maintenance of this data, when correlated with a list of which physicians receive trips etc., shows motive.  And that the data itself (increases in prescribing after receipt of trips etc., shows cause and effect, and reinforces motive.

Sounds like the next big area for an enforcement push.  Lots of ripe, low hanging fruit out there.

I have an abundance
if data to support this
most "recent" topic of
unethical practices Enclosed
one example of "Targeting".

(see following
page &ample)

P&C000008

GREG THORPE
1280 Painted Rocks Rd.
County Rd. 78
Woodland Park, CO  80863
719-687-7675

4/17/02

To Whom  (Phillips & Cohen)

I have been employed
by GlaxoSmithKline for 23½ yrs.
with an excellent record. The
data within is self-explanatory.

This must be kept confidential
as after I reported this, they offered
me nothing but a "severance pkg.";
which I am now negotiating.

There has been a massive
coverup - I only reported the last 6
items in the packet, no Repercussions
for the offenders. I have been
retaliated against.

Please advise ASAP if you are
interested as I believe I can find
someone to take this. This could
be huge.

Sincerely
Greg Thorpe

P&C000009

**EXHIBIT B**

**EXHIBIT B**

# OBERMAYER

## REBMANN MAXWELL & HIPPEL LLP

### ATTORNEYS AT LAW

William J. Leonard, Esquire
Direct Dial: (215) 665-3228
E-mail: william.leonard@obermayer.com

One Penn Center – 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
P 215-665-3000
F 215-665-3165
www.obermayer.com

April 18, 2013

**VIA E-MAIL AND FIRST CLASS MAIL**

Stephen Hasegawa, Esquire
**PHILLIPS & COHEN LLP**
100 The Embarcadero, Suite 300
San Francisco, CA  94105

   Re:   **Phillips & Cohen's Handling of Greg Thorpe's Confidential *Qui Tam* Information**

Dear Mr. Hasegawa:

   Now that we have seen Phillips & Cohen's response to our third-party subpoena, including Greg Thorpe's handwritten submission and Bonny Harbinger's letter declining Greg's case, we have some questions concerning Phillips & Cohen's duties to Greg as a former prospective client. We believe that Phillips & Cohen has an ethical obligation, quite apart from the third-party subpoena, to explain what it did to protect Greg's confidences and when.

   Greg submitted an off-label marketing *qui tam* claim to Phillips & Cohen for evaluation. He did so in confidence, because the federal False Claims Act limits the relator's share to the first filer. The District of Columbia's Rules of Professional Conduct state that a lawyer may not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter "if the lawyer received a confidence or secret from the prospective client," without obtaining the informed consent of both the client and the former prospective client or erecting an ethical screen. D.C. RPC 1.18(c) and (d). As it turned out, Phillips & Cohen did represent relators having interests materially adverse to Greg in a *qui tam* action against GSK that was substantially related to Greg's *qui tam* action against GSK. The adversity arose from the first-to-file provision of the federal False Claims Act, which sets up a race to the courthouse.

   Comment 6 to RPC 1.18 explains that "ABA Model Rule 1.18 provides for personal disqualification only if the information received by the lawyer could be significantly harmful if used in the matter, but the trigger in D.C. Rule 1.18 is receipt of any confidence or secret because of the interest in more broadly protecting the prospective client and the difficulty of determining whether use of the information would be significantly harmful to the prospective client."

   Comment 7 further explains that "imputation may be avoided if … all disqualified lawyers are timely screened." "Screened" denotes the isolation of a lawyer from any participation in a matter

4711321

Stephen Hasegawa, Esquire
Page 2
April 18, 2013

through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these Rules or other law.  D.C. RPC 1.0(l).  Comment 7 indicates that the firm "should take affirmative steps, as soon as an actual or potential conflict is suspected, to prevent a personally disqualified lawyer from disseminating any information about the potential client that is protected by Rule 1.6, except as necessary to investigate potential conflicts of interest, to any other person in the firm."  The screen is intended to protect the prospective client "regardless of the amount of information received by the personally disqualified lawyer."

Before the adoption of D.C. RPC 1.18, D.C. Ethics Opinion 279 set forth substantially the same protections for prospective clients.  Massachusetts also recognizes the duty of confidentiality toward prospective clients but does not approve of screening.  Rather, the issue is whether the obligation to maintain the confidentiality of the information received from the prospective client would materially limit the lawyer's ability to represent another client.  Massachusetts Ethics Opinion 07-01.

