## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE THIRD-PARTY SUBPOENA TO
PRODUCE DOCUMENTS

NO.  1:13-mc-00405-JEB-DAR

GREGORY THORPE, *et al.*

Plaintiffs

vs.

NO.  1:12-cv-11632-RWZ
Pending in District of Massachusetts

KEITH F. CROSS, *et al.*

Defendants

## ORDER

**AND NOW**, this \_\_\_\_ day of June , 2013, upon consideration of the Motion to Quash or,

in the Alternative, for Protective Order (the "Motion") filed by Phillips and Cohen, LLP

("P&C"), and any response thereto, it is hereby **ORDERED** that the Motion is **DENIED.**

**BY THE COURT:**

_____
                                                                          J.

4720390.10

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | NO.  1:13-mc-00405-JEB-DAR |
| GREGORY THORPE, *et al.*<br><br>Plaintiffs<br><br>vs.<br><br>KEITH F. CROSS, *et al.*<br><br>Defendants | NO.  1:12-cv-11632-RWZ<br>Pending in District of Massachusetts |

### PLAINTIFFS' OPPOSITION TO
### PHILLIPS & COHEN LLP'S MOTION TO QUASH OR,
### IN THE ALTERNATIVE, FOR PROTECTIVE ORDER

Plaintiffs, Gregory Thorpe and Blair Hamrick, submit this Opposition to the Motion to Quash or, in the Alternative, for Protective Order filed by Phillips and Cohen, LLP ("P&C").

## I.   INTRODUCTION

This non-party discovery dispute arises out of an action filed by Plaintiffs in Massachusetts alleging gross negligence against their former counsel in a *qui tam* matter filed in Colorado in 2003.  The principal thrust of the malpractice claim is that counsel's *qui tam* complaint was so deficient and so vulnerable to attack by subsequent filers that, when a second filer did come along, represented by P&C, counsel sought to cover-up the malpractice by persuading Plaintiffs (their clients at the time) to enter into a 50-50 deal with P&C's clients with respect to the relator's share, the entire amount of which was presumptively Plaintiffs, as the first-filers under the FCA.  A side benefit of the deal was that the arrival of competent *qui*

*tam* counsel in the matter, P&C, allowed the incompetent lawyers to sit back and ride P&C's coattails for the remainder of the case.

The victims of this gross negligence and subsequent cover-up discovered their unfortunate plight only when, in late 2009, they grew frustrated by counsel's refusal to follow their instructions and began interviewing experienced *qui tam* lawyers to assist them, in association with existing counsel, in advancing their own litigation agenda. As a result of these interviews, the clients fired their counsel for cause in October 2009. Two and a half years later, the *qui tam* case finally settled. Despite the fact that original counsel was removed for cause during the final quarter of the case (not to mention their gross negligence), they filed a counterclaim in the malpractice action seeking a *quantum meruit* fee of approximately $30 million dollars or forty percent (40%) of the clients' relators' share, that is, the full value of their defunct contingency-fee agreement with Plaintiffs.

The subpoena now at issue was served on P&C seeking discovery in connection with Plaintiffs' malpractice claim and Defendants' counterclaim. P&C worked with the Defendants for over six (6) years until Plaintiffs replaced C&B with new counsel. Among other things, the subpoena seeks documents relating to P&C's communications with the Defendants and the United States. P&C feigns ignorance of the relevance of the requested documents despite the fact that most of the requests, on their face, refer directly to explicit allegations asserted in Plaintiffs' malpractice claim and in defense to Defendants' counterclaim. Although P&C seeks to dismiss the requested communications as "mundane" and irrelevant documents involving "exchanges of legal theories, strategic discussions, and correspondence regarding the ordinary day-to-day administration of litigation," it ignores the

4720390.10

fact that all communications relating to the case are directly relevant to the *quantum meruit* fee claim and the defense that C&B's fee is unjustified because P&C was doing all the work.

P&C also argues that it occupies only a "tangential relationship" with this matter and, therefore, should not be burdened with producing communications that are equally available from the Defendants in the case. These arguments might be valid if P&C truly was "tangential" to this matter -- it is not -- and if all the documents were available from another reliable source – they are not. P&C was the direct beneficiary of Defendants' malpractice and cover-up. P&C ended up making tens of millions of dollars in fees for a case where it didn't even represent the first-filed relator. Moreover, the Defendants have already admitted that emails from critical periods in the case have been lost and cannot certify that it has produced all communications with P&C.

Finally, P&C says that it should not have to produce any information about how it handled the confidential, privileged information it was given by Plaintiff Thorpe (P&C's prospective client) because it fears being sued. P&C ended up representing parties directly adverse to Plaintiffs in the exact same case. Plaintiffs allege that in an effort to avoid a confrontation with P&C that would have revealed Defendants' malpractice to Plaintiffs, C&B refused to aggressively challenge P&C on the question of whether P&C had used any of Thorpe's confidential information in representing its subsequent clients. If discovery in the malpractice case against Defendants uncovers misconduct by P&C, it will be up to Thorpe to decide whether or how to pursue that. However, such potential fallout is no reason to preclude discovery of non-privileged, discoverable information relevant to explicit allegations asserted in Plaintiffs' malpractice claim.

4720390.10

## II.    SUMMARY OF FACTS AND PROCEDURAL HISTORY

### A.    The GlaxoSmithKline Lawsuits

Plaintiffs filed a complaint for legal malpractice (the "Complaint") against their former lawyers, Keith Cross, Joseph Bennett, and Cross & Bennett L.L.C. (collectively "C&B") in the United States District Court for the District of Massachusetts.  A copy of Plaintiffs' Complaint is attached as Exhibit "A."   Plaintiffs' malpractice lawsuit arises out of a whistleblower lawsuit they filed against GlaxoSmithKline LLC ("GSK") under the False Claims Act (the "FCA").  The FCA provides that citizens, officially called "relators" and often called whistleblowers, may bring suit for government's benefit against companies or individuals who have presented false claims, or caused false claims to be presented, to the government for payment.  31 U.S.C. § 3729 *et seq*.  In addition to the federal FCA, a number of states also have false claims statutes.  The federal and state FCA statutes provide that if there is a recovery for the government, the relator is entitled to a percentage of that recovery.  Id.

Plaintiffs hired C&B to represent them in their whistleblower lawsuit against GSK only after P&C declined to handle the case.  C&B filed Plaintiffs' lawsuit against GSK in the United States District Court for the District of Colorado on January 2, 2003.  The Original Complaint alleged only federal FCA claims against GSK for off-label promotion of six (6) prescription drugs.  The Original Complaint failed to allege any kickback or state FCA claims.

Prior to Plaintiffs hiring C&B, Plaintiff Greg Thorpe asked P&C to evaluate his whistleblower lawsuit against GSK in February of 2002.  Thorpe completed a confidential case-evaluation questionnaire and submitted it to P&C along with documentary evidence supporting his allegations against GSK.  P&C's case-evaluation questionnaire warranted to Thorpe that "[b]y law, your communications with us during the evaluation process are regarded

4

as privileged and confidential and will be treated by us accordingly." After reviewing Thorpe's confidential, privileged information, P&C declined to represent Thorpe in a letter dated February 25, 2002 signed by Bonny Harbinger, a junior associate at P&C.

A little more than one year later, on April 7, 2003, P&C filed a whistleblower lawsuit against GSK on behalf of two other whistleblowers in the United States District Court for the District of Massachusetts. The P&C complaint, which was promptly amended two months later, repeated a number of the claims that Thorpe had asserted in the confidential, privileged information that he submitted to P&C in February 2002, including three (3) out of the four (4) drugs that Thorpe discussed in his submission to P&C. Unlike C&B's Original Complaint, P&C's amended complaint was competently drafted. It comprised ninety-six (96) pages and included kickback and state FCA claims. C&B's Original Complaint was a mere thirteen (13) pages long.