Our client, Greg Thorpe, asks that Phillips & Cohen explain how it carried out its obligation to protect his confidences; identify the lawyers who evaluated his case; explain what actions it took to screen those lawyers from participating in the *qui tam* case that it subsequently filed on behalf of Messrs. Gerahty and/or Burke; state when those actions were taken and when it first made contact with Messrs. Gerahty and/or Burke; and identify any lawyers who were involved in evaluating his case who were also involved in the recruitment, evaluation, retention or representation of Messrs. Gerahty and/or Burke.

The only information that our client ever obtained via Attorney Cross was that Attorney Erika Kelton alleged that she had been unaware that Greg submitted his case to Phillips & Cohen for evaluation and been turned down.

Thank you for your attention to this matter.

Very truly yours,

William J. Leonard

WJL/pac

4711321



## OBERMAYER
### REBMANN MAXWELL & HIPPEL LLP

ATTORNEYS AT LAW

**William J. Leonard, Esquire**
Direct Dial:  (215) 665-3228
E-mail:  william.leonard@obermayer.com

One Penn Center – 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
P  215-665-3000
F  215-665-3165
www.obermayer.com

May 2, 2013

**<u>VIA E-MAIL AND FIRST CLASS MAIL</u>**

Stephen Hasegawa, Esquire
**PHILLIPS & COHEN LLP**
100 The Embarcadero, Suite 300
San Francisco, CA  94105

Re:   **Phillips & Cohen's Handling of Greg Thorpe's Confidential *Qui Tam* Information**

Dear Mr. Hasegawa:

Please allow this letter to clarify and supplement my letter of April 18, 2013.

In that letter, I asked you to "identify the lawyers who evaluated [Greg Thorpe's] case." In your motion to quash our subpoena, you stated in your declaration that the only lawyer at Phillips & Cohen who "evaluated" Greg Thorpe's case was Bonny Harbinger.  I would like to make clear that you should understand "evaluate" to include not only Bonny Harbinger's review and analysis of Greg Thorpe's submission, but also any discussion or consultation that Bonny Harbinger may have had with anyone else at Phillips & Cohen concerning Greg Thorpe's submission, any supervisory review of, or recommendation based on, Bonny Harbinger's evaluation, and any inspection of Greg Thorpe's submission by anyone at Phillips & Cohen besides Bonny Harbinger before the rejection of Greg Thorpe's case.

To avoid any misunderstandings about the use of the term "confidences" in my prior letter, please be advised that we believe all information Greg Thorpe provided to Phillips & Cohen was confidential, as Phillips & Cohen's website and questionnaire promised.

I would also like to supplement the questions in my letter of April 18, 2013, to ask specifically what steps Phillips & Cohen took to limit access to the information it received from Greg Thorpe, including but not limited to the information it retained – such as the contents of the questionnaire and the contents of the page Bates stamped PC-8.

4715711

Philadelphia
Pennsylvania

Harrisburg
Pennsylvania

Pittsburgh
Pennsylvania

Altoona
Pennsylvania

Berwyn
Pennsylvania

Cherry Hill
New Jersey

Wilmington
Delaware

Stephen Hasegawa, Esquire
Page 2
May 2, 2013


Finally, I would like to make clear that Phillips & Cohen's responses to my prior questions concerning the safeguarding of Greg Thorpe's information should not be limited to Messrs. Gerahty and/or Burke.  We do not actually know that Gerahty and Burke were Philips & Cohen's only clients in the matter against GSK.  We note that in Ms. Kelton's initial communications with Mr. Cross, she told Mr. Cross that Phillips & Cohen had four clients.  Therefore, please note that we are requesting explanations as to how Greg Thorpe's information was safeguarded in Philips & Cohen's representation of all of its clients.

Thank you for your continuing attention to this matter.

Very truly yours,

William J. Leonard

WJL/pac


4715711

PHILLIPS & COHEN LLP

ATTORNEYS AT LAW

*www.phillipsandcohen.com*

2000 MASSACHUSETTS AVENUE NW
1st FLOOR
WASHINGTON, DC 20036
(202) 833-4567

100 THE EMBARCADERO
SUITE 300
SAN FRANCISCO, CA 94105
(415) 836-9000

Stephen Hasegawa
ssh@pcsf.com

May 8, 2013

<u>Via Email and United States Mail</u>

William J. Leonard
Obermayer Rebmann Maxwell & Hippel LLP
One Penn Center – 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

      Re:    Your letter of April 18, 2013

Dear Mr. Leonard:

      Thank you for your recent correspondence regarding your client, Greg Thorpe.  Please accept this letter as a response to your letters of April 18 and May 2, 2013.