Under the FCA, only the first-filed relator is entitled to a relator's share. 31 U.S.C. § 3730(b)(5). The first-to-file rule only protects the claims which the relator actually asserts. An FCA claim that is inadequately pleaded, therefore, leaves open a door for a second properly pleaded action to claim first-to-file status. See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 32 (1st Cir. 2009). As the FCA sounds in fraud, courts have held that a first-filed FCA complaint which fails to satisfy the specificity required by Federal Rule of Civil Procedure 9(b), a subsequent relator may lose its first-filed status in favor of a subsequent filer who does state a valid claim. Id.

Although C&B's complaint was first in time, C&B offered P&C a 50/50 sharing agreement.   As Plaintiffs were to discover in 2009, C&B did this to avoid a confrontation with P&C that would have revealed to Plaintiffs C&B's malpractice and the deficiencies of the complaint that C&B prepared.

C&B's Colorado lawsuit was transferred to, and consolidated with, P&C's action in Massachusetts in 2010.   Following the sharing agreement, the two matters were supervised by the United States Attorney's Office in Massachusetts, with which P&C had the primary relationship.

The Government ultimately recovered over $1 billion dollars in settlement of the whistleblower lawsuits against GSK.   The Massachusetts court is currently holding approximately $30 million dollars pursuant to a lien claim filed by C&B seeking a full forty percent (40%) contingent-fee payment even though it was fired for cause 2.5 years before the GSK matter was resolved.

**B.**   **Plaintiffs' Malpractice Complaint Against C&B**

**C&B Negligently Prepares the Original Complaint**

In their malpractice Complaint against C&B, Plaintiffs allege that C&B was grossly negligent in preparing the Original Complaint.   The Original Complaint failed to state all of the claims that Plaintiffs brought to C&B's attention, neglecting to include certain legal theories arising out of GSK's illegal marketing of some drugs and failing to mention GSK's illegal marketing of other drugs completely.   C&B's failure to assert all available claims in the Original Complaint, opened the door under the "first-to-file" rule for a subsequent filer, like P&C, to undermine Plaintiffs' first-filed status through a later filed complaint that included the missing claims.   Complaint, ¶¶ 81-123.

4720390.10

**Cross Convinces Plaintiffs to Cut a Deal with
P&C's Whistleblowers to Cover Up his Malpractice**

Six months after C&B filed its deficient FCA complaint on behalf of Plaintiffs, and
more than two years before C&B filed any amendment seeking to cure the evident
deficiencies in its Original Complaint, the U.S. Attorneys' Office advised C&B that P&C had
filed a similar FCA complaint against GSK in Massachusetts three months after Plaintiffs'
complaint was filed in Colorado.  Complaint, ¶96.

Cross received a copy of P&C's amended complaint on July 25, 2003.  P&C amended
its complaint two months after filing its original complaint to incorporate additional claims
and additional detail, consistent with the duty imposed by the first-to-file rule to be ever
diligent in asserting new claims, theories, and details to stay ahead of subsequent filers.  After
reading P&C's amended complaint, Keith Cross commented to Plaintiffs in an e-mail on July
28, 2003 that "[the P&C complaint is] 96 pages and has significantly more detail than we do,
but overall, the 'cause of action' is the same."  C&B failed to tell Plaintiffs that the P&C
amended complaint included state false claims act claims and federal anti-kickback claims
that C&B should have included in its Original Complaint.  C&B also failed to explain that its
negligence had allowed P&C's relators to become first-filed on those claims.  Cross was not
being honest, therefore, when he told Plaintiffs that the causes of action in Plaintiffs' Original
Complaint and P&C's amended complaint were "the same."  Id. at 105-106.

Over the course of the next six (6) months C&B urged Plaintiffs to share the relator
fee, which a properly drafted FCA complaint would have made theirs alone as first-in-time
filers.  C&B ultimately convinced Plaintiffs to cut a generous 50-50 deal with P&C, despite
Plaintiffs' repeated demands that C&B take a more aggressive position.  During this time,
Plaintiffs expect that P&C pointed out to C&B the deficiencies of its Original Complaint.

4720390.10

Whether or not P&C and C&B had such discussions, the fact remains that C&B prevailed on Plaintiffs to give up fifty percent (50%) of the relator's share without self-disclosing to Plaintiffs the deficiencies of the Original Complaint. Id. at 111-112.

In negotiating the 50-50 sharing agreement, Cross also refused to aggressively challenge P&C, as the clients demanded, on the question of whether P&C had used any of Thorpe's confidential information in the representation of its subsequent clients. After reviewing Thorpe's confidential, privileged information in February of 2002 and declining to take the case, P&C proceeded to represent other clients, who had directly adverse interests, in the same matter. Ignoring their clients' demands, C&B failed to research P&C's ethical obligations to Thorpe, refused to investigate and challenge P&C over this issue, and declined to use the issue in negotiating the 50-50 sharing agreement that would whitewash their negligence. Id. at 114-118.

C&B's handling of the sharing agreement with P&C was tainted by a substantial conflict of interest. C&B allowed its personal interests and its desire to cover up its mistakes to influence its negotiation of the sharing agreement with the P&C relators, to the detriment of its clients. Id. at 96-123. The sharing agreement not only allowed C&B to avoid issues about the deficiencies of the Original Complaint, but also to cede responsibility for the case and ride the coattails of P&C. Id. at 113-123.

It was not until 2009 when Plaintiffs sought to involve another *qui tam* lawyer as co-counsel with C&B that Plaintiffs discovered, among other things, that C&B mishandled the Original Complaint and that C&B put its own interests ahead of their clients' interests when it negotiated the sharing agreement with P&C. Plaintiffs discharged C&B for cause on October 21, 2009. Id. at 166-169.

## C&B Lies to Plaintiffs About the Protective Order

In the GSK Lawsuits, the government agreed to let the relators and their counsel mine the documents in the government's investigatory file for data that could be used in the case against GSK, subject to a protective order.  C&B informed Plaintiffs, over their strong objections, that they could not participate in mining the government's documents because the data-mining was limited to attorneys.  C&B also told Plaintiffs that they could not share any of the confidential information developed through data mining with them.  Id. at 143-145.

C&B's statements concerning the data-mining and the protective order were false. After Plaintiffs discharged C&B, they discovered that the protective order permitted relators the same access as their counsel and that the government had no objection to their having access to confidential information.  Id. at 147.

Recently, in response to an ethics investigation in Colorado, Keith Cross has suggested that his original understanding of the protective order was based upon statements made by P&C regarding the terms of the Protective Order and the government's plan for data mining.

### C.   P&C Refuses to Produce or Search for Discoverable Documents and to Meet and Confer in Good Faith.

On March 8, 2013, Plaintiffs served their third-party subpoena on P&C requesting documents related to Plaintiffs' legal malpractice claims and C&B's claim for fees.  Plaintiffs allege that P&C took the lead in litigating the case after the sharing agreement was entered into and, as a result, its communications with C&B and the government are not only related to Plaintiffs' legal malpractice claim, but also to Plaintiffs' defense of C&B's claim to a full forty percent (40%) contingent fee.  In fact, all of the documents requested by Plaintiffs'

subpoena relate to either explicit, core allegations of malpractice by C&B or defenses to C&B's excessive fee claim.

On April 5, 2013, P&C produced ten (10) pages in response to Plaintiffs' subpoena and objected to producing anything else. P&C claims Plaintiffs' subpoena is overbroad, unduly burdensome, and seeks privileged information. The ten (10) pages (attached as Exhibit "B") produced by P&C are a redacted copy of the case-evaluation questionnaire completed by Thorpe in February 2002 and the Bonny Harbinger letter advising that P&C was declining to handle Thorpe's *qui tam* lawsuit against GSK.