      We are currently unaware of any rule or principle that would require Phillips & Cohen LLP ("P&C") to provide you with the information you have requested.  If you are aware of any such rule, please advise us.  In addition, as you know, we have filed a motion to quash the third-party subpoena served upon us, which seeks similar information.  Our position regarding any information relating to Mr. Thorpe is set forth in that motion.  We suggest waiting until the resolution of that motion to address these issues.

      On a separate note, we have learned that you have sought to obtain information from Bonny Harbinger, a former P&C lawyer, regarding attorney work that she performed while employed by P&C.  We believe that it is inappropriate for you to ask Ms. Harbinger to disclose information concerning her work on behalf of P&C without the permission of the firm and without appropriate protections in place to ensure that she does not disclose any confidential information belonging either to P&C or to any P&C client or prospective client.  We respectfully ask that you discontinue any further communication with Ms. Harbinger regarding work she performed while she was an attorney at P&C.

{00049054; 1}

Page 2
May 8, 2013

Very truly yours,

Stephen Hasegawa

**EXHIBIT C**

**EXHIBIT C**



# OBERMAYER
REBMANN MAXWELL & HIPPEL LLP

ATTORNEYS AT LAW

**William J. Leonard, Esquire**
Direct Dial: (215) 665-3228
E-mail: william.leonard@obermayer.com

One Penn Center · 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
P 215-665-3000
F 215-665-3165
www.obermayer.com

April 18, 2013

**VIA E-MAIL AND FIRST CLASS MAIL**

Dr. Bonny Harbinger
Deputy Director
Office of Technology Transfer
National Institutes of Health
6011 Executive Boulevard, Suite 325
Rockville, MD 20852

> Re:   **Request for Information Regarding Phillips & Cohen's**
> **Handling of Greg Thorpe's Confidential *Qui Tam* Information**

Dear Dr. Harbinger:

My name is Bill Leonard. I am a partner in this law firm.

We represent Greg Thorpe and Blair Hamrick in a legal malpractice case and fee dispute with the Colorado law firm of Cross & Bennett, LLC and its principals Keith Cross, Esquire and Joseph Bennett, Esquire (hereafter referred to collectively as "Cross & Bennett"). I am writing to you in the hope that you might be able to provide information that will be helpful in connection with those matters.

From 2002 to 2009, Keith Cross represented Greg and Blair in a *qui tam* case against GlaxoSmithKline ("GSK") involving the off-label marketing of a number of drugs, including Wellbutrin, Advair, Lamictal and Imitrex. Mr. Cross initiated the action in January 2003. Subsequently, Mr. Cross negotiated a sharing agreement with other relators represented by the law firm of Phillips & Cohen, who had filed an off-label *qui tam* lawsuit on behalf of a single relator several months after Greg and Blair. Greg and Blair discharged Cross & Bennett in 2009 and engaged new counsel in the *qui tam* case. That case settled in 2012 for a substantial sum. Judge Rya Zobel of the United States District Court for the District of Massachusetts oversaw the settlement.

Before engaging Cross & Bennett, Greg Thorpe sought representation from Phillips & Cohen for his case. At that time, April 2002, Greg submitted information to Phillips & Cohen concerning the off-label promotion of Wellbutrin, Imitrex and Lamictal, and described evidence in the form of sales call notes and a nationwide speakers program, among other things. See Exhibit A (the first page of this exhibit included attorney notes that Phillips & Cohen has redacted). Phillips & Cohen declined to represent Mr. Thorpe on the ground that "promotion of

Dr. Bonny Harbinger
Page 2
April 18, 2013

off-label use is not fraud under the False Claims Act". It communicated this decision to him in a letter dated April 25, 2002, which you signed. I have attached a copy of this letter for your reference. See Exhibit B.

As mentioned above, approximately one year later, in April 2003, Phillips & Cohen filed a *qui tam* complaint on behalf of a relator other than Greg Thorpe setting forth a claim for the off-label promotion of Wellbutrin. It filed an amended *qui tam* complaint on behalf of that same relator in June 2003 adding the drugs Imitrex, Lamictal, and Advair (which appeared in Greg and Blair's complaint), as well as Valtrex and Zofran (which did not appear in Greg and Blair's complaint). The Phillips & Cohen complaint and amended complaint referred to sales call notes, although not the same ones that Greg had provided, and the nationwide speakers program.