At a mandatory meet and confer on April 17, 2013, P&C refused to cooperate with Plaintiffs in a good faith effort to resolve the discovery disputes. P&C refused to consider producing any additional documents regardless of the degree or manner in which Plaintiffs might seek to narrow the subpoena. P&C refused even to search for responsive documents, claiming that any search, regardless how limited, would be unduly burdensome. P&C also claimed that none of the documents requested in the subpoena were relevant to Plaintiffs' litigation, or reasonably calculated to lead to the discovery of admissible evidence, but refused to listen to any explanation as to how the requested documents were relevant. P&C accused Plaintiffs of using their subpoena as a pretext to discover information upon which to sue P&C. In its Motion to Quash, P&C even argues that Plaintiffs' counsel said as much. This is untrue. At no time did counsel for Plaintiffs ever state or imply that Plaintiffs' subpoena was being used as a tool to dig up a claim against P&C. See Declaration of H. David Seidman, Esquire ("Seidman Declaration") at ¶¶ 1-7 (attached as Exhibit "C").

4720390.10

It is apparent that P&C intends to stonewall discovery in this matter to avoid having to disclose any information or answer any questions as to what really happened in this matter in which it made tens of millions of dollars in fees as the direct beneficiary of a 50-50 deal that was deceitfully crafted to cover-up gross legal malpractice. By letter dated April 22, 2013 (attached as Exhibit "D"), Plaintiffs followed up with P&C in a further effort to resolve P&C's objections. Plaintiffs explained the relevance of the requested documents and expressed a willingness to narrow the requests to reduce the alleged burden on P&C. Plaintiffs also proposed providing a list of key-words that P&C could use to search its computer system for responsive documents and/or limiting searches for requested documents to particular custodians. P&C ignored Plaintiffs' letter.

### D.   P&C Also Refused to Answer Thorpe's Ethics Letter

In the face of P&C's stonewalling of discovery, Plaintiffs' counsel wrote to P&C outside of the discovery rules and requested information regarding the handling of Thorpe's confidential privileged information. Plaintiffs' letters to P&C requesting the Rule 1.18 information and P&C's response to Plaintiffs' letters are attached as Exhibit "E". Despite its ethical duties, P&C has refused to provide the requested information.

Rather than being open and transparent with their former prospective clients, P&C has attacked them, calling them greedy and opportunists. In P&C's view, it is above even reasonable inquiries regardless of its central role in the matter. P&C benefited immensely from C&B's malpractice, and is now helping C&B to cover up the malpractice a second time and to earn an unjust fee by stonewalling discovery.

4720390.10

E.     **C&B Deleted Emails and Failed to Preserve Evidence**

C&B has recently admitted that emails from critical periods in the case have been lost. C&B cannot certify that it has produced all communications with P&C. Seidman Declaration, ¶¶ 7-28.

## III.    **ARGUMENT**

A trial court may, on a motion by the party seeking relief, quash or modify the subpoena if it requires disclosure of privileged or other protected matter, if no exception or waiver applies, or if it subjects a person to undue burden. Fed. R. Civ. P. 45(c)(3). What constitutes unreasonableness or oppression is a matter to be decided in the light of all the circumstances of the case. Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984). "[T]he burden of proving that a subpoena ... is oppressive is on the party moving for relief on this ground. ... The burden is particularly heavy to support a motion to quash as contrasted to some more limited protection." Westinghouse Electric Corp. v. City of Burlington, 351 F.2d 762, 766 (D.C. Cir. 1965).

To determine whether a burden is "undue," courts consider the factors set forth in Rule 26. Watts v. SEC, 482 F.3d 501, 509 (D.C. Cir. 2007). Rule 26(b)(2)(C)(iii) limits discovery if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." The district court must balance the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena. Flanagan v. Wyndham International Inc., 231 F.R.D. 98, 102-03 (D.D.C. 2005) (citations omitted). In this case, P&C has fallen far short of meeting its heavy burden to quash Plaintiffs' subpoena.

### A.      P&C's Motion Should Be Denied For Violation of Federal Rule of Civil
### Procedure 37(a)(1) and the Meet and Confer Obligations of Local Rule 37(m).

In its Motion, P&C goes to great lengths to portray Plaintiffs' subpoena as overly broad

and unduly burdensome.  Conspicuously, however, P&C fails to mention that it has refused

Plaintiffs' multiple offers to work together to narrow the scope of the requests.  Rule 37(a)(1)

of the Federal Rules of Civil Procedure requires that P&C cooperate and confer or attempt to

confer in good faith with Plaintiffs to resolve its objections.  This Court's Local Rule 7(m)

likewise requires that "[b]efore filing any nondispositive motion in a civil action, counsel shall

discuss the anticipated motion with opposing counsel, either in person or by telephone, *in a*

*good-faith effort to determine whether there is any opposition to the relief sought and, if there*

*is opposition, to narrow the areas of disagreement*."  P&C has made no such good-faith effort

to resolve or narrow the issues before the Court.  On April 17, 2013, at the mandatory meet and

confer, P&C refused Plaintiffs' offer to narrow their requests despite its multiple objections to

the scope of Plaintiffs' subpoena.  P&C also refused to produce any additional documents

regardless of the degree or manner in which Plaintiffs narrowed their subpoena.

P&C also *ignored* Plaintiffs letter dated April 22, 2013 following up on the meet and

confer.  The letter further explained the relevance of the requested documents and again

offered to work to narrow the requests to address P&C's objections.  Plaintiffs proposed

providing a list of key-words that P&C could use to narrow its search for responsive

documents on its computer system and offered to limit particular searches to specific

custodians.  Specifically, in their April 22, 2013 letter, Plaintiffs offered:

> With respect to the scope of our requests, certainly some are
> broader than others.  As we discussed on the phone we are willing
> to make our requests more focused in order to reduce the burden
> on P&C in responding to them.  With respect to electronically
> stored information, such as e-mail, we are willing to develop a list

of key words that could be used to search your computer system for responsive documents.  It may also be possible, particularly with e-mail, to limit our requests to particular record keepers.

The best way to narrow our requests is, to some extent, dependent on how your system is set up.  Assuming you have a central e-mail server that can be searched globally, we suggest searching for e-mails with the "@crossbennett.com" domain name.  That should capture all e-mails to or from Cross.  Depending of the volume of hits, further filtering could be done with additional key words or by using restrictions as to date or record keeper.  With respect to communications with the government, we suggest searching for the specific e-mail addresses of government attorneys involved in the Qui Tam Litigation.  Again, further filtering could be done to the extent that the number of hit was too large to reasonably review.

April 22, 2013 Letter from Plaintiffs to P&C (attached as Exhibit "D").

P&C's refusal to discuss the discovery dispute with opposing counsel, beyond getting on a single call to state its intransigence, violates Rule of Civil Procedure 37(a)(1) and Local Rule 37(m) and is grounds alone for denying its Motion.  "Failure to comply with the duty to confer requirement set forth in these rules is grounds for dismissing a [discovery] motion … ." Equal Rights Ctr. v. Post Props., Inc., 246 F.R.D. 29, 31 (D.D.C. 2007)(citing Ellipso, Inc. v. Mann, 460 F. Supp. 2d 99, 102 (D.D.C. 2006) (denying discovery motions for failure to comply with LCvR 7(m)); U.S. ex rel Pogue v. Diabetes Treatment Centers of America, Inc., 235 F.R.D. 521, 528 (D.D.C. 2006) (denying a motion to compel for failure to comply with FRCP 37(a)(2)(A) and LCvR 7(m)).