In 2012, after the *qui tam* case settled, we filed our malpractice action against Cross & Bennett. Around that same time, Cross & Bennett filed a complaint against Greg and Blair for compensation in the *qui tam* case.

In the malpractice case, we have alleged, inter alia, that Cross & Bennett failed to protect Greg and Blair's interests in the *qui tam* matter as they related to Phillips & Cohen. Specifically, we have alleged that, although Greg pointed out to Cross & Bennett the similarity between the Phillips & Cohen complaints and the information that he had asked Phillips & Cohen to evaluate, Cross & Bennett failed to conduct the due diligence that was appropriate under the circumstances.[1] To properly evaluate what Cross & Bennett could have accomplished in this regard, we need to know: (a) the names of the Phillips & Cohen lawyers who evaluated Greg Thorpe's case and whether those lawyers were involved in any way with Phillips & Cohen's later-filed action; and (b) whether Greg, or the later-filed relator, was first in time in discussing the GSK off-label *qui tam* case with Phillips & Cohen.

We have asked Phillips & Cohen to provide us with documents identifying the lawyers who evaluated both Greg's case and its later-filed case. Phillips & Cohen has objected on the grounds that the information sought is irrelevant and not likely to lead to the discovery of relevant information and on the grounds that the information is protected by the attorney client privilege, the work product immunity and the common interest doctrine.

Phillips & Cohen has refused to provide any additional information or documents in the matters, beyond what it has already produced, all of which I have attached hereto, and has indicated an intention to move to quash our subpoena. We will oppose Phillips & Cohen's motion, of course, and we intend to seek further information from it. See Exhibit C. In the

---

[1] Although Phillips & Cohen's complaint and amended complaint were filed on behalf of just one relator, it told Attorney Cross during the negotiation of the relator share agreement that it represented as many as four relators. As it turned out, only two relators signed the sharing agreement and those two were named in subsequent amendments of Phillips & Cohen's complaint.

4702947

Dr. Bonny Harbinger
Page 3
April 18, 2013

meantime, however, we have decided to ask you for information. We do not believe that Phillips
& Cohen's objections are valid in so far as they have been interposed to prevent us from learning
the names of lawyers who were involved in these matters. In our view, there is no privilege that
protects the identity of lawyers who work on a matter. We also do not believe that your telling
us which client was first in time to share his case with Phillips & Cohen implicates any privilege
or confidentiality issue. Therefore, in an effort to obtain reliable, limited, and non-objectionable
information, I am asking you to provide that information.

Because you are a former employee of Phillips & Cohen, and not a current employee, it is
permissible for me to contact you under Rule 4.2 of the Pennsylvania Rules of Professional
Conduct. I wish to stress that I do not want to elicit information that is privileged or that would
involve a violation of any duties imposed upon you by law. As I've already said, I do not
believe my request raises such issues for you. I do believe, however, that my client, Greg
Thorpe, is entitled to know whether his confidential information was protected by Phillips &
Cohen, as it was required to be under the ethical rules governing duties to prospective clients.

If you are represented in this matter, you should forward this e-mail to your counsel or
provide me with contact information for your counsel. I will deal with this through counsel if
you are represented. If you or your attorney have any questions, please feel free to call or e-mail
me.

Thank you for considering this request.

Very truly yours,

William J. Leonard

WJL/pac

4702947

# EXHIBIT A

# EXHIBIT B

# Phillips & Cohen, LLP
**Attorneys at Law**
**2000 Massachusetts Ave., N.W.**
**First Floor**
**Washington, D.C. 20036**

Bonny Harbinger
(202) 833-4567

Telecopier
(202) 833-1815

April 25, 2002

**Confidential and Privileged**

Gregory W. Thorpe
1280 Painted Rocks Road
Woodland Park, CO 80863

Re: <u>Potential False Claims Act Litigation</u>

Dear Mr. Thorpe:

We have now had the opportunity to complete our review of the materials you sent us regarding the False Claims Act claim that you wish to pursue.  I regret to inform you that we have decided against accepting your case as, in our opinion, promotion of off-label use is not fraud under the False Claims Act.

Of course, other law firms may view the matter differently.  I, therefore, urge you to look further for counsel if you remain interested in exploring such a lawsuit.  Please bear in mind that the statute of limitations for filing a False Claims Act lawsuit can be as short as six years and that your opportunity to bring such an action on behalf of the government may be cut off earlier if someone else publicizes the conduct at issue, files their own False Claims action, or otherwise spurs the government into action on the matter before the suit you are contemplating is filed. Therefore, if you remain interested in pursuing such a claim, it would be prudent to contact as soon as possible other attorneys who might be interested in your case.