4720390.10

**B.**     **Plaintiffs Proposed Modified Requests Moot Many of the Arguments Raised by P&C.**

Notwithstanding P&C's failure to cooperate with Plaintiffs, in an effort to address some of the issues raised by P&C in its Motion, Plaintiffs propose modifying their requests as follows (the "Modified Requests"):

1)     All communications between P&C and C&B from July 1, 2003 to the present regarding the GSK Lawsuits;

2)     All documents reflecting or referring to any communications between P&C and C&B from July 1, 2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement;

3)     All communications between P&C and the Government from July 1, 2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement;

4)     All documents reflecting or referring to any communications between P&C and the Government from July 1, 2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement;

5)     All documents, including any communications between P&C and the Government, from January 1, 2007 to November 1, 2009 referring to the data-mining project and/or the protective order entered in the GSK Lawsuits;

6)     All documents from April 1, 2002 to February 29, 2004 reflecting, relating, or referring to Gregory Thorpe's prospective *qui tam* claim against GSK;

7)     All documents from April 1, 2002 to February 29, 2004 reflecting any review or dissemination of the information that Gregory Thorpe submitted to P&C regarding P&C's evaluation of Gregory Thorpe's prospective *qui tam* claim against GSK, including documents that reflect the names of individuals who reviewed or had access to such information;

8)   All written policies from April 1, 2002 to February 29, 2004 regarding P&C's evaluation of prospective matters and the handling of confidential materials submitted by a prospective client in connection with P&C's evaluation of a prospective matter;

9)   Documents submitted to GSK in connection with P&C's claim for statutory attorneys' fees in the *Qui Tam* Litigation;

10)  All agreements or proposed agreements relating to any business or commercial relationship or potential relationship between P&C and C&B other than the GSK Lawsuits from 2001 through the present; and

11)  Documents, including any communications with the Government, from September 2009 to the present referring to Plaintiffs' malpractice claim and C&B's fee dispute.

As set forth below, the Modified Requests moot many of the arguments raised in P&C's Motion to Quash. Had P&C conferred in good faith before filing its Motion to Quash, the issues now before the Court could have been narrowed in scope or possibly eliminated altogether. At the very least, the Court would not have been burdened with reviewing thirty-plus pages of mostly moot argument.

### C.   Plaintiffs' Modified Requests Seek Relevant Discovery and Are Narrowly Tailored.

P&C generally contends that none of the documents requested in the subpoena are either relevant to Plaintiffs' malpractice claim, or reasonably calculated to lead to the discovery of admissible evidence. P&C's argument is without merit. Federal Rule of Civil Procedure 26(b)(1) provides that a party may gather discovery regarding "any matter" from any source, including non-parties, possessing relevant information or documents. Relevancy is "broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case." In re Veiga, 746 F. Supp. 2d 8, 19 (D.D.C. 2010)(quoting Alexander v. Fed. Bureau of Investigation, 194 F.R.D.

4720390.10

316, 325 (D.D.C. 2000)).  A request for discovery should be allowed unless it is clear that the information sought can have no possible bearing on the claim.  Id.  Where, as here, a subpoena is served in a district with respect to an action pending in another district, "[the] court . . . should hence be cautious in determining relevance of evidence, and in case of doubt should err on the side of permissive discovery[,]" since the court with jurisdiction of the discovery dispute "generally has limited exposure to and understanding of the primary action."  Flanagan v. Wyndham International Inc., 231 F.R.D. 98, 103 (D.D.C. 2005) (citations omitted).  Additionally, on a motion to quash a subpoena, the merits of a case are not at issue.  See Arista Records LLC v. Does 1-19, 551 F. Supp. 2d 1, 8 (D.D.C. 2008) ("factual and technical arguments . . . are unrelated to any appropriate inquiry associated with a motion to quash").

Here, Plaintiffs' Modified Requests seek documents that are directly relevant to either explicit allegations asserted in Plaintiffs' malpractice claim or in defense to C&B's fee claims.  Plaintiff's malpractice Complaint involves allegations that C&B failed to appropriately represent Plaintiffs in numerous respects, including, but not limited to, as follows:

1)    Failing to file an adequate Original Complaint, thus jeopardizing Plaintiffs' position as first-filed relators **(Modified Request Nos. 1-4, 11)**;

2)    Failing to negotiate an appropriate sharing agreement between Plaintiffs and P&C's relators **(Modified Request Nos. 1-4, 6-8, 11)**;

3)    Failing to follow Plaintiffs' instructions with respect to the negotiations with P&C regarding the relator share split **(Modified Request Nos. 1-4, 11)**;

4)    Failing to investigate P&C's ethical obligations to Thorpe as a former prospective client **(Modified Request Nos. 6- 8, 11)**;

4720390.10

5)      Failing to adequately represent Plaintiffs' interests subsequent
        to the execution of the sharing agreement by, in essence,
        ceding prosecution of the case against GSK to P&C and
        relying on P&C to perform most of the work **(Modified
        Request Nos. 1, 9, 11)**;

6)      Misrepresenting the protective order entered in the GSK
        Lawsuits regarding data mining **(Modified Request Nos. 5,
        11)**; and

7)      Failing to disclose to Plaintiffs his relationship with P&C
        **(Modified Request Nos. 10, 11).**

P&C's feigned ignorance of the relevance of the requested documents is not credible.

On their face, most of the requested documents refer directly to explicit allegations in

Plaintiffs' malpractice Complaint.

### 1.      Plaintiffs' Modified Requests for Documents Concerning P&C's Evaluation of Thorpe's Prospective Lawsuit and P&C's Handling of Thorpe's Confidential Information are Relevant and Narrowly Tailored.

P&C objects to requests 4, 22, 23, and 25-28 of Plaintiffs' subpoena as requesting

documents not relevant to Plaintiffs' Malpractice claim.  P&C Memorandum, pp. 22-22.

Request 4 seeks documents reflecting or relating to communications between P&C and

Thorpe from January 1, 2001 to the present.   Plaintiffs' Modified Requests eliminate request

4.  Modified Requests 6-8 replace requests 22, 23, and 25-28 and seek documents related to

P&C's evaluation of Thorpe's prospective lawsuit against GSK and its handling of Thorpe's

confidential, privileged information included with his case-evaluation questionnaire.

P&C claims that documents related to its evaluation of Thorpe's prospective lawsuit

against GSK and its handling of Thorpe's confidential, privileged information have no

"relevance whatsoever" to Plaintiffs' malpractice claim.  P&C contends that Plaintiffs'

requests are intended solely to discover information for Plaintiffs to assert a claim against

P&C.  P&C even states that Plaintiffs' counsel admitted that they would like to use this information to evaluate claims against P&C.  This is not true.  Counsel never said any such thing.  See Affidavit of H. David Seidman, ¶¶ 1-7 (attached as Exhibit "C").

Notwithstanding P&C's fear of being sued, the requests at issue relate directly to explicit allegations asserted in Plaintiffs' malpractice Complaint.  In its Complaint, Plaintiffs allege:

> In addition, Cross failed to address the fact that Thorpe had asked P&C to evaluate his qui tam case against GSK in February of 2002.  After reviewing Thorpe's confidential information, P&C declined to take Thorpe's case.  Nevertheless, approximately one year later, P&C proceeded to file complaints covering the same drugs as in Thorpe and Hamrick's Original Complaint.  Cross failed to research P&C's ethical obligations to Thorpe as a prospective client, failed to raise the issue with P&C when asked to do so, and failed to use the issue in negotiating the sharing agreement with P&C.  This was contrary to his clients' instructions and another violation of CRPC Rules 1.1 and 1.2(a) concerning "Competence" and "Allocation of Authority."
>
> ***
>
> Cross was also negligent in negotiating the 50-50 sharing agreement with Phillips & Cohen, in that he failed to raise the issue of P&C's prior dealings with Thorpe and failed to take proper advantage of the fact that Thorpe and Hamrick were first to file.  Cross allowed his personal interests and his desire to cover up his mistakes to influence his negotiation of the 50-50 sharing agreement with the P&C relators, to the detriment of his clients.

Complaint, ¶118, 197.

The cases relied on by P&C are inapposite.  In each of the cases the court explicitly held that third-party discovery at issue did not relate to any claims or defenses asserted in the case that the discovery was sought.  That is not the case here.