I am enclosing with this letter the documents that you provided us.  Unless you request otherwise, we will keep the questionnaire you completed in our confidential files.

Thank you for contacting our office, and good luck to you.

Sincerely yours,

Bonny Harbinger

P&C000010

# EXHIBIT C

Stephen Hasegawa, Esquire
Page 2
April 18, 2013

through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these Rules or other law. D.C. RPC 1.0(l). Comment 7 indicates that the firm "should take affirmative steps, as soon as an actual or potential conflict is suspected, to prevent a personally disqualified lawyer from disseminating any information about the potential client that is protected by Rule 1.6, except as necessary to investigate potential conflicts of interest, to any other person in the firm." The screen is intended to protect the prospective client "regardless of the amount of information received by the personally disqualified lawyer."

Before the adoption of D.C. RPC 1.18, D.C. Ethics Opinion 279 set forth substantially the same protections for prospective clients. Massachusetts also recognizes the duty of confidentiality toward prospective clients but does not approve of screening. Rather, the issue is whether the obligation to maintain the confidentiality of the information received from the prospective client would materially limit the lawyer's ability to represent another client. Massachusetts Ethics Opinion 07-01.

Our client, Greg Thorpe, asks that Phillips & Cohen explain how it carried out its obligation to protect his confidences; identify the lawyers who evaluated his case; explain what actions it took to screen those lawyers from participating in the *qui tam* case that it subsequently filed on behalf of Messrs. Gerahty and/or Burke; state when those actions were taken and when it first made contact with Messrs. Gerahty and/or Burke; and identify any lawyers who were involved in evaluating his case who were also involved in the recruitment, evaluation, retention or representation of Messrs. Gerahty and/or Burke.

The only information that our client ever obtained via Attorney Cross was that Attorney Erika Kelton alleged that she had been unaware that Greg submitted his case to Phillips & Cohen for evaluation and been turned down.

Thank you for your attention to this matter.

Very truly yours,

William J. Leonard

WJL/pac

4711321

**EXHIBIT D**

**EXHIBIT D**

Have a case

We appreciate having the opportunity to review your case. Please keep in mind the following:

By providing you these materials and by reviewing the information you send, Phillips & Cohen has *not* agreed to represent you nor have you agreed to retain Phillips & Cohen.

Our review to determine whether your case is viable and our decision whether to accept it may take considerable time for several reasons. Before we commit ourselves to representing someone, we thoroughly analyze the applicability of the False Claims Act to the potential case. This process may include an investigation of the facts presented and sometimes consultations with experts in the field. Our firm has limited human, legal and financial resources available. While we review your potential case, we must continue to work on our existing cases and conduct reviews of other potential lawsuits. You should be aware that the vast majority of the cases we review are not accepted by the firm.

You may inquire about the status of our review of your potential case at any time.

A False Claims Act lawsuit can, and usually does, take a number of years from start to finish. The process of bringing a successful case is a major commitment by us in terms of personnel and other resources, which is why we conduct thorough analyses of potential cases before we accept them. The expense a law firm bears in bringing these lawsuits in both lawyer time and out-of-pocket costs is considerable.

Part of our analysis of your potential case will focus on practical considerations. Cases may be too small or too unsubstantiated (and therefore too risky) to justify the commitment of our firm's resources.

If our time constraints do not fit your needs, you may wish to discuss your potential case with other counsel. Other law firms may approach the investigation of a potential False Claims Act case differently, such as filing a lawsuit at an earlier date with less substantiation than Phillips & Cohen requires, or may have more time and resources instantly available to

**EXHIBIT E**

**EXHIBIT E**

**From:** Leonard, William
**Sent:** Friday, April 26, 2013 4:26 PM
**To:** harbingb@mail.nih.gov
**Subject:** Request for Information Regarding Greg Thorpe

Dear Dr. Harbinger:

I have not heard back from you in response to the letter I mailed and emailed to you last Thursday. I did receive yesterday, however, a motion to quash the subpoena my clients previously served on Phillips & Cohen. In a declaration in support of that motion, a copy of which is attached, Attorney Stephen Hasegawa makes certain representations about how you handled the confidential information Greg Thorpe submitted to Phillips & Cohen. I would like to talk to you about the statements made in Mr. Hasegawa's declaration. Assuming you are willing to speak with me, please let me know a time when we might meet or speak by phone. Naturally, if you are represented by counsel, I will be happy to discuss this with your attorney. Thank you in advance for considering and responding to this request.