P&C contends that "nothing responsive to Plaintiffs' requests 4 and 21-26 [Modified Requests 6-8] has any relevance whatsoever to the central issue of C&B's alleged malpractice."  Memorandum, p. 18.  P&C argues that "C&B's duty of care arises from its

4720390.10

agreement to serve as Thorpe and Hamrick's counsel, not from anything P&C did in response to Thorpe's inquiry into representation ... . C&B's breach of its duty of care ..., and any resulting damages, must be determined by reference to C&B's conduct, not by reviewing materials concerning P&C's ... rejection of Thorpe's inquiry into representation." P&C's argument is without any basis in the rules of discovery and misunderstands the elements of a malpractice claim. Federal Rule of Civil Procedure 26(b)(1) provides that a party may gather discovery regarding any matter from any source, including non-parties, possessing relevant information or documents. Relevancy is "broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case." In re Veiga, 746 F. Supp. 2d 8, 19 (D.D.C. 2010)(quoting Alexander v. Fed. Bureau of Investigation, 194 F.R.D. 316, 325 (D.D.C. 2000)). Furthermore, the Advisory Committee Note to Rule 45 explains that "[t]he non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34." Fed. R. Civ. P. 45 advisory committee's note. The rules in no way limit discovery or third-party discovery to requests seeking information that directly support a "central issue" of a party's claim or defense.

Notwithstanding no such limitation on discovery, Plaintiffs' request, in fact, seeks information going to a "central issue" of Plaintiffs' malpractice claim. As P&C acknowledges in its Motion, to establish a claim for malpractice in Colorado, Plaintiffs must establish that "'(1) the attorney owed a duty of care to the client; (2) the attorney breached that duty; and (3) by breaching his duty, the attorney proximately caused damage to the client.'" P&C Memorandum, p. 18 (quoting Hopp & Flesch, LLC v. Bacstreet, 123 P.3d 1176, 1183 (Colo. 2005). Plaintiffs allege in their malpractice claim that C&B would have

been able to negotiate a much more favorable sharing agreement for Plaintiffs if P&C failed to properly protect Thorpe's privileged and confidential information as it was ethically obligated to do.  Plaintiffs must, therefore, establish that C&B's failure to question P&C as to its handling of Thorpe's privileged, confidential information caused harm to the Plaintiffs. For C&B's failure to question P&C to have caused harm to Plaintiffs, Plaintiffs must establish that P&C, in fact, misused or mishandled Thorpe's privileged, confidential information.  This is the typical "case-within-the-case" that a malpractice plaintiff must establish.  Accordingly, documents related to P&C's evaluation of Thorpe's prospective claim and handling of his privileged, confidential information are directly related to the allegations asserted in Plaintiffs' malpractice claim and are directly related to proving an element of their malpractice claim.

In P&C counsel's declaration included with its Motion, Mr. Hasegawa states that Bonny Harbinger, a junior associate at the time, "was the only P&C attorney involved in the evaluation of Thorpe's submission."  P&C Memorandum, p. 6; Hasegawa Declaration, ¶¶ 8-9. Tellingly, Mr. Hasegawa did not state that no other P&C attorney or employee was involved in the decision to reject Thorpe's prospective case, or that Harbinger did not report to a more senior attorney before rejecting Thorpe's prospective case, or that no other P&C attorney or employee had access to Thorpe's confidential information.  It is not credible to suggest that a firm such as P&C would leave the decision to reject a potential multi-billion dollar lawsuit solely to a junior associate.  On its case-evaluation form, P&C represented that it thoroughly analyzes potential cases.  Specifically, P&C stated:

> Our review to determine whether your case is viable and our
> decision whether to accept it may take considerable time for
> several reasons.  Before we commit ourselves to representing
> someone, we thoroughly analyze the applicability of the False

> Claims Act to the potential case.  This process may include an
> investigation of the facts presented and sometimes consultations
> with experts in the field. ... .

P&C Website Excerpt on June 14, 2002 (attached as Exhibit "F").  Leaving the decision to

reject a potential multi-billion dollar lawsuit to an unsupervised, junior associate does not

comport with P&C's representations.  Accordingly, Plaintiffs should be permitted to test

P&C's factual assertion by deposition of Dr. Harbinger and by discovery of the documents

requested.

There is also no basis to protect documents related to P&C's evaluation of Thorpe's

prospective claim in 2002 and its handling of Thorpe's privileged, confidential information as

work product.  P&C contends that such documents are "P&C's internal work product

communications," Hasegawa Declaration, ¶17, and should be protected because Plaintiffs

have purportedly threatened action against P&C.  The work product doctrine provides P&C

no sanctuary.  Documents related to P&C's evaluation of Thorpe's prospective claim is

Thorpe's work product.  P&C performed the evaluation for Thorpe.  As P&C rightly points

out, it did not represent Plaintiffs.  Nevertheless, P&C had an ethical obligation to Thorpe as a

prospective client.  If discovery in the malpractice case against C&B uncovers misconduct by

P&C, it will be up to Thorpe to decide whether or how to pursue that.  However, such

potential fallout is no reason to preclude discovery of non-privileged, discoverable

information relevant to explicit allegations asserted in Plaintiffs' malpractice Complaint.

Furthermore, Plaintiffs' Modified Requests 6-8 are narrowly tailored.  The requested

documents are limited to the date that Thorpe submitted his case-evaluation questionnaire and

confidential information to the date of the sharing agreement (April 2002 to February 2004).

P&C's objection to the scope of request 23 is moot.  Request 23 requested all documents reflecting or relating to any policies or procedures regarding the evaluation of prospective clients in effect at P&C from January 1, 2001 to the present.  P&C claims that this request would require it to review millions of emails and other documents generated by every lawyer in the firm for the last dozen years and that most or all of the documents sought are privileged or protected from discovery.  P&C Memorandum, p. 21.  While P&C mischaracterizes what Plaintiffs were seeking and overstates the burden, Plaintiff narrowed request 23 (now Modified Request 8) to now include only "[a]ny written policy from April 2002 to February 2004 regarding P&C's evaluation of prospective matters and the handling of confidential materials submitted by a prospective client in connection with P&C's evaluation of a prospective matter."  This request seeks only the actual written policy/policies, not related documents.  It will not require a burdensome investigation and will not require the production of any privileged information.

2. **Plaintiffs' Modified Request for P&C's Time Records Submitted to GSK is Relevant.**

P&C objects to request no. 21 that seeks "documents relating to P&C's claim for statutory attorneys' fees in the Qui Tam Litigation … ."  P&C argues that such documents include P&C's work product. This objection is moot.  P&C has modified request no. 21 (now Modified Request 9) to now include only P&C's documents submitted to GSK in connection with P&C's claim for statutory attorneys' fees in the GSK Lawsuits.  This request does not include any work product.

P&C's time records submitted with its claim for statutory attorneys' fees are relevant to C&B's counterclaim against Plaintiffs for *quantum meruit* seeking compensation for its representation of Plaintiffs.  That claim is dependent on the amount and value of the work done

4720390.10

by Cross in the GSK matter.  To the extent Cross ceded responsibility for working on the GSK

lawsuits to P&C, as a comparison of P&C's timesheets and C&B's timesheets would show, that

is directly relevant to whether Cross is entitled to compensation, and, if so, how much.

### 3.    Plaintiffs' Requests for Communications with the Government Are Relevant and Not Work Product.

P&C objects to requests 5, 6, 11, 12, 17, 18, 19, and 20 of Plaintiffs' subpoena as

requesting documents not relevant to either Plaintiffs' malpractice claim or the defense of

C&B's fee claim and protected by the work-product privilege.  P&C Memorandum, p. 25-26.

Requests 5 and 6 seek all documents related to communications between P&C and the

Government in connection with the GSK lawsuits.  Requests 11, 12, 17, 18, 19, and 20

request subsets of requests 5 and 6 and seek communications between P&C and the

government from 2001 to the present regarding first-to-file matters, the quality of C&B's

services, and the fee dispute, and all documents related to such communications.