Best regards,

Bill



William J. Leonard
**Obermayer Rebmann Maxwell & Hippel LLP**
One Penn Center, 19th floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

215.665.3228 tel | 215.665.3165 fax
william.leonard@obermayer.com | www.obermayer.com

The information in this e-mail may be confidential and legally privileged.

It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful. If you believe you have received this e-mail in error, please contact the sender.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | Case No._____ |
| GREGORY THORPE and BLAIR HAMRICK, | No. 1:12-cv-11632-RWZ Pending in the DISTRICT OF MASSACHUSETTS |
| Plaintiffs, | |
| v. | |
| KEITH F. CROSS, JOSEPH F. BENNETT, and CROSS & BENNETT L.L.C., | |
| Defendants. | |

**DECLARATION OF STEPHEN HASEGAWA IN SUPPORT OF NON-PARTY
PHILLIPS & COHEN LLP'S MOTION TO QUASH OR, IN THE
ALTERNATIVE, FOR PROTECTIVE ORDER RE: SUBPOENA**

DECLARATION OF STEPHEN HASEGAWA - NON-PARTY P&C'S MOTION TO QUASH OR IN
THE ALTERNATIVE FOR PROTECTIVE ORDER

## DECLARATION OF STEPHEN HASEGAWA

I, Stephen Hasegawa, hereby declare and state as follows:

1.      I am an attorney with Phillips & Cohen, LLP, counsel for non-party subpoena recipient Phillips & Cohen LLP ("P&C") in the above-captioned matter.  I serve as P&C's General Counsel.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      I have obtained copies of the operative pleadings in *Thorpe, et al. v. Cross, et al.*, Case No. 12-cv-11632-RWZ (D. Mass.) (the "Malpractice Action"), the case in which the subpoena at issue was issued.  I obtained those pleadings by downloading them from the PACER site for the District of Massachusetts.

3.      Attached as Exhibit 1 is a true and correct copy of Gregory Thorpe and Blair Hamrick's Complaint against Keith F. Cross, Joseph F. Bennett, and Cross & Bennett L.L.C., filed on August 31, 2012 in the Malpractice Action.

4.      Attached as Exhibit 2 is a true and correct copy of the First Amended Answer of Defendants Keith F. Cross, Joseph F. Bennett, and Cross & Bennett L.L.C. to the Plaintiffs' Complaint (which includes, beginning at page 16, Cross & Bennett L.L.C.'s Counterclaim Against Gregory W. Thorpe and Blair Hamrick), filed on November 16, 2012 in the Malpractice Action.

5.      Attached as Exhibit 3 is a true and correct copy of Thorpe and Hamrick's Answer to Cross & Bennett's [Amended] Counterclaim, filed on November 26, 2012 in the Malpractice Action.

6.      On March 8, 2013, P&C was served with a Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena").  A true and correct copy of the Subpoena is appended to the Motion. P&C was not served with, and does not have, a more legible copy of the Subpoena.

DECLARATION OF STEPHEN HASEGAWA - NON-PARTY P&C'S MOTION TO QUASH OR IN THE ALTERNATIVE FOR PROTECTIVE ORDER

7.     On April 5, 2013, I served all parties in the Malpractice Action with a copy of P&C's Objections to the Subpoena, via U.S. mail with a courtesy copy by electronic mail.  A copy of these objections is attached hereto as Exhibit 4.  Pursuant to an agreement with counsel for Thorpe and Hamrick as confirmed in a March 16, 2013 email exchange, these objections were timely.

8.     Thorpe printed a copy of a questionnaire from P&C's web site on April 3, 2002 (according to a date-stamped footer in the document).  The questionnaire stated, among other things, "until we both sign a written agreement, we do not represent you and have not agreed to do so."  Thorpe hand-wrote responses to the questions in the questionnaire (asserting allegations as to the marketing of four GlaxoSmithKline ("GSK") drugs), signed his responses, and dated the questionnaire "4/17/02."  Thorpe sent the questionnaire to P&C.

9.     Bonny Harbinger, P&C's intake coordinator as of April 2002, reviewed Thorpe's submission on April 25, 2002.  No other P&C attorney was involved in the evaluation of Thorpe's case.  The same day that Harbinger reviewed Thorpe's submission, she sent Thorpe a letter stating that P&C had "decided against accepting your case."  Harbinger's letter states that "I am enclosing with this letter the documents that you provided us."  Other than the questionnaire, P&C did not retain any documents that Thorpe provided to P&C.  Harbinger left P&C on January 9, 2004.