Plaintiffs Modified Requests eliminate requests 5 and 6 and narrow the time and scope

of requests 11, 12, 17, 18, 19, and 20 (now Modified Requests 3, 4 and 12).  Modified

Requests 3 and 4 seek only communications between P&C and the Government from July 1,

2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original

Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement, and all

documents referring or reflecting such communications.  Modified Request 12 seeks only

documents, including any communications with the Government, from September 2009 to the

present referring to Plaintiffs' malpractice claim and C&B's fee dispute.

P&C claims that Plaintiffs' requests concerning first-to-file matters, the quality of

C&B's services, and the fee dispute "*seek purely irrelevant information.*"  P&C

Memorandum, p. 25-26, 29-30.  P&C argues that "P&C's and the government's opinions,

analysis, or casual comments concerning those matters … are not admissible to prove or disprove the malpractice and fee claims at issue in this litigation and cannot lead to the discovery of any admissible evidence." Id. By P&C's definition of relevance, no third-party discovery could ever be relevant in a legal malpractice claim. Including, for example, a letter from P&C to the government stating that "Cross admitted to me that he committed malpractice by failing to include Paxil in the Original Complaint" would not be "relevant" to Plaintiffs' malpractice claim. This argument is frivolous. First-to-file matters, the quality of C&B's services, and the fee dispute are core issues in Plaintiffs' malpractice claim and C&B's counterclaim. Documents relating to such issues are plainly relevant.

Furthermore, Plaintiffs' Modified Requests relating to these core issues are narrowly tailored. The time period for Plaintiffs' Modified Request 3 seeking communications regarding first-to-file' matters and the quality of C&B's services is limited to the date that C&B filed the Original Complaint and the date of the sharing agreement (July 1, 2003 to February 29, 2004). The time period for its Modified Request 11 seeking documents referring to Plaintiffs' malpractice claim and C&B's fee dispute is limited to the date just before Plaintiffs terminated C&B to the present (September 2009 to the present).

P&C also objects to producing documents relating to first-to-file matters, the quality of C&B's services, and the fee dispute based on the work-product privilege under Rule 26(b)(3) and Hickman v. Taylor, 329 U.S. 495 (1947). P&C argues that all such documents were made in anticipation of litigation and that, based on the common interest doctrine, P&C did not waive the work product privilege by disclosure of any such documents to the government. P&C Memorandum, pp. 25-28. P&C is wrong on both accounts. The work product doctrine does not protect materials prepared by P&C in the present litigation because

P&C's clients are not parties to this litigation and protecting P&C's communications with the government and documents referring to such communications is not consistent with <u>Hickman</u>. Even if the work product doctrine did apply, the common interest doctrine does not apply to the disclosure of the requested communications because such communications were not designed to facilitate a common legal interest shared by P&C's clients and the government.

Rule 26(b)(3) protects attorney "work product" from discovery in certain specified circumstances. The Rule provides in pertinent part: "[A] party may obtain discovery of documents and tangible things … prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."  Fed.R.Civ.P. 26(b)(3).  To qualify for protection against discovery under this rule, documents must have two characteristics: (1) they must be "prepared in anticipation of litigation or for trial," and (2) they must be prepared "by or for another party or by or for that other party's representative." <u>Id.</u>

The Rule, on its face, limits its protection to one who is a party (or a party's representative) to the litigation in which discovery is sought.  The federal courts have repeatedly held, when confronted with the issue, that a non-party witness may not invoke work-product protection under this rule to preclude production of materials prepared by or for that witness, even if created in contemplation of the witness's own pending or anticipated litigation.  Thus, "documents prepared by one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) … ."  8 C. Wright, A. Miller & R. Marcus, Federal Practice & Procedure: Civil § 2024 at 354-56 (2d ed. 1994).  <u>Accord</u>, 6 Moore's Federal Practice §

26.70[4] at 26-218.3.  This conclusion has been adhered to by the Supreme Court in *dictum*,

by at least four circuit courts and by numerous district courts.  Federal Trade Commission v.

Grolier Inc., 462 U.S. 19, 25 (1983) (citing 8 Wright & Miller, Federal Practice and Procedure

§ 2024 at 201 (1970)); Tambourine Comercio Internacional SA v. Solowsky, 312 Fed. Appx.

263, 284 (11th Cir. 2009); In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 924 (8th

Cir. Ark. 1997); Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co., 1994 U.S. App.

LEXIS 3828 (6th Cir. 1994)(unpublished); In re California Public Utilities Comm'n, 892 F.2d

778, 781 (9th Cir. 1989) In re California Public Utilities Comm'n, 892 F.2d 778, 781 (9th Cir.

1989); Westwood Prods. v. Great Am. E&S Ins. Co., 2011 U.S. Dist. LEXIS 84171 (D.N.J.

Aug. 1, 2011); LG Elecs., Inc. v. Motorola, Inc., 2010 U.S. Dist. LEXIS 116652 (N.D. Ill.

Nov. 2, 2010); Jean v. City of New York, 2010 U.S. Dist. LEXIS 2282 (E.D.N.Y. Jan. 12,

2010); Bryant v. Ferrellgas, Inc., 2008 U.S. Dist. LEXIS 47148 ( E.D. Mich. June 17, 2008);

Abdell v. City of New York, 2006 U.S. Dist. LEXIS 66114 (S.D.N.Y. Sept. 14, 2006);

Ramsey v. NYP Holdings, Inc., 2002 U.S. Dist. LEXIS 11728, 18-20 (S.D.N.Y. June 26,

2002); Burton v. R.J. Reynolds Tob. Co., 200 F.R.D. 661, 676 (D. Kans. 2001); Go Medical

Industs. Pty., Ltd. v. C.R. Bard, Inc., 1998 U.S. Dist. LEXIS 22919, 1998 WL 1632525, *6

(D. Conn. Aug. 14, 1998); In re Polypropylene Carpet Antitrust Litig., 181 F.R.D. 680, 691

(N.D. Ga. 1998); Hunter v. Heffernan, 1996 U.S. Dist. LEXIS 9244, 1996 WL 363842, *4

(E.D. Pa. June 28, 1996); Schultz v. Talley, 152 F.R.D. 181, 184 (W.D. Mo. 1993);

Doubleday v. Ruh, 149 F.R.D. 601, 606 (E.D. Cal. 1993); Hawkins v. South Plains Int'l

Trucks, Inc., 139 F.R.D. 682, 683-84 (D. Colo. 1991); Polycast Technology Corp. v.

Uniroyal, Inc., 1990 U.S. Dist. LEXIS 12444, 1990 WL 138968, *1-2 (S.D.N.Y. Sept. 20,

1990); Gomez v. City of Nashua, 126 F.R.D. 432, 434 n.1 (D.N.H. 1989); Chaney v. Slack,

99 F.R.D. 531, 533 (S.D. Ga. 1983); Galambus v. Consolidated Freightways Corp., 64 F.R.D. 468, 473 (N.D. Ind. 1974).

Courts occasionally apply Rule 26(b)(3) analysis to work-product objections by a non-party who is subject to a subpoena, but in those cases, the parties typically have not argued the inapplicability of that rule to a non-party's own work-product.  For example, the cases cited by P&C do not include any discussion as to the applicability of Rule 26(b)(3) to a non-party. P&C Memorandum, p. 13 (citing In re Sealed Case, 856 F.2d 268, 270 (D.C. Cir. 1988); National Union Fire Ins. Co. v. Murray Sheet Metal Co., 967 F.2d 980 (4th Cir. W. Va. 1992); Roatan Cruise Terminal, S.A. de S.V. v. HPA, Inc., 2011 U.S. Dist. LEXIS 109223 (S.D. Fla. Sept. 26, 2011); Official Comm. of Admin. Claimants v. Bricker, 2011 U.S. Dist. LEXIS 49504 (N.D. Ohio 2011).  The fact that these courts ultimately applied Rule 26(b)(3) *sub silentio* to a non-party is not necessarily evidence of how the courts would rule if it had been argued that Rule 26(b)(3) did not apply to a non-party.  In fact, in Tambourine, the eleventh circuit held that Rule 26(b)(3) does not apply to non-parties. 312 Fed. Appx. at 284. Therefore, had it been argued that Rule 26(b)(3) did not apply to the non-party in the Roatan case cited by P&C, the Florida district court would have been bound by Tambourine to agree.