10.    On April 5, 2013, I produced to all parties in the Malpractice Action copies of Thorpe's submission to P&C (with internal attorney notes redacted) and Harbinger's letter to Thorpe.  Other than those two documents, P&C does not possess, and is not aware of, any other correspondence between P&C and Thorpe.  Because Thorpe requested, in his submission, that P&C keep that submission confidential, P&C has not filed the correspondence with this motion, and instead has described relevant

DECLARATION OF STEPHEN HASEGAWA - NON-PARTY P&C'S MOTION TO QUASH OR IN
THE ALTERNATIVE FOR PROTECTIVE ORDER

portions of that correspondence without revealing the substance of the information that Thorpe provided to P&C.

11.     At all times since prior to Thorpe's submission to P&C, P&C has employed an attorney "intake coordinator." P&C's intake coordinator is responsible for, among other things, conducting a preliminary evaluation of information submitted to P&C by persons seeking to retain P&C to file cases under the False Claims Act. Most submissions to P&C—including Thorpe's submission—are reviewed, evaluated, and rejected by the intake coordinator alone.

12.     A much smaller number of submissions by potential clients require review by additional attorneys. Every attorney within the firm participates in the evaluation of some submissions by potential clients. P&C currently employs 22 attorneys and, at various times in the last 12 years, has employed numerous additional attorneys.

13.     Thorpe and Hamrick have sought, in the Subpoena, "all documents reflecting or relating to any policies or procedures regarding the evaluation of prospective clients in effect at P&C from January 1, 2001 to the present." P&C does not maintain any case evaluation manual or centralized collection of such policies or procedures. The only way to identify all the documents sought by this request would be to review the electronic and hard-copy correspondence of every P&C attorney for the past 12 years in search of documents that touch upon such "policies and procedures."

14.     Thorpe and Hamrick have sought, in the Subpoena, "all communications between you and Cross & Bennett regarding any business or commercial relationship or potential business or commercial relationship between P&C and Cross & Bennett ...," and "all documents reflecting or relating to" any such communications. P&C has a local counsel or co-counsel relationship with Cross & Bennett ("C&B") in one or more cases that remain under seal pursuant to statute and court order. P&C cannot produce documents to Thorpe and Hamrick concerning such cases without violating the seal. As

DECLARATION OF STEPHEN HASEGAWA - NON-PARTY P&C'S MOTION TO QUASH OR IN
THE ALTERNATIVE FOR PROTECTIVE ORDER

to other cases in which P&C and C&B have or had any business or commercial relationship, Thorpe and Hamrick can obtain identification of those cases, details concerning C&B's recovery under them, and responsive correspondence concerning those cases (to the extent relevant and not covered by any applicable privilege or protection) from C&B itself.

15.     If P&C were required to respond to the Subpoena, it would impose a substantial and undue burden.  As described above, Thorpe and Hamrick's request for "all documents reflecting or relating to any policies or procedures regarding the evaluation of prospective clients in effect at P&C from January 1, 2001 to the present" would require a search through all electronic and hard-copy documents of every lawyer that has been at the firm at any time from 2001 to the present.  Even excluding that request, however, the Subpoena would impose a tremendous burden.  Searches for all documents comprising or relating to (a) communications with C&B, including in the GSK litigation and in other cases in which C&B was P&C's co-counsel or local counsel (Requests 1-2, 7-10, 13-16, and 27-28), (b) communications between P&C and the government concerning the litigation against GSK (Requests 5-6, 11-12, and 17-20), and (c) "the identities of all P&C attorneys" involved in the litigation against GSK (Request 24) would require review of the electronic and hard-copy files of 13 out of P&C's 22 current attorneys and at least two staff members who may have responsive information. P&C additionally would have to recover and search through the files and electronic records—to the extent those records still exist—of at least two former P&C lawyers and over a dozen former P&C paralegals and staff members who might have responsive information.