Some courts have held that the work-product doctrine is only a partial codification of the work product doctrine and have extended the privilege when doing so furthers the purposes underlying the Hickman decision.  Crosby v. City of New York, 269 F.R.D. 267, 278 (S.D.N.Y. 2010).  The purposes include: "protecting an attorney's ability to formulate legal theories and prepare cases, preventing opponents from 'free-loading' off their adversaries' work, and preventing interference with ongoing litigation. 'In some instances it was also significant that the non-party was at least potentially a party or had interests that

4720390.10

were likely to be affected by the litigation in which the work product was sought.'" Id. (citations and footnotes omitted).

In this case, the principles of the work product doctrine do not support its application to P&C's communications with the government and documents referring to such communications.  P&C's clients are not Plaintiffs' adversaries.  Plaintiffs will in no way be "free-loading" off of P&C's clients.  P&C's clients have no case to prepare, and there is no danger that Plaintiffs will use the documents against them.  This is not a situation like the one in Eirini Zagklara v. Sprague Energy Corp. cited by P&C where the non-party is one of multiple individuals liable for the plaintiff's injuries and could be later joined as a defendant. 2011 U.S. Dist. LEXIS 56782, 6-7 (D. Me. May 26, 2011).  In Eirini, the court was concerned with the following situation:

> Whenever multiple individuals or entities might be liable for a plaintiff's injury, the plaintiff could sue only one and immediately subpoena a report prepared for another potentially-liable party. After obtaining the report, the plaintiff could then amend his or her complaint to add that party as a defendant. That possibility is not one that would be countenanced by any court interpreting the work product doctrine or Rule 26(b)(3).

> Unless and until it is clearly shown that Armada (Greece) is not and cannot be made a party to this case, the plaintiff's argument is premature.

Id.

In this case, P&C's clients are not (and cannot be) liable for Plaintiffs' malpractice claims against C&B.  There is no reasonable basis to contend that P&C's clients will be joined as defendants in Plaintiffs' malpractice claim.  There is also no reasonable basis to contend that disclosure of P&C's communications with the government regarding first-to-file matters, the quality of C&B's services, and the fee dispute will in any way harm or prejudice P&C's clients.

4720390.10

Even if the work product doctrine did apply, the common interest doctrine does not apply to the disclosure of the requested communications to the government because such communications were not designed to facilitate a common legal interest shared by P&C's clients and the government.  The common interest doctrine is not a privilege in and of itself.  Rather, it is an exception to the rule on waiver where communications are disclosed to third parties.  See United States v. Bergonzi, 216 F.R.D. 487, 495-96 (N.D. Cal. 2003)(discussing "the common interest exception to waiver of the attorney-client/work product privilege").  "The common interest privilege ... applies where (1) the communication is made by separate parties in the course of a matter of common [legal] interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." Id. at 495.

P&C cannot demonstrate that the specific communications at issue were designed to facilitate a common legal interest.  If a common interest has been proved to exist, "the party seeking to rely on the doctrine must still demonstrate that the *specific communications at issue* were designed to facilitate a common legal interest ... ."  Intex Rec. Corp. v. Team Worldwide Corp., 471 F. Supp. 2d 11, 16 (D.D.C. 2007)(Minebea Co. v. Papst, 228 F.R.D. 13, 23 (D.D.C. 2005)).   While Plaintiffs acknowledge that P&C's clients and the government share a comment interest in the government's FCA litigation against GSK, P&C's communications, "*casual comments*" as P&C calls them, with the government relating to first-to-file matters, the quality of C&B's services, and the fee dispute between C&B and Plaintiffs were not designed to facilitate such common legal interest.  P&C shares no common interest with the government on such issues.  P&C, therefore, waived any privilege relating to communications with the government relating to first-to-file matters, the quality of C&B's services, and the fee dispute when it disclosed such communications to the government.

4720390.10

Even if P&C's communications with the government relating to first-to-file matters and the quality of C&B's services are work-product privileged, P&C waived the privilege by disclosing some of those communications with Plaintiffs.  For example, attached as Exhibit "G" is a copy of a letter from P&C to the government discussing first-to-file issues and the sufficiency of Plaintiffs' Original Complaint that P&C shared with Plaintiffs.

Finally, in the unlikely event that this court finds that P&C's communications with the government are valid work product and that protection has not been waived, Plaintiffs still have a legitimate right to discovery because Plaintiffs have demonstrated a substantial need for such documents and communications.  "Even where work-product protection applies, the protection is not absolute.  Disclosure of work product may be ordered if the party seeking it can demonstrate substantial need for the information and an inability to obtain the information, or a substantial equivalent of it, by other means without undue hardship." Crosby v. City of New York, 269 F.R.D. 267, 277 (S.D.N.Y. 2010).

### 4.   P&C's Communications With C&B Are Not Equally Available From P&C Because P&C Has Admitted to Deleting Emails.

P&C objects to request 1 seeking "all communications between you [P&C] and Cross & Bennett from January 1, 2000 to the present, including but not limited to, communications related to the *Qui Tam* Litigation."  P&C objects to this request because it includes communications between P&C and C&B related to matters other than the GSK Lawsuits. This objection is moot.  Plaintiffs' Modified Request 1 narrows request 1 to now include only "communications between P&C and C&B from July 1, 2003 to the present regarding the GSK Lawsuits."

P&C also objects to producing communications with C&B claiming that it imposes an undue burden inasmuch as the same documents are available from C&B. This objection should be overruled.

First, none of the cases requiring discovery from parties before non-parties involve situations like this one where the non-party was the direct beneficiary of a cover-up and received tens of millions of dollars as a result. Those cases also do not limit discovery as to a non-party when the party whose honesty in sharing information is at the heart of the lawsuit and very much in question.

Second, C&B has admitted that emails from critical periods in the case have been lost. C&B cannot certify that it has produced all communications with P&C. Seidman Declaration, ¶¶ 7-28 (attached as Exhibit "C"). In each of the cases cited by P&C, the courts held that the documents requested from the non-party were available from a party to the litigation. Educ. Fin. Council v. Oberg, 2010 U.S. Dist. LEXIS 102221, 8-9 (D.D.C. Mar. 8, 2010)(subpoena "imposes an undue burden on EFC because it appears many, if not all, of EFC's communications with the defendants are available from the defendants"); Burlodge Ltd. v. Standex Int'l Corp. (In re Motion to Compel Compliance), 257 F.R.D. 12, 19 (D.D.C. 2009)("subpoena is "unduly burdensome because of the absence of any showing that the information sought is not available from other sources"); Nidec Corp. v. Victor Co., 249 F.R.D. 575, 577 (N.D. Cal. 2007)("There is simply no reason to burden nonparties when the documents sought are in possession of the party defendant."). Here, all communications between P&C and C&B are not available from C&B.