16.     Those searches would be time-consuming.  For example, as set forth in the Declaration of Erika Kelton, filed herewith, the amount of documents P&C generated in the lawsuit against GSK was commensurate with that case's status as the government's

largest health-care fraud recovery of all time.  Because of the breadth of Thorpe and Hamrick's requests, P&C would have to search all documents (including correspondence, emails, notes, and memoranda) created in the prosecution of that decade-long lawsuit. Moreover, the vast majority of the documents that Thorpe and Hamrick seek constitute confidential attorney work product generated in representing P&C's clients in the lawsuit against GSK or its clients in other cases in which C&B are co-counsel or local counsel. Thus, the Subpoena would impose upon P&C a tremendous burden of logging thousands of individual documents referring or relating to communications with C&B or with the government.  P&C either would have to pull attorneys off of pending cases to create this privilege log (thus interfering with P&C's business) or would have to hire outside attorneys to perform this task (thus imposing substantial cost upon P&C).

17.   Even other requests would impose an undue burden.  The Subpoena seeks, for example, P&C's internal documents relating to Thorpe's 2002 submission.  Other than the correspondence that P&C has already produced to Thorpe and Hamrick, those requests seek only P&C's internal work product communications, which would have to be privilege-logged even though they are not relevant to defendants' alleged malpractice. Indeed, the majority of the communications responsive to requests for information relating to Thorpe's 2002 submission consist of correspondence (dated 2012 and later) between me, acting as P&C's General Counsel, and members of the firm concerning requests for information by Thorpe's counsel in the Malpractice Lawsuit and, later, concerning the Subpoena itself.

18.   On April 17, 2013, I met and conferred with counsel for Thorpe and Hamrick concerning P&C's objections to the Subpoena.  In discussing requests seeking communications between P&C and C&B, I stated that it is generally improper to seek documents from a non-party that are equally available from a party, absent a showing that the documents cannot be obtained from the party.  Counsel for Thorpe and Hamrick

responded that there is "nothing strange about testing" a party's production of communications by "going to the other party [to those communications]," seeking the same communications from the non-party, "and asking, 'do they match?'"

19.    I also stated that it appeared to me that Thorpe and Hamrick were seeking documents to evaluate potential claims against P&C, and asked whether that was the purpose of the Subpoena.  Thorpe and Hamrick's counsel responded that P&C's production of documents responsive to the Subpoena (as set forth in Paragraph 10 above) "raised questions in our mind," and stated that they would be sending P&C a letter seeking information about purported ethical concerns regarding P&C's representation of two other relators, Thomas Gerahty and Matthew Burke, in the GSK lawsuits.  Thorpe and Hamrick's counsel explained that they are investigating whether P&C was precluded from sharing fees in the GSK lawsuits.  They stated that their forthcoming letter was based upon documents that P&C produced in response to the subpoena (*i.e.* communications between P&C and Thorpe in April 2002), and that P&C's response to the letter "will resolve various requests in the Subpoena."

20.    On April 18, 2013, Thorpe and Hamrick's counsel sent P&C the letter described in Paragraph 19.  They sent an additional letter to Bonny Harbinger (a former P&C lawyer), asserting that they are "entitled" to information from her concerning the evaluation of Thorpe's 2002 submission and concerning the identity of P&C lawyers who worked on Gerahty and Burke's case.

21.    Attached as Exhibit 5 is a true and correct copy of Thorpe and Hamrick's original complaint in the underlying GSK litigation.

DECLARATION OF STEPHEN HASEGAWA - NON-PARTY P&C'S MOTION TO QUASH OR IN
THE ALTERNATIVE FOR PROTECTIVE ORDER

22.     Attached as Exhibit 6 is a true and correct copy of Thomas Gerahty's First
Amended Complaint in the underlying GSK litigation, filed by P&C in June 2003.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25 day of April, 2013.


Stephen Hasegawa

DECLARATION OF STEPHEN HASEGAWA - NON-PARTY P&C'S MOTION TO QUASH OR IN
THE ALTERNATIVE FOR PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE THIRD-PARTY SUBPOENA TO
PRODUCE DOCUMENTS

NO.  1:13-mc-00405-JEB-DAR

GREGORY THORPE, *et al.*

Plaintiffs

vs.

KEITH F. CROSS, *et al.*

Defendants

NO. 1:12-cv-11632-RWZ
Pending in District of Massachusetts

## CERTIFICATE OF SERVICE

The undersigned hereby certifies and states that a true and correct copy of the attached

Reply in Support of Motion for Enlargement of Time has been served via ECF upon the

following:

Peter Wilson Chatfield, Esquire
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036

Stephen Hasegawa, Esquire
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105

_____/S/_____
Joseph J. McGovern, Esquire

*Attorney for Plaintiffs
Gregory Thorpe and Blair Hamrick*

Dated: May 14, 2013