Plaintiffs cannot reasonably rely on C&B to produce all documents.  Plaintiffs have already demonstrated that C&B failed to produce documents.  For example, P&C previously claimed that it had not received a copy of the protective order entered in the GSK Lawsuits.  When Cross first turned over a copy of his file to replacement counsel, he represented to replacement counsel and to Plaintiffs' counsel that such copy was a complete copy of his file.  That turned out to be false.  In Cross's recent response to the Colorado Disciplinary Board's investigation, Cross attached to that response a copy of the March 28, 2008 protective order issued by Judge Gertner, as well as an October 6, 2008 letter from U.S. Attorney, Sara Bloom, enclosing the protective order.  Neither document was included in Cross's previously produced file, even though they naturally belong in the file.  Seidman Declaration, ¶27.  This is the same protective order that Cross falsely told his clients allowed only attorneys to data-mine the government's database.  Complaint, ¶¶ 143-149.  Plaintiffs have also discovered at least one email that Cross failed to include in his copy of the file that he first turned over.  Seidman Declaration, ¶28.  "'[I]n appropriate circumstances, production from a third party will be compelled in the face of an argument that the 'same' documents could be obtained from a party, because there is reason to believe that the files of the third party may contain different versions of documents, additional material, or perhaps, significant omissions.'"  Viacom Int'l, Inc. v. YouTube, Inc., 2008 U.S. Dist. LEXIS 79777 (N.D. Cal. Aug. 18, 2008)(quoting Visto Corp. v. Smartner Info. Sys., Ltd.,2007 U.S. Dist. LEXIS 8481 (N.D. Cal. Jan. 29, 2007)).  In Viacom, the California district court compelled non-parties to produce communications between the non-parties and the defendant.  The court held, "there is no general rule that plaintiffs cannot seek nonparty discovery of documents likely to be in defendant's possession. ... Plaintiffs have provided the Court with sufficient reason to believe

that respondents' files may contain additional material. Defendant YouTube's poor initial record keeping raises questions about the completeness of its files, and neither YouTube nor respondents have provided the Court with reason to believe that YouTube retained all communications and documents shared with respondents." Id at 10-11 (N.D. Cal. Aug. 18, 2008). See also Coffeyville Res. Ref. & Mktg. LLC v. Liberty Surplus Ins. Corp., No. 08-00017, 2008 U.S. Dist. LEXIS 91224, at *5 (E.D. Ark. Nov. 6, 2008)("there is no absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party, nor is there an absolute rule providing that the party must first seek those documents from an opposing party before seeking them from a non-party."); Software Rights Archive, LLC v. Google, Inc., 2009 U.S. Dist. LEXIS 43835 (D. Del. May 21, 2009)("where a party requests documents from a non-party that are likely to be in the possession of an opposing party, production of documents is appropriate where those documents constitute a "non-well-defined set" "whose completeness is not readily verifiable ... [I]n these circumstances, allowing for discovery from both the party and non-party, completeness of discovery is more likely to be achieved.")  Like the defendant in Viacom, C&B's poor record keeping, incomplete production, and deletion of files raises questions about the completeness of its files, and P&C has not provided the Court with reason to believe that C&B retained all communications and documents shared with P&C.

P&C also objects to producing its communication with C&B as not being relevant because the purported majority of such communications relate to mundane correspondence regarding the ordinary, day-to-day administration of litigation.  P&C Memorandum, p. 24. Such "mundane" correspondence regarding the administration of the GSK Lawsuits is directly

related to C&B's *quantum meruit* counterclaim. It will show that Cross ceded responsibility of the case to P&C and that P&C performed the majority of work advancing the GSK Lawsuits.

> **5.** **Plaintiffs' Modified Requests Seeking Documents Reflecting or Referring to Communications Between P&C and C&B Related to First-to-File Matters, the Quality of C&B's Services, the Sharing Agreement, the Malpractice Claim, and the Fee Dispute Are Relevant, Narrowly Tailored and Not Work Product.**

P&C objects to requests 2, 8, 10, 14, and 16 as not relevant and seeking only work product and attorney-client privileged communications. P&C Memorandum, pp. 29-30. These requests seek documents referring or reflecting P&C's communications with C&B. Plaintiffs narrowed these requests in time and scope. Modified Request 2 seeks only "documents reflecting or referring to communications between P&C and C&B from July 1, 2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement." Modified Request 11 seeks only "[d]ocuments, including any communications with the Government, from September 2009 to the present referring to Plaintiffs' malpractice claim and C&B's fee dispute."

As described above, these requests are undeniably relevant. They relate specifically to allegations asserted in Plaintiffs' malpractice claim.

These requested documents are also not work product. As described above, the work product doctrine does not protect materials prepared by P&C in the present litigation because P&C's clients are not parties to this litigation and protecting the requested documents is not consistent with Hickman.

**6.      Plaintiffs' Requests Do Not Cause Any Undue Burden on P&C.**

Requiring P&C to produce the requested documents will not cause any undue burden. "The issue is not whether compliance creates a burden but rather whether that burden is unduly.  The issue of undue burden 'is, of course, a matter to be decided in the light of the circumstances of the case … .'"  First Am. Corp. v. Sheik Zayed Bin Sultan Al-Nahyan, 1996 U.S. Dist. LEXIS 4577, 12-13 (D.D.C. 1996)(quoting Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984)).  "To evaluate the burden, the Court must consider 'the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues.'"  Id. (quoting Fed. R. Civ. P. 26(b)(2)(C)(iii)).  As set forth above, Plaintiffs' Requests seek documents directly related to the allegations asserted in their malpractice Complaint or the defenses raised in the counterclaim for a fee.  In a further effort to reduce any purported burden on P&C, Plaintiffs have not required P&C to log its attorney-client privileged communications with its clients, except for any communications relating to P&C's evaluation of Thorpe's prospective claim and handling of Thorpe's confidential information.

The amount in controversy is quite large.  The Massachusetts District Court is currently holding C&B's disputed contingency-fee award in the approximate amount of $30 million dollars pending the resolution of Plaintiffs' legal malpractice claim and C&B's fee dispute.

The issues at stake are not only important for both Plaintiffs and C&B, but also for protecting the integrity of the legal profession.  Compelling compliance with Plaintiffs' subpoena is particularly important due to C&B's failure to properly manage and preserve its file and evidence in this matter.  C&B had a duty to preserve documents and information that it knew, or reasonably should have known, would be relevant to this litigation.  C&B also had

a duty to properly maintain and preserve its file while representing Plaintiffs.  C&B's failure

to properly maintain and preserve its clients' file and evidence during active litigation is an

extremely serious issue.  Such a failure by lawyers cannot be excused or allowed to further

harm their former clients.

P&C has the resources to produce the requested documents.  It need not hire counsel

(it is representing itself) and received a contingency-fee award plus statutory fees that likely

exceed $30 million dollars.  According to its website, P&C "is the nation's most successful

and most experienced law firm representing whistleblowers."   It claims that "[w]histleblower

cases brought by Phillips & Cohen attorneys have recovered more than $11 billion in civil and

related criminal settlements for government entities - a record of success that far exceeds any

other law firm."  P&C website, http://www.phillipsandcohen.com/About-the-Firm.shtml

(visited on May 24, 2013).  Certainly, P&C has the sophistication, the experience, and the

resources to easily cull and produce the requested, non-privileged communications.

4720390.10

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request this Honorable Court deny

Phillips and Cohen, LLP's Motion to Quash as provided in the attached form of Order.

Respectfully submitted,

**OBERMAYER REBMANN
MAXWELL & HIPPEL LLP**


_____/s/_____

Joseph J. McGovern, Esquire
(D.C. Bar No. 936609)
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone:  (215) 665-3000
Fax:  (215) 665-3165

*Attorney for Plaintiffs
Gregory Thorpe and Blair Hamrick*

Date: May 28, 2013

4720390.10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE THIRD-PARTY SUBPOENA TO
PRODUCE DOCUMENTS

NO.  1:13-mc-00405-JEB-DAR

GREGORY THORPE, *et al.*

   Plaintiffs

     vs.

NO.  1:12-cv-11632-RWZ
Pending in District of Massachusetts

KEITH F. CROSS, *et al.*

   Defendants

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies and states that a true and correct copy of the attached

Response has been served via ECF upon the following:

> Peter Wilson Chatfield, Esquire
> PHILLIPS & COHEN LLP
> 2000 Massachusetts Avenue, NW
> Washington, DC 20036
>
> Stephen Hasegawa, Esquire
> PHILLIPS & COHEN LLP
> 100 The Embarcadero, Suite 300
> San Francisco, CA 94105

       /s/
_____
Joseph J. McGovern, Esquire

*Attorney for Plaintiffs*
*Gregory Thorpe and Blair Hamrick*

Dated: May 28, 2013

4720390.10