# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE THIRD-PARTY SUBPOENA TO
PRODUCE DOCUMENTS

NO.  1:13-mc-00405-JEB-DAR

GREGORY THORPE, *et al.*

Plaintiffs

vs.

KEITH F. CROSS, *et al.*

Defendants

NO.  1:12-cv-11632-RWZ
Pending in District of Massachusetts

**PLAINTIFFS' OBJECTION, PURSUANT TO FED.R.CIV.P. 72(a), TO
MEMORANDUM ORDER GRANTING PHILLIPS & COHEN LLP'S MOTION TO
QUASH OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER RE: SUBPOENA**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................1

      Magistrate Robinson's Memorandum Order ........................................3

II.    SUMMARY OF FACTS AND PROCEDURAL HISTORY................................4

      A.    The GlaxoSmithKline Lawsuits.................................................4

      B.    Plaintiffs' Malpractice Complaint Against C&B.........................5

          C&B Negligently Prepares the Original Complaint.. ...................5

          Cross Convinces Plaintiffs to Cut a Deal with P&C's Whistleblowers to Cover Up His Malpractice.. ..........................................................6

          C&B Lies to Plaintiffs About the Protective Order.. ...................7

          Cross Falsely Denies a Relationship with P&C..........................8

      C.    P&C Refuses to Produce or Search for Discoverable Documents and to Meet and Confer in Good Faith.. ...................................................8

      D.    Plaintiffs Modify Their Requests, Mooting Many of The Issues Raised in P&C's Motion to Quash.. .........................................................10

      E.    Plaintiffs and P&C Amicably Resolve Modified Requests 6-9, Mooting, Among Other Things, P&C's Claim that Plaintiffs' Subpoena Sought Information to Evaluate a Potential Claim Against P&C.. .......................11

      F.    Plaintiffs Request P&C's Communications with C&B Because C&B Failed to Maintain Emails, Including C&B's Emails With P&C.. ............12

III.    ARGUMENT ...................................................................................15

      A.    There is No Basis to Support Magistrate Robinson's Finding That The Requests Currently At Issue Seek Documents That Are of "No Conceivable Relevance" to The Underlying Malpractice Action..............16

          1.  Magistrate Robinson erroneously based her Memorandum Order on Modified Requests 6-9, which were no longer at issue. ............................16

          2.  The Modified Requests at issue seek relevant information, as they request documents relating directly to explicit allegations in Plaintiffs' malpractice action. ...................................................................17

B.      Plaintiffs Are Entitled to P&C's Communications With C&B (i.e., Modified Request 1) Because Such Communications Are Not Equally Available From C&B. ................................................................................20

C.      Plaintiffs Are Entitled to Any Agreements Relating to Any Other Commercial Relationship Between P&C and C&B (i.e., Modified Request 1) Because Such Agreements Are Not Equally Available From C&B. ....23

D.      Plaintiffs' Modified Requests 3 and 11 Seeking Communications With The Government Are Not Work Product...................................................24

E.      Plaintiffs' Modified Requests 2 and 4 Seeking Documents Reflecting or Referring to Communications Between P&C and C&B and P&C and the Government Are Relevant, Narrowly Tailored and Not Work Product. ...30

F.      Plaintiffs' Modified Request 5 Seeking Communications Between P&C and the Government Regarding Data Mining and the Protective Order Are Relevant, Narrowly Tailored and Not Work Product. ..............................30

G.      Plaintiffs' Modified Request 12 Seeking P&C's Letter to the Government Referenced in Its June 26, 2012 Letter to the Government Is Not Protected From Discovery Under Federal Rule of Evidence 408.............................31

H.      Plaintiffs' Modified Requests at Issue Do Not Cause Any Undue Burden on P&C.......................................................................................................32

III.    CONCLUSION..................................................................................................35

Plaintiffs, Gregory Thorpe and Blair Hamrick, object to the Memorandum Order entered on November 19, 2013 by United States Magistrate Judge Deborah A. Robinson (Dkt. 17) granting the Motion to Quash or, in the Alternative, for Protective Order Re: Subpoena ("Motion to Quash") filed by Phillips and Cohen, LLP.

## I.      INTRODUCTION

This matter concerns a third-party document subpoena (the "Subpoena")[1] that Plaintiffs served on the law firm of Phillips & Cohen ("P&C").  Plaintiffs' Subpoena seeks documents relevant to their legal malpractice lawsuit against the named Defendants, Keith Cross, Joseph Bennett and Cross & Bennett PC (collectively, "C&B") in a matter before the United States District for the District of Massachusetts.  In their legal malpractice claim, Plaintiffs sued C&B in connection with their representation of Plaintiffs, as whistleblowers ("relators"), in a *qui tam* lawsuit filed against GlaxoSmithKline LLC ("GSK") under the False Claims Act (the "FCA").

The principal thrust of the malpractice claim is that C&B's *qui tam* complaint was so deficient and so vulnerable to attack by subsequent filers that, when second filers did come along, represented by P&C, C&B sought to cover-up their malpractice by persuading Plaintiffs (their clients at the time) to enter into a deal with P&C's clients, in which Plaintiffs gave away fifty percent (50%) of their relators' share to P&C's clients – the entire amount of which was presumptively Plaintiffs, as the first-filers under the FCA.  As Plaintiffs would later discover in 2009, C&B did this to avoid a confrontation with P&C that would have revealed to Plaintiffs C&B's malpractice and the deficiencies of the complaint that C&B prepared.  A side benefit of the deal was that the arrival of competent *qui tam* counsel in the matter, P&C, allowed the incompetent lawyers to sit back and ride P&C's coattails for the remainder of the case.

Plaintiffs fired C&B for cause in October 2009.  Two and a half years later, the *qui tam* case finally settled.  Despite the fact that C&B was removed for cause during the final quarter of

---

[1] A copy of Plaintiffs' Subpoena is attached to P&C's Motion to Quash (Dkt. 1).

the case, they filed a counterclaim in the malpractice action seeking a *quantum meruit* fee of

approximately $30 million dollars or forty percent (40%) of Plaintiffs' relators' share, that is, the

full value of C&B's defunct contingency-fee agreement with Plaintiffs.  P&C worked with C&B

for over six (6) years until Plaintiffs replaced C&B with new counsel.

Principally, as modified in Plaintiffs' Opposition to the Motion to Quash (Dkt. 11), the

Subpoena seeks communications between P&C and C&B and between P&C and the

Government relating to the sufficiency and quality of C&B's *qui tam* complaint (the "Original

Complaint"); (b) the first-filed status of such complaint; and (c) the sharing agreement between

Plaintiffs and P&C's relators.

In its Motion to Quash, P&C objected to producing its communications with C&B

claiming that it imposes an undue burden inasmuch as the same documents are available from

C&B.  P&C also objected to producing its communications with the Government and other

documents based on the attorney-client privilege, the work-product doctrine, relevance, and

undue burden.  P&C claimed that Plaintiffs' Subpoena was a "naked attempt" to gather

information for use in evaluating a claims against P&C.

Notwithstanding P&C's failure to cooperate with Plaintiffs during the meet and confer, in

its Opposition to P&C's Motion to Quash (Dkt. 11), Plaintiffs narrowed significantly their

Subpoena in time and scope to twelve (12) discrete requests (the "Modified Requests"), mooting

many of the issues raised in P&C's Motion to Quash.  In addition, after Plaintiffs filed their

Opposition to P&C's Motion to Quash, but prior to oral argument, P&C and Plaintiffs amicably

resolved P&C's objections to four (4) of the Modified Requests (i.e., Modified Requests 6-9),

*including specifically the Modified Requests that formed the basis of P&C's claim that Plaintiffs'*

*Subpoena was an attempt to gather information for use in evaluating a claim against P&C.*[2]

---

[2] Currently at issue are Plaintiffs' Modified Requests 1-5, 10-12.  <u>See</u> infra, pages 10-12 (Sections II, E and F).

**Magistrate Robinson's Memorandum Order**

In a Memorandum Order dated November 19, 2013 (Dkt. 17), Magistrate Robinson granted P&C's Motion to Quash, quashing Plaintiffs' Subpoena in its entirety.  Magistrate Robinson held that Plaintiffs' Subpoena requested documents that are of "no conceivable relevance" to Plaintiffs' malpractice action, finding that "'the Subpoena is a naked attempt to gather information for use in evaluating, and perhaps litigating, a claim against [Phillips & Cohen].'"  Memorandum Order, p. 5 (internal citation omitted).  In addition, *relying exclusively on P&C's Declaration included with its opening Motion to Quash*, Magistrate Robinson also held that compliance with the Subpoena would impose a "substantial and undue" burden on P&C, finding specifically that Plaintiffs did "not attempt[] to rebut" P&C's Declaration.  Id.  As to communications between P&C and C&B, Magistrate Robinson held that Plaintiffs were first required to file in the Massachusetts District Court a motion to compel C&B to produce all such communications.  Magistrate Robinson did not rule on P&C's objections based on the work product doctrine and the attorney client privilege.

Magistrate Robinson's Memorandum Order is in error for multiple reasons.  Magistrate Robinson inexplicably based her ruling exclusively on Modified Requests 6-9, *which are no longer at issu*e, and ignored Modified Requests 1-5, 10-12, *the only requests that remain at issue*.  On their face, Modified Requests 1-5, 10-12 seek documents that are directly relevant to either explicit allegations asserted in Plaintiffs' malpractice claim or in defense to C&B's fee claims.  These requests do not, *in any way*, seek documents related to P&C's representation of its own clients and its evaluation of potential clients or to any potential claim against P&C.

As to Magistrate Robinson's finding of "substantial and undue" burden, Magistrate Robinson's reliance on P&C's Declaration, *drafted before Plaintiffs modified their requests and withdrew Modified Requests 6-9*, is likewise erroneous.  Plaintiffs mooted most, *if not all*, of the purported burden that P&C asserts in its Declaration when Plaintiffs modified the requests in

3

their Opposition to P&C's Motion to Quash and withdrew Modified Requests 6-9 by agreement. As modified, the requests currently at issue would likely require P&C to search only the emails of one (1) custodian using a few keyword searches.

Furthermore, as to the communications between P&C and C&B, C&B has admitted to deleting emails that cannot be recovered. The District of Massachusetts cannot compel C&B to produce what it does not possess. Plaintiffs, therefore, are entitled to such communications from P&C.

## II.   SUMMARY OF FACTS AND PROCEDURAL HISTORY

### A.   The GlaxoSmithKline Lawsuits.

Plaintiffs hired C&B to represent them in their whistleblower lawsuit against GSK. C&B filed Plaintiffs' lawsuit against GSK in the United States District Court for the District of Colorado on January 2, 2003. The Original Complaint alleged only federal FCA claims against GSK for off-label promotion of six (6) prescription drugs. The Original Complaint failed to allege any kickback or state FCA claims.

Prior to Plaintiffs hiring C&B, Plaintiff Greg Thorpe asked P&C to evaluate his whistleblower lawsuit against GSK in February of 2002. Thorpe completed a confidential case-evaluation questionnaire and submitted it to P&C along with documentary evidence supporting his allegations against GSK. After reviewing Thorpe's confidential, privileged information, P&C declined to represent Thorpe in a letter dated February 25, 2002 signed by Bonny Harbinger, a junior associate at P&C.

A little more than one year later, on April 7, 2003, P&C filed a whistleblower lawsuit against GSK on behalf of two other whistleblowers in the United States District Court for the District of Massachusetts. The P&C complaint, which was promptly amended two months later, repeated a number of the claims that Thorpe had asserted in the confidential, privileged

information that he submitted to P&C in February 2002.[3]  Unlike C&B's Original Complaint,

P&C's amended complaint was competently drafted.  It comprised ninety-six (96) pages and

included kickback and state FCA claims. C&B's Original Complaint was a mere thirteen (13)

pages long.

Under the FCA, only the first-filed relator is entitled to a relator's share.  31 U.S.C. §

3730(b)(5).  The first-to-file rule only protects the claims which the relator actually asserts.  An

FCA claim that is inadequately pleaded or insufficiently specific leaves open a door for a second

properly pleaded action to claim first-to-file status.  See United States ex rel. Duxbury v. Ortho

Biotech Prods., L.P., 579 F.3d 13, 32 (1st Cir. 2009).

The relators entered into a 50/50 sharing agreement.  Following the sharing agreement, the

two matters were supervised by the United States Attorney's Office in Massachusetts, with which

P&C had the primary relationship. C&B's Colorado lawsuit was transferred to, and consolidated

with, P&C's action in Massachusetts in 2010.

The Government ultimately recovered over $1 billion dollars in settlement of the

whistleblower lawsuits against GSK.  The Massachusetts court is currently holding

approximately $30 million dollars pursuant to a lien claim filed by C&B.

**B.**     **Plaintiffs' Malpractice Complaint Against C&B.**

**C&B Negligently Prepares the Original Complaint**

In their malpractice Complaint against C&B, Plaintiffs allege that C&B was grossly

negligent in preparing the Original Complaint.  The Original Complaint failed to state all of the

claims that Plaintiffs brought to C&B's attention, neglecting to include certain legal theories

arising out of GSK's illegal marketing of some drugs and failing to mention GSK's illegal

---

[3] Plaintiffs' Modified Requests 6-8 (**withdrawn, no longer at issue**) sought information relating to P&C's use of
Plaintiff Greg Thorpe's confidential information that he submitted to P&C regarding  P&C's evaluation of his
prospective *qui tam* claim against GSK.  The information sought in these withdrawn Modified Requests was the
basis for which P&C claimed that C&B's subpoena was an attempt to gather information for use in evaluating a
claim against P&C.

marketing of other drugs completely.  In particular, C&B failed to include state FCA claims and

illegal kickback claims.  C&B's failure to assert all available claims in the Original Complaint,

opened the door under the "first-to-file" rule for a subsequent filer, like P&C, to undermine

Plaintiffs' first-filed status through a later filed complaint that included the missing claims.

Complaint, ¶¶ 81-123.

**Cross Convinces Plaintiffs to Cut a Deal with
P&C's Whistleblowers to Cover Up his Malpractice**

Six months after C&B filed its deficient FCA complaint on behalf of Plaintiffs, and more

than two years before C&B filed any amendment seeking to cure the evident deficiencies in its

Original Complaint, the U.S. Attorneys' Office advised C&B that P&C had filed a similar FCA

complaint against GSK in Massachusetts three months after Plaintiffs' complaint was filed in

Colorado.  Complaint, ¶96.

Cross received a copy of P&C's amended complaint on July 25, 2003.  After reading

P&C's amended complaint, Defendant Keith Cross stated to Plaintiffs in an e-mail on July 28,

2003 that "[the P&C complaint is] 96 pages and has significantly more detail than we do, but

overall, the 'cause of action' is the same."  *This was not true*.  C&B failed to tell Plaintiffs that

the P&C amended complaint included state false claims act claims and federal anti-kickback

claims that C&B should have included in its Original Complaint.  C&B also failed to explain that

its negligence had allowed P&C's relators to become first-filed on those claims.  Id. at 105-106.

Over the course of the next six (6) months C&B urged Plaintiffs to share the relator fee,

which a properly drafted FCA complaint would have made theirs alone as first-in-time filers.

C&B ultimately convinced Plaintiffs to cut a generous 50-50 deal with P&C, despite Plaintiffs'

repeated demands that C&B take a more aggressive position.  During this time, Plaintiffs expect

that P&C pointed out to C&B the deficiencies of its Original Complaint.  Whether or not P&C

and C&B had such discussions, the fact remains that C&B prevailed on Plaintiffs to give up fifty

6

percent (50%) of the relator's share without self-disclosing to Plaintiffs the deficiencies of the Original Complaint.  Id. at 111-112.

In negotiating the 50-50 sharing agreement, Cross also refused to aggressively challenge P&C, as the clients demanded, on the question of whether P&C had used any of Thorpe's confidential information in the representation of its subsequent clients.  After reviewing Thorpe's confidential, privileged information in February of 2002 and declining to take the case, P&C proceeded to represent other clients, who had directly adverse interests, in the same matter.  Id. at 114-118.

C&B's handling of the sharing agreement with P&C was tainted by a substantial conflict of interest.  C&B allowed its personal interests and its desire to cover up its mistakes to influence its negotiation of the sharing agreement with the P&C relators, to the detriment of its clients.  Id. at 96-123.  The sharing agreement not only allowed C&B to avoid issues about the deficiencies of the Original Complaint, but also to cede responsibility for the case and ride the coattails of P&C.  Id. at 113-123.

It was not until 2009 when Plaintiffs sought to involve another qui tam lawyer as co-counsel with C&B that Plaintiffs discovered, among other things, that C&B mishandled the Original Complaint and that C&B put its own interests ahead of their clients' interests when it negotiated the sharing agreement with P&C.  Plaintiffs discharged C&B for cause on October 21, 2009.  Id. at 166-169.

### C&B Lies to Plaintiffs About the Protective Order

In the GSK Lawsuits, the government agreed to let the relators and their counsel mine the documents in the government's investigatory file for data that could be used in the case against GSK, subject to a protective order.  C&B informed Plaintiffs, over their strong objections, that they could not participate in mining the government's documents because the data-mining was

7

limited to attorneys.  C&B also told Plaintiffs that they could not share any of the confidential

information developed through data mining with them.  Id. at 143-145.

C&B's statements were false.  After Plaintiffs discharged C&B, they discovered that the

protective order permitted relators the same access as their counsel and that the government had

no objection to their having access to confidential information.  Id. at 147.

### Cross Falsely Denies a Relationship with P&C

In 2004, Cross disclosed to Thorpe and Hamrick that he had agreed to serve as local

counsel for P&C in an unrelated matter.   In 2008, Cross stated emphatically that he had never

received anything from P&C.  In 2009, he again agreed to serve as local counsel for P&C.  This

time, however, he did not disclose his arrangement with P&C to Thorpe and Hamrick.  Id. at

170-172.

### C.     P&C Refuses to Produce or Search for Discoverable Documents and to Meet and Confer in Good Faith.

On March 8, 2013, Plaintiffs served their third-party subpoena on P&C requesting

documents related to Plaintiffs' legal malpractice claims and C&B's claim for fees.  Plaintiffs

allege that P&C took the lead in litigating the case after the sharing agreement was entered into

and, as a result, its communications with C&B and the government are not only related to

Plaintiffs' legal malpractice claim, but also to Plaintiffs' defense of C&B's claim to a full forty

percent (40%) contingent fee.  In fact, all of the documents requested by Plaintiffs' subpoena

relate to either explicit, core allegations of malpractice by C&B or defenses to C&B's excessive

fee claim.

On April 5, 2013, P&C produced ten (10) pages in response to Plaintiffs' subpoena and

objected to producing anything else.  P&C claims Plaintiffs' subpoena is overbroad, unduly

burdensome, and seeks privileged information.  The ten (10) pages (attached as Exhibit "B" to

Plaintiffs' Opposition to Motion to Quash (Dkt. 11) produced by P&C are a redacted copy of the

case-evaluation questionnaire completed by Thorpe in February 2002 and the Bonny Harbinger

letter advising that P&C was declining to handle Thorpe's *qui tam* lawsuit against GSK.

At a mandatory meet and confer on April 17, 2013, P&C refused to cooperate with

Plaintiffs in a good faith effort to resolve the discovery disputes.  P&C refused to consider

producing any additional documents regardless of the degree or manner in which Plaintiffs might

seek to narrow the subpoena.  P&C refused even to search for responsive documents, claiming that

any search, regardless how limited, would be unduly burdensome.  P&C also claimed that none of

the documents requested in the subpoena were relevant to Plaintiffs' litigation, or reasonably

calculated to lead to the discovery of admissible evidence, but refused to listen to any explanation

as to how the requested documents were relevant.  P&C accused Plaintiffs of using their subpoena

as a pretext to discover information upon which to sue P&C.  In its Motion to Quash, P&C even

argues that Plaintiffs' counsel said as much.  This is untrue.  At no time did counsel for Plaintiffs

ever state or imply that Plaintiffs' subpoena was being used as a tool to dig up a claim against

P&C.  See Declaration of H. David Seidman, Esquire ("Seidman Declaration") at ¶¶ 1-7 (attached

as Exhibit "C" to Plaintiffs' Opposition to Motion Quash (Dkt. 11).

By letter dated April 22, 2013 (attached as Exhibit "D" to Plaintiffs' Opposition to

Motion Quash (Dkt. 11)), Plaintiffs followed up with P&C in a further effort to resolve P&C's

objections.  Plaintiffs explained the relevance of the requested documents and expressed a

willingness to narrow the requests to reduce the alleged burden on P&C.  Plaintiffs also proposed

providing a list of key-words that P&C could use to search its computer system for responsive

documents and/or limiting searches for requested documents to particular custodians.  P&C

ignored Plaintiffs' letter.

In the face of P&C's stonewalling of discovery, Plaintiffs' counsel wrote to P&C outside

of the discovery rules and requested information regarding the handling of Thorpe's confidential

privileged information.  See Rule 1.18 Letter (attached as Exhibit "E" to Plaintiffs' Opposition to

P&C's Motion to Quash (Dkt. 11)).  P&C refused to provide the requested information.

> **D.**    **Plaintiffs Modify Their Requests, Mooting Many of The Issues Raised in P&C's Motion to Quash.**

Notwithstanding P&C's failure to cooperate with Plaintiffs, in an effort to address some

of the issues raised by P&C in its Motion to Quash, in its Opposition to P&C's Motion to Quash

(Dkt. 11), Plaintiffs proposed modifying their requests (the "Modified Requests") as follows:

1) All communications between P&C and C&B from July 1, 2003 to the present regarding the GSK Lawsuits;

2) All documents reflecting or referring to any communications between P&C and C&B from July 1, 2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement;

3) All communications between P&C and the Government from July 1, 2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement;

4) All documents reflecting or referring to any communications between P&C and the Government from July 1, 2003 to February 29, 2004 related to (a) the sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such complaint; and (c) the sharing agreement;

5) All documents, including any communications between P&C and the Government, from January 1, 2007 to November 1, 2009 referring to the data-mining project and/or the protective order entered in the GSK Lawsuits;

6) All documents from April 1, 2002 to February 29, 2004 reflecting, relating, or referring to Gregory Thorpe's prospective qui tam claim against GSK (**withdrawn, no longer at issue**);

7) All documents from April 1, 2002 to February 29, 2004 reflecting any review or dissemination of  the information that Gregory Thorpe submitted to P&C regarding  P&C's evaluation of Gregory Thorpe's prospective qui tam claim against GSK, including documents that reflect the names of individuals who reviewed or had access to such information (**withdrawn, no longer at issue**);

8)      All written policies from April 1, 2002 to February 29, 2004 regarding P&C's evaluation of prospective matters and the handling of confidential materials submitted by a prospective client in connection with P&C's evaluation of a prospective matter (**withdrawn, no longer at issue**);

9)      Documents submitted to GSK in connection with P&C's claim for statutory attorneys' fees in the Qui Tam Litigation (**withdrawn, no longer at issue**);

10)     All agreements or proposed agreements relating to any business or commercial relationship or potential relationship between P&C and C&B other than the GSK Lawsuits from 2001 through the present;

11)     Documents, including any communications with the Government, from September 2009 to the present referring to Plaintiffs' malpractice claim and C&B's fee dispute; and

12)     The "more complete letter" referenced in paragraph one of P&C's June 26, 2012 letter to the Government (attached as Exhibit "G" to Plaintiffs' Opposition to P&C's Motion to Quash), in which P&C challenges the sufficiency of Plaintiffs' complaint, and all communications with the Government related to the June 26, 2012 letter and the "more complete letter."[4]

**E.      Plaintiffs and P&C Amicably Resolve Modified Requests 6-9, Mooting, Among Other Things, P&C's Claim that Plaintiffs' Subpoena Sought Information to Evaluate a Potential Claim Against P&C.**

After Plaintiffs filed their Opposition to P&C's Motion to Quash, but prior to oral argument before Magistrate Robinson, Plaintiffs and P&C entered into an agreement in which P&C agreed to provide certain information in exchange for Plaintiffs withdrawing Modified Requests 6-9. See P&C's Reply, pp. 2-3 (Dkt. 14); Oral Argument Transcript, p. 4, line 5. , p. 5, line 5.  These withdrawn requests include the requests (i.e., Modified Requests 6-8) that sought information relating to P&C's use of Plaintiff Greg Thorpe's confidential information that he submitted to P&C regarding  P&C's evaluation of his prospective *qui tam* claim against GSK.

---

[4] As counsel for Plaintiffs explained at oral argument, Plaintiffs inadvertently omitted this Modified Request in its Opposition.  See Oral Argument Transcript, p. 84, line 21 to p. 86, line 2.  Relevant portions of the transcript for Oral Argument on P&C's Motion to Quash is attached as Exhibit 6.

The information sought in these withdrawn Modified Requests is the same information sought in Plaintiffs' Rule 1.18 letter to P&C.  See Rule 1.18 Letter (attached as Exhibit "E" to Plaintiffs' Opposition to P&C's Motion to Quash (Dkt. 11)).  The information sought in Modified Requests 6-8 and Plaintiffs' Rule 1.18 letter was the basis for which P&C claimed that Plaintiffs' Subpoena was an attempt to gather information for use in evaluating a claim against P&C.  See P&C Motion to Quash, pp. 2, 7-8 (Dkt. 1); Oral Argument Transcript, p. 62, line 8 to p. 63, line  4.

**F.      Plaintiffs Request P&C's Communications with C&B Because C&B Failed to Maintain Emails, Including C&B's Emails With P&C.**

C&B has admitted that it deleted emails from critical periods in the case that cannot be recovered.  C&B cannot certify that it maintained and produced all of its communications with P&C.  Specifically, counsel for C&B admitted that C&B no longer possess emails in their original Outlook system from July 2002 through March 2008, except for Defendant Keith Cross's sent emails from 2005 through 2006.  Any emails that C&B did not manually save from its Outlook system to its document management system, Amicus, during these time periods, no longer exist and cannot be recovered.  See Opposition to Motion to Quash, Exhibit C, ¶¶ 7-28 (Declaration of H. David Seidman)(Dkt. 11).

Discovery has revealed that C&B neglected to save to its Amicus system a substantial number of emails between C&B and P&C that C&B no longer possesses due to C&B failing to retain the Outlook files.  This is evidenced by the fact that C&B produced a dearth of emails between C&B and P&C during the specific time periods of the deleted Outlook emails, especially considering P&C asserts that it was in "frequent contact" with C&B from 2004 to 2009.  The following is a breakdown by year of the number of emails between P&C and C&B that were produced in discovery by C&B in the underlying action. [5]

---

[5] Plaintiffs' counsel provided this information orally to the Court at argument.  See Oral Argument Transcript, p. 45, line 9, p. 46, line 13.

| C&B Production of Emails Between C&B and P&C | | | |
|---|---|---|---|
| Year | Number of Emails Between P&C and C&B | Number of Emails Sent by P&C to C&B | Number of Emails Sent By C&B to P&C |
| **2003** | 9 | 5 | 4 |
| **2004** | 63 | 12 | 51 |
| **2005** | 64 | 12 | 52 |
| **2006** | 146 | 58 | 88 |
| **2007** | 132 | 63 | 69 |
| **2008** | 419 | 192 | 227 |
| **2009** | 911 | 489 | 422 |

**Total Emails = 1,744**

### Time Periods of C&B Deleted Outlook Email Files

| | |
|---|---|
| July 2002 through 2004: | All Outlook Files Deleted |
| 2005 through 2006: | All Outlook Files Deleted, Except C&B Sent Emails |
| 2007 through March 2008: | All Outlook Files Deleted |

Since oral argument on P&C's Motion to Quash, during the course of discovery in the underlying malpractice action, Plaintiffs have since discovered additional evidence further demonstrating that C&B's document production is not complete.[6]  At the time the Magistrate Robinson took this matter under advisement in August, 2013, Plaintiffs had not completed processing its document production, and therefore, was not able to fully compare its document production with C&B's document production to further demonstrate that the production of documents by the C&B was not complete.  At the time of the argument on P&C's Motion to Quash, Plaintiff was able to identify only a few communications with C&B exchanged during the *qui tam* litigation, but that were not included in C&B's document production in the underlying malpractice action.

---

[6] Pursuant to Rule 72(b)(3), in deciding objections to a magistrate judge's decision ,the district judge may receive further evidence not presented to the magistrate judge.

Plaintiffs have now performed a more comprehensive comparison of C&B's document production with Plaintiffs' document production and have been able to identify *at least two hundred forty-eight (248) emails* between Plaintiffs and C&B that were exchanged during the *qui tam* litigation, but that were <u>not</u> included in C&B's document production in the underlying malpractice action.  This is based on a random sampling of approximately 600 emails exchanged during the *qui tam* litigation between Plaintiffs and C&B that were included in Plaintiffs' document production in the malpractice action.  *Of this random sampling of 600 emails, approximately forty-one percent (41%) were missing from C&B's document production.*  Attached as Exhibit 1 is a spreadsheet identifying the two hundred forty-eight (248) emails missing from C&B's production.  <u>See</u> Declaration from H. David Seidman (attached as Exhibit 2).

Furthermore, since Magistrate Robinson took P&C's Motion to Quash under advisement, counsel for Plaintiffs have also deposed the IT consultant for the C&B with regard to the deleted Outlook email files.  The IT consultant confirmed that certain Outlook emails were deleted as Plaintiffs previously reported to the Court.  Specifically, the IT consultant explained that the file in which all of Defendant Keith Cross's emails were automatically stored was unintentionally removed from the firm's server by the auto-archiving feature of Outlook when Mr. Cross replaced his personal computer and another IT consultant turned on the auto-archiving feature for the new computer instead of disabling it.  He confirmed that C&B employed a software package known as Amicus that allowed them to save emails manually to a database on a case-specific basis.  He also confirmed that emails included in the deleted Outlook emails that were not manually saved to the Amicus database were irretrievably lost from C&B's system.  <u>See</u> Deposition Transcript of Joseph Jay Baldwin, October 25, 2013, pp. 58-69 (attached as Exhibit 3).

III.   **ARGUMENT**

A trial court may, on a motion by the party seeking relief, quash or modify the subpoena if it requires disclosure of privileged or other protected matter, if no exception or waiver applies, or if it subjects a person to undue burden.  Fed. R. Civ. P. 45(c)(3).  What constitutes unreasonableness or oppression is a matter to be decided in the light of all the circumstances of the case.  Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984). "[T]he burden of proving that a subpoena ... is oppressive is on the party moving for relief on this ground. … The burden is particularly heavy to support a motion to quash as contrasted to some more limited protection."  Westinghouse Electric Corp. v. City of Burlington, 351 F.2d 762, 766 (D.C. Cir. 1965).

To determine whether a burden is "undue," courts consider the factors set forth in Rule 26.  Watts v. SEC, 482 F.3d 501, 509 (D.C. Cir. 2007).  Rule 26(b)(2)(C)(iii) limits discovery if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  The district court must balance the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena.  Flanagan v. Wyndham International Inc., 231 F.R.D. 98, 102-03 (D.D.C. 2005) (citations omitted).

In this case, Magistrate Robinson's Memorandum Order is in error.  P&C has fallen far short of meeting its heavy burden to quash Plaintiffs' subpoena.  Pursuant to Federal Rule of Civil Procedure 72(b)(3), "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."

A.      **There is No Basis to Support Magistrate Robinson's Finding That The Requests Currently At Issue Seek Documents That Are of "No Conceivable Relevance" to The Underlying Malpractice Action.**

In her Memorandum Order, Magistrate Robinson quashed Plaintiffs' subpoena, holding inexplicably that the subpoena seeks documents that are of "no conceivable relevance in the context of the action now pending in the District of Massachusetts … ." Memorandum Order, p. 5 (Dkt. 17).  In reaching this decision, Magistrate Robinson found that "the documents which are the subject of the subpoena concern Petitioners [P&C's] representation of its own clients and its evaluation of potential clients.  Accordingly, the undersigned finds, as Petitioner suggests, that 'the Subpoena is a naked attempt to gather information for use in evaluating, and perhaps litigating, a claim against [Phillips & Cohen].'  No interpretation of Rule 26 can be read to countenance such an effort." Id. (internal citation omitted).

Magistrate Robinson's holding is in error for multiple reasons.  Magistrate Robinson erroneously based her ruling exclusively on Modified Requests 6-9, *which are no longer at issu*e, and ignored Modified Requests 1-5, 10-12, *the only requests that remain at issue*.  On their face, Modified Requests 1-5, 10-12 seek documents that are directly relevant to either explicit allegations asserted in Plaintiffs' malpractice claim or in defense to C&B's fee claims.  These requests do not, *in any way*, seek documents related to P&C's representation of its own clients and its evaluation of potential clients or to any potential claim against P&C.

1.      **Magistrate Robinson erroneously based her Memorandum Order on Modified Requests 6-9, which were no longer at issue.**

It was in error for Magistrate Robinson to hold that Plaintiffs' subpoena sought information relating to P&C's representation of its own clients and its evaluation of potential clients or to any potential claim against P&C, as any request for such information was no longer at issue.  Prior to oral argument before Magistrate Robinson, Plaintiffs and P&C entered into an agreement in which P&C agreed to provide certain information in exchange for Plaintiffs

16

withdrawing Modified Requests 6-9.  In P&C's Reply Brief and at oral argument, counsel for

P&C advised Magistrate Robinson of this agreement.  P&C's Reply, pp. 2-3 (Dkt. 14); Oral

Argument Transcript, p. 4, line 5 to p. 5, line 5.  The information sought in Modified Requests 6-

9 and Plaintiffs' Rule 1.18 letter was the basis for which P&C claimed that C&B's Subpoena

sought documents related to the representation of its client and was an attempt to gather

information for use in evaluating a claim against P&C.  Motion to Quash, pp. 2 and 7-8.  The

withdraw of Modified Requests 6-9, therefore, mooted P&C's argument that Plaintiffs'

Subpoena sought such information.  The remaining requests, Modified Requests 1-5, 10-12, do

not, *in any way*, seek documents related to P&C's representation of its own clients and its

evaluation of potential clients or to any potential claim against P&C.  Accordingly, it was in

error for Magistrate Robinson to base her Memorandum Order on Modified Requests 6-9, as

such requests were no longer at issue.

> **2.    The Modified Requests at issue seek relevant information, as they request documents relating directly to explicit allegations in Plaintiffs' malpractice action.**

Magistrate Robinson's holding that Plaintiffs' subpoena "seeks documents which are of

no conceivable relevance" is without any factual basis.  Magistrate Robinson simply ignores

Modified Requests 1-5, 10-12, *the only requests that remain at issue*.  Federal Rule of Civil

Procedure 26(b)(1) provides that a party may gather discovery regarding "any matter" from any

source, including non-parties, possessing relevant information or documents.  Relevancy is

"broadly construed and encompasses any material that bears on, or that reasonably leads to other

matters that could bear on, any issue that is or may be in the case."  In re Veiga, 746 F. Supp. 2d

8, 19 (D.D.C. 2010)(quoting Alexander v. Fed. Bureau of Investigation, 194 F.R.D. 316, 325

(D.D.C. 2000)).  A request for discovery should be allowed unless it is clear that the information

sought can have no possible bearing on the claim.  Id.  Where, as here, a subpoena is served in a

district with respect to an action pending in another district, "[the] court . . . should hence be

cautious in determining relevance of evidence, and in case of doubt should err on the side of permissive discovery[,]" since the court with jurisdiction of the discovery dispute "generally has limited exposure to and understanding of the primary action." Flanagan v. Wyndham International Inc., 231 F.R.D. 98, 103 (D.D.C. 2005) (citations omitted).  Additionally, on a motion to quash a subpoena, the merits of a case are not at issue.  See Arista Records LLC v. Does 1-19, 551 F. Supp. 2d 1, 8 (D.D.C. 2008) ("factual and technical arguments . . . are unrelated to any appropriate inquiry associated with a motion to quash").

In this case, Modified Requests 1-5, 10-12 seek documents directly relevant to Plaintiffs' malpractice action.  See supra, pages 10-12 (Sections II, E and F).

These requests refer directly to explicit allegations that C&B failed to appropriately represent Plaintiffs in numerous respects, including, but not limited to, as follows:

1)   Failing to file an adequate Original Complaint, thus jeopardizing Plaintiffs' position as first-filed relators (**Modified Requests 1-4, 11-12**);

2)   Failing to negotiate an appropriate sharing agreement between Plaintiffs and P&C's relators (**Modified Requests 1-4**);

3)   Failing to adequately represent Plaintiffs' interests subsequent to the execution of the sharing agreement by, in essence, ceding prosecution of the case against GSK to P&C and relying on P&C to perform most of the work (**Modified Requests 1, 5, 11-12**); and

4)   Misrepresenting the protective order entered in the GSK Lawsuits regarding data mining (**Modified Requests 1, 5**).

5)   Failing to disclose to Plaintiffs C&B's relationship with P&C (**Modified Requests 10, 11**).

Although Magistrate Robinson simply ignores Modified Requests 1-5, 10-12 in her Memorandum Decision, in P&C's Motion to Quash, P&C claims that Plaintiffs' requests concerning first-to-file matters, the quality of C&B's services, and the fee dispute "*seek purely irrelevant information*."  P&C Memorandum, p. 25-26, 29-30 (Dkt. 1).  P&C argues that "P&C's and the government's opinions, analysis, or casual comments concerning those matters … are

not admissible to prove or disprove the malpractice and fee claims at issue in this litigation and cannot lead to the discovery of any admissible evidence." Id. By P&C's definition of relevance, no third-party discovery could ever be relevant in a legal malpractice claim. Including, for example, a letter from P&C to the government stating that "Cross admitted to me that he committed malpractice by failing to include Paxil in the Original Complaint." This argument is frivolous. First-to-file matters, the quality of C&B's services, and the fee dispute are core issues in Plaintiffs' malpractice claim and C&B's counterclaim. Documents relating to such issues are plainly relevant.

Furthermore, Plaintiffs' Modified Requests relating to these core issues are narrowly tailored. The time period for Plaintiffs' Modified Request 3 seeking communications regarding first-to-file' matters and the quality of C&B's services is limited to the date that C&B filed the Original Complaint and the date of the sharing agreement (July 1, 2003 to February 29, 2004). The time period for its Modified Request 11 seeking documents referring to Plaintiffs' malpractice claim and C&B's fee dispute is limited to the date just before Plaintiffs terminated C&B to the present (September 2009 to the present).

P&C also objects to producing its communication with C&B as not being relevant because the purported majority of such communications relate to mundane correspondence  regarding the ordinary, day-to-day administration of litigation. P&C Memorandum, p. 24 (Dkt. 1). Such "mundane" correspondence regarding the administration of the GSK Lawsuits is directly related to C&B's *quantum meruit* counterclaim. It will show that Cross ceded responsibility of the case to P&C and that P&C performed the majority of work advancing the GSK Lawsuits.

**B.**      **Plaintiffs Are Entitled to P&C's Communications With C&B (i.e., Modified Request 1) Because Such Communications Are Not Equally Available From C&B.**

P&C objects to producing communications with C&B claiming that it imposes an undue burden inasmuch as the same documents are available from C&B.  This objection should be overruled.  In their Opposition filed with the Court (Dkt 11), Plaintiffs demonstrated that the production of documents by C&B was not complete.  C&B has admitted that emails from critical periods in the case have been lost.  C&B cannot certify that it has produced all communications with P&C.  Seidman Declaration, ¶¶ 7-28 (attached as Exhibit "C" to Plaintiffs' Opposition (Dkt 11)).  In each of the cases cited by P&C, the courts held that the documents requested from the non-party were available from a party to the litigation.  Educ. Fin. Council v. Oberg, 2010 U.S. Dist. LEXIS 102221, 8-9 (D.D.C. Mar. 8, 2010)(subpoena "imposes an undue burden on EFC because it appears many, if not all, of EFC's communications with the defendants are available from the defendants"); Burlodge Ltd. v. Standex Int'l Corp. (In re Motion to Compel Compliance), 257 F.R.D. 12, 19 (D.D.C. 2009)("subpoena is "unduly burdensome because of the absence of any showing that the information sought is not available from other sources"); Nidec Corp. v. Victor Co., 249 F.R.D. 575, 577 (N.D. Cal. 2007)("There is simply no reason to burden nonparties when the documents sought are in possession of the party defendant.").  Here, all communications between P&C and C&B are not available from C&B.

In her Memorandum Order, Magistrate Robinson held that "it is a judge of the District of Massachusetts, rather than a judge of this district, who must determine the sufficiency of a party's responses to discovery requests propounded in the civil action pending in the District of Massachusetts."  Memorandum Order, p. 5.  Magistrate Robinson held that Plaintiffs are first required to file a motion to compel against C&B in the District of Massachusetts.  This is not the case.  C&B has admitted to deleting emails that cannot be recovered.  The District of Massachusetts cannot compel C&B to produce what it does not possess.  To the extent that

Magistrate Robinson suggests that Plaintiffs should file a spoliation motion, such a motion would be premature before first determining whether the deleted documents are available from another source, i.e., from P&C.

Plaintiffs have amply demonstrated C&B's document production is not complete. Discovery has revealed that C&B neglected to maintain a substantial number of emails between C&B and P&C that C&B no longer possesses due to C&B failing to retain the Outlook files. See supra pages 12-15, Section F.

Assuming for argument sake that it turns out that C&B did in fact maintain and produce all of its emails with P&C, at worst P&C would have been required to search the emails of one (1) custodian, i.e., Erika Kelton, for one (1) email address, i.e., Keith Cross' email address, and produce a total of 1,174 emails, none of which are privileged requiring a privilege review. See supra pages 12-15, Section F. This is hardly an undue burden for a law firm with P&C's resources and expertise in reviewing document productions including millions of documents.

Furthermore none of the cases requiring discovery from parties before non-parties involve situations where such parties' honesty in sharing information is at the heart of the lawsuit and very much in question. In addition to deleting emails, Plaintiffs have also demonstrated that C&B failed to produce documents that it in fact possessed. For example, P&C previously claimed that it had not received a copy of the protective order entered in the GSK Lawsuits. When Cross first turned over a copy of his file to replacement counsel, he represented to replacement counsel and to Plaintiffs' counsel that such copy was a complete copy of his file. That turned out to be false. In Cross's recent response to the Colorado Disciplinary Board's investigation, Cross attached to that response a copy of the March 28, 2008 protective order issued by Judge Gertner, as well as an October 6, 2008 letter from U.S. Attorney, Sara Bloom, enclosing the protective order. Neither document was included in Cross's previously produced file, even though they naturally belong in the file. Seidman Declaration, ¶27 (attached as Exhibit

21

"C" to Plaintiffs' Opposition (Dkt 11)).  This is the same protective order that Cross falsely told

his clients allowed only attorneys to data-mine the government's database.  Complaint, ¶¶ 143-

149.  (attached as Exhibit "A" to Plaintiffs' Opposition (Dkt 11)).

 "'[I]n appropriate circumstances, production from a third party will be compelled in the

face of an argument that the 'same' documents could be obtained from a party, because there is

reason to believe that the files of the third party may contain different versions of documents,

additional material, or perhaps, significant omissions.'"  Viacom Int'l, Inc. v. YouTube, Inc.,

2008 U.S. Dist. LEXIS 79777 (N.D. Cal. Aug. 18, 2008)(quoting Visto Corp. v. Smartner Info.

Sys., Ltd.,2007 U.S. Dist. LEXIS 8481 (N.D. Cal. Jan. 29, 2007)).   In Viacom, the California

district court compelled non-parties to produce communications between the non-parties and the

defendant.  The court held, "there is no general rule that plaintiffs cannot seek nonparty

discovery of documents likely to be in defendant's possession. … Plaintiffs have provided the

Court with sufficient reason to believe that respondents' files may contain additional material.

Defendant YouTube's poor initial record keeping raises questions about the completeness of its

files, and neither YouTube nor respondents have provided the Court with reason to believe that

YouTube retained all communications and documents shared with respondents."  Id at 10-11

(N.D. Cal. Aug. 18, 2008).  See also Coffeyville Res. Ref. & Mktg. LLC v. Liberty Surplus Ins.

Corp., No. 08-00017, 2008 U.S. Dist. LEXIS 91224, at *5 (E.D. Ark. Nov. 6, 2008)("there is no

absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as

can be obtained from a party, nor is there an absolute rule providing that the party must first seek

those documents from an opposing party before seeking them from a non-party."); Software

Rights Archive, LLC v. Google, Inc., 2009 U.S. Dist. LEXIS 43835 (D. Del. May 21,

2009)("where a party requests documents from a non-party that are likely to be in the possession

of an opposing party, production of documents is appropriate where those documents constitute a

"non-well-defined set" "whose completeness is not readily verifiable …  [I]n these

circumstances, allowing for discovery from both the party and non-party, completeness of discovery is more likely to be achieved.")  Like the defendant in Viacom, C&B's poor record keeping, incomplete production, and deletion of files raises questions about the completeness of its files, and P&C has not provided the Court with reason to believe that C&B retained all communications and documents shared with P&C.

**C.      Plaintiffs Are Entitled to Any Agreements Relating to Any Other Commercial Relationship Between P&C and C&B (i.e., Modified Request 1) Because Such Agreements Are Not Equally Available From C&B.**

In their Complaint, Plaintiffs allege that Cross failed to disclose at least one agreement between P&C and C&B for C&B to serve as local counsel for P&C in an unrelated matter. Complaint, ¶¶ 170-172.  In Modified Request 10, Plaintiffs request "[a]ll agreements or proposed agreements relating to any business or commercial relationship or potential relationship between P&C and C&B other than the GSK Lawsuits from 2001 through the present."  P&C objects to producing such agreements with C&B claiming that it imposes an undue burden inasmuch as the same documents are available from C&B.  P&C also argues that C&B is co-counsel to P&C on one or more cases that are under seal pursuant to statute and court order, and that P&C cannot produce the requested information without violating the seal in those cases.  Motion to Quash, pp. 24-25.

P&C's objections should be overruled.  First, all local counsel agreements are not equally available from C&B.  As set forth in a letter dated August 2, 2013 from counsel for C&B to counsel for Plaintiffs (attached as Exhibit 4), counsel for C&B stated that C&B entered into three (3) local counsel agreements, but that C&B possess only copies of the agreements for two (2) of the three (3) matters.  As to P&C's objection based on confidentiality, as counsel for Plaintiffs made clear at oral argument, P&C may redact any confidential information in its local counsel agreements with C&B.  Plaintiffs request only the number of local counsel agreements P&C

entered into with C&B, the year each agreement was entered into, and the general payment

terms.  See Oral Argument Transcript, p. 76, line 9 to p. 78, line 15.

**D.      Plaintiffs' Modified Requests 3 and 11 Seeking Communications With The Government Are Not Work Product.**

Although not addressed in Magistrate Robinson's Memorandum Order, P&C also objects

to producing documents relating to first-to-file matters, the quality of C&B's services, and the

fee dispute based on the work-product privilege pursuant to Rule 26(b)(3), Hickman v. Taylor,

329 U.S. 495 (1947), Rule 26(c) and Rule 45.  P&C argues that all such documents were made in

anticipation of litigation and that, based on the common interest doctrine, P&C did not waive the

work product privilege by disclosure of any such documents to the government.  P&C Motion to

Quash, pp. 25-28.  P&C is wrong on both accounts.  The work product doctrine does not protect

materials prepared by P&C in the present litigation because P&C's clients are not parties to this

litigation and protecting P&C's communications with the government and documents referring

to such communications is not consistent with Hickman.  Even if the work product doctrine did

apply, the common interest doctrine does not apply to the disclosure of the requested

communications because such communications were not designed to facilitate a common legal

interest shared by P&C's clients and the government.

Rule 26(b)(3) protects attorney "work product" from discovery in certain specified

circumstances. The Rule provides in pertinent part: "[A] party may obtain discovery of

documents and tangible things … prepared in anticipation of litigation or for trial by or for

another party or by or for that other party's representative only upon a showing that the party

seeking discovery has substantial need of the materials in the preparation of the party's case and

that the party is unable without undue hardship to obtain the substantial equivalent of the

materials by other means."  Fed.R.Civ.P. 26(b)(3).  To qualify for protection against discovery

under this rule, documents must have two characteristics: (1) they must be "prepared in

24

anticipation of litigation or for trial," and (2) they must be prepared "by or for another party or by or for that other party's representative." Id.

The Rule, on its face, limits its protection to one who is a party (or a party's representative) to the litigation in which discovery is sought. The federal courts have repeatedly held, when confronted with the issue, that a non-party witness may not invoke work-product protection under this rule to preclude production of materials prepared by or for that witness, even if created in contemplation of the witness's own pending or anticipated litigation. Thus, "documents prepared by one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) … ." 8 C. Wright, A. Miller & R. Marcus, Federal Practice & Procedure: Civil § 2024 at 354-56 (2d ed. 1994). Accord, 6 Moore's Federal Practice § 26.70[4] at 26-218.3. This conclusion has been adhered to by the Supreme Court in *dictum*, by at least four circuit courts and by numerous district courts. Federal Trade Commission v. Grolier Inc., 462 U.S. 19, 25 (1983) (citing 8 Wright & Miller, Federal Practice and Procedure § 2024 at 201 (1970)); Tambourine Comercio Internacional SA v. Solowsky, 312 Fed. Appx. 263, 284 (11th Cir. 2009); In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 924 (8th Cir. Ark. 1997); Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co., 1994 U.S. App. LEXIS 3828 (6th Cir. 1994)(unpublished); In re California Public Utilities Comm'n, 892 F.2d 778, 781 (9th Cir. 1989) In re California Public Utilities Comm'n, 892 F.2d 778, 781 (9th Cir. 1989); Westwood Prods. v. Great Am. E&S Ins. Co., 2011 U.S. Dist. LEXIS 84171 (D.N.J. Aug. 1, 2011); LG Elecs., Inc. v. Motorola, Inc., 2010 U.S. Dist. LEXIS 116652 (N.D. Ill. Nov. 2, 2010); Jean v. City of New York, 2010 U.S. Dist. LEXIS 2282 (E.D.N.Y. Jan. 12, 2010); Bryant v. Ferrellgas, Inc., 2008 U.S. Dist. LEXIS 47148 ( E.D. Mich. June 17, 2008); Abdell v. City of New York, 2006 U.S. Dist. LEXIS 66114 (S.D.N.Y. Sept. 14, 2006); Ramsey v. NYP Holdings, Inc., 2002 U.S. Dist. LEXIS 11728, 18-20 (S.D.N.Y. June 26, 2002); Burton v. R.J. Reynolds Tob. Co., 200 F.R.D. 661, 676 (D. Kans. 2001); Go Medical Industs. Pty., Ltd. v. C.R. Bard, Inc., 1998 U.S. Dist.

LEXIS 22919, 1998 WL 1632525, *6 (D. Conn. Aug. 14, 1998); In re Polypropylene Carpet

Antitrust Litig., 181 F.R.D. 680, 691 (N.D. Ga. 1998); Hunter v. Heffernan, 1996 U.S. Dist.

LEXIS 9244, 1996 WL 363842, *4 (E.D. Pa. June 28, 1996); Schultz v. Talley, 152 F.R.D. 181,

184 (W.D. Mo. 1993); Doubleday v. Ruh, 149 F.R.D. 601, 606 (E.D. Cal. 1993); Hawkins v.

South Plains Int'l Trucks, Inc., 139 F.R.D. 682, 683-84 (D. Colo. 1991); Polycast Technology

Corp. v. Uniroyal, Inc., 1990 U.S. Dist. LEXIS 12444, 1990 WL 138968, *1-2 (S.D.N.Y. Sept.

20, 1990); Gomez v. City of Nashua, 126 F.R.D. 432, 434 n.1 (D.N.H. 1989); Chaney v. Slack,

99 F.R.D. 531, 533 (S.D. Ga. 1983); Galambus v. Consolidated Freightways Corp., 64 F.R.D.

468, 473 (N.D. Ind. 1974).

Courts occasionally apply Rule 26(b)(3) analysis to work-product objections by a non-

party who is subject to a subpoena, but in those cases, the parties typically have not argued the

inapplicability of that rule to a non-party's own work-product.  For example, the cases cited by

P&C do not include any discussion as to the applicability of Rule 26(b)(3) to a non-party.  P&C

Memorandum, p. 13 (citing In re Sealed Case, 856 F.2d 268, 270 (D.C. Cir. 1988); National

Union Fire Ins. Co. v. Murray Sheet Metal Co., 967 F.2d 980 (4th Cir. W. Va. 1992); Roatan

Cruise Terminal, S.A. de S.V. v. HPA, Inc., 2011 U.S. Dist. LEXIS 109223 (S.D. Fla. Sept. 26,

2011); Official Comm. of Admin. Claimants v. Bricker, 2011 U.S. Dist. LEXIS 49504 (N.D.

Ohio 2011).  The fact that these courts ultimately applied Rule 26(b)(3) *sub silentio* to a non-

party is not necessarily evidence of how the courts would rule if it had been argued that Rule

26(b)(3) did not apply to a non-party.  In fact, in Tambourine, the eleventh circuit held that Rule

26(b)(3) does not apply to non-parties. 312 Fed. Appx. at 284.  Therefore, had it been argued that

Rule 26(b)(3) did not apply to the non-party in the Roatan case cited by P&C, the Florida district

court would have been bound by Tambourine to agree.

Some courts have held that the work-product doctrine is only a partial codification of the work product doctrine and have extended the privilege when doing so furthers the purposes underlying the <u>Hickman</u> decision.  <u>Crosby v. City of New York</u>, 269 F.R.D. 267, 278 (S.D.N.Y. 2010).   The purposes include: "protecting an attorney's ability to formulate legal theories and prepare cases, preventing opponents from 'free-loading' off their adversaries' work, and preventing interference with ongoing litigation. 'In some instances it was also significant that the non-party was at least potentially a party or had interests that were likely to be affected by the litigation in which the work product was sought.'"  <u>Id</u>. (citations and footnotes omitted).

In this case, the principles of the work product doctrine do not support its application to P&C's communications with the government and documents referring to such communications. P&C's clients are <u>not</u> Plaintiffs' adversaries.  Plaintiffs will in no way be "free-loading" off of P&C's clients.  P&C's clients have no case to prepare, and there is no danger that Plaintiffs will use the documents against them.  This is not a situation like the one in <u>Eirini Zagklara v. Sprague Energy Corp</u>. cited by P&C where the non-party is one of multiple individuals liable for the plaintiff's injuries and could be later joined as a defendant.  2011 U.S. Dist. LEXIS 56782, 6-7 (D. Me. May 26, 2011).  In <u>Eirini</u>, the court was concerned with the following situation:

> Whenever multiple individuals or entities might be liable for a plaintiff's injury, the plaintiff could sue only one and immediately subpoena a report prepared for another potentially-liable party. After obtaining the report, the plaintiff could then amend his or her complaint to add that party as a defendant. That possibility is not one that would be countenanced by any court interpreting the work product doctrine or Rule 26(b)(3).
>
> Unless and until it is clearly shown that Armada (Greece) is not and cannot be made a party to this case, the plaintiff's argument is premature.

<u>Id</u>.

In this case, P&C's clients are not (and cannot be) liable for Plaintiffs' malpractice claims against C&B. There is no reasonable basis to contend that P&C's clients will be joined as defendants in Plaintiffs' malpractice claim. There is also no reasonable basis to contend that disclosure of P&C's communications with the government regarding first-to-file matters, the quality of C&B's services, and the fee dispute will in any way harm or prejudice P&C's clients.

In P&C's Motion to Quash, P&C also argues that some courts have held that third-party work product is excluded from discovery under Rule 45 and Rule 26(c). Motion to Quash, pp. 16-17, 27, 30. Rule 45 permits non-parties to seek protection from a subpoena that "requires disclosure of privileged or other protected matter." P&C also argues that a protective order may be issued under Rule 26(c) to prevent disclosure of non-party work product. As set forth in the cases cited by P&C in its Motion to Quash, the condition precedent for protecting third-party "work product" under these Rules is, of course, that the information at issue must be "work product," as defined under <u>Hickman</u>. In this case, as set forth above, the communications at issue are not protected work product under <u>Hickman</u>.

Even if the work product doctrine did apply, the common interest doctrine does not apply to the disclosure of the requested communications to the government because such communications were not designed to facilitate a common legal interest shared by P&C's clients and the government. The common interest doctrine is not a privilege in and of itself. Rather, it is an exception to the rule on waiver where communications are disclosed to third parties. <u>See</u> <u>United States v. Bergonzi</u>, 216 F.R.D. 487, 495-96 (N.D. Cal. 2003)(discussing "the common interest exception to waiver of the attorney-client/work product privilege"). "The common interest privilege … applies where (1) the communication is made by separate parties in the course of a matter of common [legal] interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." <u>Id</u>. at 495.

P&C cannot demonstrate that the specific communications at issue were designed to facilitate a common legal interest.  If a common interest has been proved to exist, "the party seeking to rely on the doctrine must still demonstrate that the *specific communications at issue* were designed to facilitate a common legal interest … ."  Intex Rec. Corp. v. Team Worldwide Corp., 471 F. Supp. 2d 11, 16 (D.D.C. 2007)(Minebea Co. v. Papst, 228 F.R.D. 13, 23 (D.D.C. 2005)).   While Plaintiffs acknowledge that P&C's clients and the government share a comment interest in the government's FCA litigation against GSK, P&C's communications, "*casual comments*" as P&C calls them, with the government relating to first-to-file matters, the quality of C&B's services, and the fee dispute between C&B and Plaintiffs were not designed to facilitate such common legal interest.  P&C shares no common interest with the government on such issues.  P&C, therefore, waived any privilege relating to communications with the government relating to first-to-file matters, the quality of C&B's services, and the fee dispute when it disclosed such communications to the government.

Even if P&C's communications with the government relating to first-to-file matters and the quality of C&B's services are work-product privileged, P&C waived the privilege by disclosing some of those communications with Plaintiffs.  For example, attached as Exhibit "G" to Plaintiffs' Opposition to Motion to Quash (Dkt 11) is a copy of a letter from P&C to the government discussing first-to-file issues and the sufficiency of Plaintiffs' Original Complaint that P&C shared with Plaintiffs.

Finally, in the unlikely event that this court finds that P&C's communications with the government are valid work product and that protection has not been waived, Plaintiffs still have a legitimate right to discovery because Plaintiffs have demonstrated a substantial need for such documents and communications.  The documents are not available from any other source and relate to core issues in Plaintiffs' malpractice action.  "Even where work-product protection applies, the protection is not absolute.  Disclosure of work product may be ordered if the party

seeking it can demonstrate substantial need for the information and an inability to obtain the

information, or a substantial equivalent of it, by other means without undue hardship."  Crosby v.

City of New York, 269 F.R.D. 267, 277 (S.D.N.Y. 2010).

> **E.      Plaintiffs' Modified Requests 2 and 4 Seeking Documents
> Reflecting or Referring to Communications Between P&C and
> C&B and P&C and the Government Are Relevant, Narrowly
> Tailored and Not Work Product.**

P&C objects to Modified Request 2 and 4 as seeking only work product and attorney-

client privileged communications.  P&C Motion to Quash, pp. 29-30 (Dkt. 1).  Modified

Requests 2 and 4 seek only documents reflecting or referring to  communications between P&C

and C&B and P&C and the Government from July 1, 2003 to February 29, 2004 related to (a) the

sufficiency and quality of Plaintiffs' Original Complaint; (b) the first-filed status of such

complaint; and (c) the sharing agreement."  Modified Request 11 seeks only "[d]ocuments,

including any communications with the Government, from September 2009 to the present

referring to Plaintiffs' malpractice claim and C&B's fee dispute."

As explained above, these requests are undeniably relevant.  They relate specifically to

allegations asserted in Plaintiffs' malpractice claim.

These requested documents are also not work product.  As described above, the work

product doctrine does not protect materials prepared by P&C in the present litigation because

P&C's clients are not parties to this litigation and protecting the requested documents is not

consistent with Hickman.

> **F.      Plaintiffs' Modified Request 5 Seeking Communications Between P&C and
> the Government Regarding Data Mining and the Protective Order Are
> Relevant, Narrowly Tailored and Not Work Product.**

In Modified Request 5, Plaintiffs seek "[a]ll documents, including any communications

between P&C and the Government, from January 1, 2007 to November 1, 2009 referring to the

data-mining project and/or the protective order entered in the GSK Lawsuits."  In the GSK

Lawsuits, the government agreed to let the relators and their counsel mine the documents in the government's investigatory file for data that could be used in the both Plaintiffs' case and P&C's clients' case against GSK, subject to a protective order (the Protective Order).  P&C on behalf of both its clients and Plaintiffs communicated with the government regarding the entry of the Protective Order and P&C's and Plaintiffs' efforts to data mine the government's investigatory file.  Although the Protective Order was entered in the case filed by P&C's relators in Massachusetts, the Protective Order, as set forth in paragraph two, applied also to Plaintiffs' *qui tam* case filed in Colorado, as the purpose of the Order was to aid not only P&C's clients, but also Plaintiffs.  See Protective Order (attached as Exhibit 6).

Although P&C does not specifically address P&C's communications with the government regarding the Protective Order and data mining in its Motion to Quash, P&C argues generally that all of its communications with the government are work product.  As described above, the work product doctrine does not protect materials prepared by P&C in the present litigation because P&C's clients are not parties to this litigation and protecting the requested documents is not consistent with Hickman.  Furthermore, communications between P&C and the government relating to the Protective Order are not work product, as such communications were to advance Plaintiffs' and P&C's collective efforts to data mine the government's investigatory file.

**G.     Plaintiffs' Modified Request 12 Seeking P&C's Letter to the Government Referenced in Its June 26, 2012 Letter to the Government Is Not Protected From Discovery Under Federal Rule of Evidence 408.**

Attached as Exhibit "G" to Plaintiffs' Opposition to Motion to Quash (Dkt 11) is a copy of a letter from P&C to the government discussing first-to-file issues and the sufficiency of Plaintiffs' Original Complaint that P&C shared with Plaintiffs.  In the first paragraph of the letter, P&C states that the letter is intended to be preliminary and that P&C intends to send the government "a more complete letter … ."  At the top of each page of the letter, P&C indicates

31

that the letter is "Privileged and Confidential Settlement Communication Per Federal Rule of Evidence 408."

Modified Request 12 seeks "[t]he letter referenced in paragraph 1 of P&C's June 26, 2012 letter to the Government … and all communications with the Government related to the June 26, 2012 letter and the "more complete letter" referenced therein. At oral argument, P&C argued that like the June 26, 2012 letter, the "more complete letter" to the Government was part of a settlement negotiation with the Government and protected from disclosure under Federal Rule of Evidence 408. This is not the case. The settlement privilege in Rule 408 does not apply. Rule 408 applies <u>only</u> to the admissibility of evidence at trial. It does <u>not</u> protect evidence from discovery. <u>In re Subpoena Issued to CFTC</u>, 370 F. Supp. 2d 201, 211 (D.D.C. 2005)(Court held that Rule 408 does not protect settlement communications from discovery.). Furthermore, under Rule 408 settlement offers are inadmissible only when offered to prove liability or damages. <u>See</u> Fed. R. Evid. 408. In this case, the letter at issue will not be used to establish liability on the part of P&C but will be used for another purpose.

Furthermore, it is indisputable that the June 26, 2012 letter and the "more complete letter" are not work product, but rather settlement communications exchanged with an adversary. P&C does not argue otherwise.

### H.     Plaintiffs' Modified Requests at Issue Do Not Cause Any Undue Burden on P&C.

In her Memorandum Order, Magistrate Robinson found that P&C has demonstrated – through a declaration – that compliance with the subpoena would impose a "substantial and undue" burden. Magistrate Robinson asserts that Plaintiffs' did "not attempt" to rebut P&C's declaration. Memorandum Order, p. 5. This is not case. Magistrate Robinson's reliance on P&C's Declaration, *drafted before Plaintiffs modified their requests and withdrew Modified Requests 6-9*, is erroneous. Plaintiffs mooted most, *if not all*, of the purported burden that P&C

asserts in its Declaration when Plaintiffs modified the requests in their Opposition to P&C's

Motion to Quash and withdrew Modified Requests 6-9 by agreement.  In its Opposition, Plaintiffs

also make clear that they did not require P&C to log its attorney-client privileged communications

with its clients, except for any communications relating to P&C's evaluation of Thorpe's

prospective claim and handling of Thorpe's confidential information.  Opposition, p. 38 (Dkt. 11).

Now that Plaintiffs' have withdrawn their request for documents related to P&C's evaluation of

Thorpe's prospective claim and handling of Thorpe's confidential information (i.e., Modified

Requests 6-8), P&C is not required to provide a log for any attorney client communications.  At

oral argument, counsel for Plaintiffs also explained that any burden in searching for responsive

documents would be minimal.  As modified, the requests currently at issue would likely require

P&C to search only the emails of one (1) custodian, i.e., Erika Kelton, using a few key-word

searches.  Oral Argument Transcript, p. 53, line 8 to p. 54, line 7.  Prior to P&C filing its Motion

to Quash, on multiple occasions, Plaintiffs expressed a willingness to narrow their requests to

reduce the alleged burden on P&C.  Plaintiffs also proposed providing a list of key-words that

P&C could use to search its computer system for responsive documents and/or limiting searches

for requested documents to particular custodians.  P&C ignored Plaintiffs' letter.  See letter dated

April 22, 2013 (attached to Plaintiffs' Opposition as Exhibit "D").

         Requiring P&C to produce the requested documents will not cause any undue burden.

"The issue is not whether compliance creates a burden but rather whether that burden is unduly.

The issue of undue burden 'is, of course, a matter to be decided in the light of the circumstances

of the case … .'"  First Am. Corp. v. Sheik Zayed Bin Sultan Al-Nahyan, 1996 U.S. Dist. LEXIS

4577, 12-13 (D.D.C. 1996)(quoting Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395,

403 (D.C. Cir. 1984)).  "To evaluate the burden, the Court must consider 'the needs of the case,

the amount in controversy, the parties' resources, the importance of the issues at stake in the

action, and the importance of discovery in resolving the issues.'"  Id. (quoting Fed. R. Civ. P.

26(b)(2)(C)(iii)).  As set forth above, Plaintiffs' Requests seek documents directly related to the allegations asserted in their malpractice Complaint or the defenses raised in the counterclaim for a fee.

The amount in controversy is quite large.  The Massachusetts District Court is currently holding C&B's disputed contingency-fee award in the approximate amount of $30 million dollars pending the resolution of Plaintiffs' legal malpractice claim and C&B's fee dispute.

The issues at stake are not only important for both Plaintiffs and C&B, but also for protecting the integrity of the legal profession.  Compelling compliance with Plaintiffs' subpoena is particularly important due to C&B's failure to properly manage and preserve its file and evidence in this matter.  C&B had a duty to preserve documents and information that it knew, or reasonably should have known, would be relevant to this litigation.  C&B also had a duty to properly maintain and preserve its file while representing Plaintiffs.  C&B's failure to properly maintain and preserve its clients' file and evidence during active litigation is an extremely serious issue.  Such a failure by lawyers cannot be excused or allowed to further harm their former clients.

P&C has the resources to produce the requested documents.  It need not hire counsel (it is representing itself) and received a contingency-fee award plus statutory fees that likely exceed $30 million dollars.  According to its website, P&C "is the nation's most successful and most experienced law firm representing whistleblowers."   It claims that "[w]histleblower cases brought by Phillips & Cohen attorneys have recovered more than $11 billion in civil and related criminal settlements for government entities - a record of success that far exceeds any other law firm."  P&C website, http://www.phillipsandcohen.com/About-the-Firm.shtml (visited on May 24, 2013).  Certainly, P&C has the sophistication, the experience, and the resources to easily cull and produce the requested, non-privileged communications.

IV.     **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request this Honorable Court vacated

Magistrate Robinson's Memorandum Order and deny Phillips and Cohen, LLP's Motion to

Quash as provided in the form of Order attached as Exhibit 7.

Respectfully submitted,

**OBERMAYER REBMANN
MAXWELL & HIPPEL LLP**


_____/s/_____
Joseph J. McGovern, Esquire
(D.C. Bar No. 936609)
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone:  (215) 665-3000
Fax:  (215) 665-3165

*Attorney for Plaintiffs*
*Gregory Thorpe and Blair Hamrick*

Date: December 16, 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | |
| | NO.  1:13-mc-00405-JEB-DAR |
| GREGORY THORPE, *et al.* | |
| Plaintiffs | |
| vs. | NO.  1:12-cv-11632-RWZ Pending in District of Massachusetts |
| KEITH F. CROSS, *et al.* | |
| Defendants | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies and states that a true and correct copy of the attached

Response has been served via ECF upon the following:

> Peter Wilson Chatfield, Esquire
> PHILLIPS & COHEN LLP
> 2000 Massachusetts Avenue, NW
> Washington, DC 20036
>
> Stephen Hasegawa, Esquire
> PHILLIPS & COHEN LLP
> 100 The Embarcadero, Suite 300
> San Francisco, CA 94105

> _____/s/_____
> Joseph J. McGovern, Esquire
>
> *Attorney for Plaintiffs*
> *Gregory Thorpe and Blair Hamrick*

Dated: December 16, 2013

# EXHIBIT 1

# EXHIBIT 1

## EMAILS MISSING FROM C&B'S DOCUMENT PRODUCTION

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-HamrickK0085348 | 12/24/2002 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085892 | 1/9/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085288 | 1/14/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0085591 | 1/19/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0086299 | 1/21/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-HamrickK0085866 | 1/28/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0096843 | 1/28/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-HamrickK0085373 | 2/10/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085436 | 2/10/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085547 | 2/12/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085243 | 2/13/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0096873 | 2/19/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-HamrickK0085284 | 2/20/2003 | Greg Thorpe | Keith Cross | Greg Thorpe |
| Thorpe-HamrickK0085518 | 2/20/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085520 | 2/20/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085654 | 2/20/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0085194 | 2/22/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0085804 | 2/22/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0086129 | 2/22/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0086260 | 2/24/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0086103 | 2/26/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0085166 | 3/5/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0086269 | 3/5/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085923 | 3/17/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-HamrickK0085130 | 3/21/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085099 | 3/28/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-HamrickK0084894 | 4/7/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-HamrickK0085090 | 4/24/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-HamrickK0085575 | 4/28/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0085930 | 5/2/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-HamrickK0098018 | 5/15/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-HamrickK0086075 | 5/22/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-HamrickK0097922 | 5/24/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |

47681493

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-Hamrick0086398 | 5/29/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0085188 | 6/18/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0097011 | 6/18/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0085356 | 6/23/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0086309 | 6/23/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0086142 | 6/24/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0098017 | 7/14/2003 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0085091 | 7/16/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097035 | 7/22/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097957 | 7/23/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0085163 | 7/30/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085780 | 7/31/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086250 | 7/31/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085223 | 8/8/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085840 | 8/8/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086172 | 8/8/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086439 | 8/8/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0097977 | 8/9/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097953 | 8/11/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097874 | 8/12/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0086259 | 8/19/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0084879 | 8/20/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086020 | 8/21/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097100 | 8/21/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097980 | 8/21/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097981 | 8/21/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0084862 | 8/28/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0084964 | 8/28/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085021 | 8/28/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085960 | 8/28/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085641 | 9/4/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0097872 | 9/7/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097884 | 9/7/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097951 | 9/7/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0098010 | 9/7/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0098015 | 9/7/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |

47681493

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-Hamrick0097879 | 9/8/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0085637 | 9/11/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085557 | 9/16/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085246 | 10/7/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0086428 | 10/7/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097916 | 10/25/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097867 | 10/28/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0085963 | 11/3/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086434 | 11/11/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097899 | 11/11/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097970 | 11/11/2003 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0085002 | 11/20/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085170 | 12/12/2003 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0084954 | 12/16/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085971 | 12/16/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085488 | 12/17/2003 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086386 | 12/17/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0098028 | 12/17/2003 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0084900 | 1/7/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086151 | 1/22/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097298 | 1/22/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097299 | 1/23/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097305 | 1/28/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097306 | 1/30/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0085333 | 2/3/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0085482 | 2/4/2004 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0097315 | 2/4/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097982 | 2/17/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097988 | 2/17/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0086451 | 2/19/2004 | Greg Thorpe | Keith Cross | |
| | | | Blair Hamrick | |
| Thorpe-Hamrick0097959 | 3/15/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |

47681493

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-Hamrick0097966 | 3/20/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097976 | 3/20/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0085409 | 3/24/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0085044 | 3/25/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085817 | 3/25/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086415 | 3/25/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0098019 | 3/27/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0085442 | 3/29/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085761 | 3/31/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085851 | 3/31/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085548 | 4/7/2004 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0086240 | 4/20/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0085691 | 5/4/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0085697 | 5/5/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0085870 | 5/13/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0086311 | 5/13/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0097434 | 6/2/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0097437 | 6/2/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0097445 | 6/3/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0085807 | 6/5/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0097997 | 6/9/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0097931 | 6/16/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0095876 | 6/21/2004 | Blair Hamrick | Greg Thorpe | |
| Thorpe-Hamrick0097927 | 6/21/2004 | Blair Hamrick | Keith Cross | Greg Thorpe |
| Thorpe-Hamrick0085590 | 7/1/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085687 | 7/8/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | |
| Thorpe-Hamrick0085981 | 7/21/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick<br>Greg Thorp | |
| Thorpe-Hamrick0085181 | 7/27/2004 | Greg Thorpe | Keith Cross | |

47681493

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-Hamrick0085484 | 7/30/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0097486 | 7/31/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0085289 | 8/22/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0097494 | 8/22/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0085249 | 8/24/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0086322 | 8/24/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0086118 | 8/26/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0097510 | 8/26/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0086465 | 9/11/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | Blair Hamrick |
| Thorpe-Hamrick0084927 | 9/13/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0085182 | 9/14/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0085646 | 9/14/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0097545 | 9/16/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0084896 | 9/21/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086059 | 9/21/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086048 | 9/23/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0097567 | 9/23/2004 | Greg Thorpe | Keith Cross / Blair Hamrick | |
| Thorpe-Hamrick0085416 | 10/2/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085320 | 10/5/2004 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0085784 | 10/7/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085273 | 10/11/2004 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0086084 | 10/11/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086161 | 10/18/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085836 | 11/6/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086169 | 11/16/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085790 | 11/18/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085206 | 11/19/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085019 | 11/22/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |

47681493

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-Hamrick0085948 | 12/2/2004 | Greg Thorpe | Keith Cross<br>Blair Hamrick | Blair Hamrick |
| Thorpe-Hamrick0086423 | 12/3/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085472 | 12/7/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085647 | 12/7/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085148 | 12/15/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0084925 | 12/19/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0085474 | 12/23/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0086102 | 12/23/2004 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088810 | 6/20/2006 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0088910 | 6/20/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088852 | 6/21/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089250 | 6/22/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089283 | 8/24/2006 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0078407 | 10/9/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088765 | 10/12/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088858 | 10/20/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089070 | 10/20/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088905 | 10/25/2006 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0088896 | 11/20/2006 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0089016 | 12/1/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089015 | 12/2/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088745 | 12/14/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088744 | 12/15/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089063 | 12/19/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088920 | 12/22/2006 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088991 | 1/4/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0079816 | 1/5/2007 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0088800 | 1/5/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089192 | 1/5/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088768 | 1/16/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088752 | 1/19/2007 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0089159 | 1/22/2007 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0092388 | 1/22/2007 | Blair Hamrick | Keith Cross | |
| Thorpe-Hamrick0088837 | 1/24/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0087299 | 1/26/2007 | Blair Hamrick | Keith Cross<br>Greg Thorpe | |
| Thorpe-Hamrick0089164 | 2/8/2007 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0088979 | 2/12/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089091 | 2/14/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088797 | 2/15/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089100 | 2/16/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |

47681493

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-Hamrick0089109 | 2/21/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088835 | 3/1/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089075 | 3/6/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0087254 | 4/1/2007 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0133623 | 4/12/2007 | Blair Hamrick | Keith Cross | |
| Thorpe-Hamrick0078338 | 5/7/2007 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0087261 | 5/9/2007 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0087262 | 5/9/2007 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0088985 | 5/9/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089113 | 5/9/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0079214 | 5/10/2007 | Keith Cross | Blair Hamrick | Blair Hamrick |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0078406 | 5/11/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089239 | 5/11/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0087268 | 5/21/2007 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0088793 | 5/22/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089266 | 5/22/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0087269 | 5/25/2007 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0089034 | 5/26/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0078399 | 5/29/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0087271 | 6/6/2007 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0089029 | 6/7/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089174 | 6/9/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089217 | 6/13/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089218 | 7/4/2007 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0088801 | 7/23/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088850 | 7/26/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089115 | 9/5/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089246 | 9/14/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088883 | 9/19/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088753 | 9/25/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089193 | 9/27/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0078408 | 10/4/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089251 | 10/4/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089244 | 10/20/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089253 | 10/23/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |

47681493

| Production Bates# | Email Date | From | To | Cc |
|---|---|---|---|---|
| Thorpe-Hamrick0089254 | 10/23/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088779 | 11/5/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089169 | 11/19/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089263 | 11/26/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088957 | 12/5/2007 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0088763 | 1/2/2008 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089270 | 1/5/2008 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0088943 | 2/8/2008 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089201 | 3/1/2008 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089222 | 3/17/2008 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0089166 | 3/18/2008 | Greg Thorpe | Keith Cross | Blair Hamrick |
| Thorpe-Hamrick0087562 | 11/4/2008 | Greg Thorpe | Keith Cross | |
| Thorpe-Hamrick0092427 | 4/9/2009 | Blair Hamrick | Keith Cross | |
| | | | Greg Thorpe | |
| Thorpe-Hamrick0087597 | 9/30/2009 | Greg Thorpe | Keith Cross | |

47681493

# EXHIBIT 2

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | |
| | NO.  1:13-mc-00405-JEB-DAR |
| GREGORY THORPE, *et al.*<br><br>Plaintiffs<br><br>vs.<br><br>KEITH F. CROSS, *et al.*<br><br>Defendants | NO.  1:12-cv-11632-RWZ<br>Pending in District of Massachusetts |

## <u>DECLARATION OF H. DAVID SEIDMAN, ESQ.</u>

I, H. David Seidman, certify and state as follows:

      1.      I am an attorney with the law firm of Obermayer Rebmann Maxwell & Hippel LLP and represent Gregory Thorpe and Blair Hamrick, plaintiffs in the above captioned litigation ("Plaintiffs").  I have personal knowledge of the facts set forth below.

      2.      At the time Magistrate Robinson took P&C's Motion to Quash under advisement in August, 2013, Plaintiffs had not completed processing their document production, and therefore, were not able to fully compare their document production with C&B's document production to further demonstrate that the production of documents by C&B was not complete.

      3.      At the time of argument on P&C's Motion to Quash, Plaintiffs were able to identify only a few communications between Plaintiffs and C&B exchanged during the *qui tam* litigation that were in Plaintiffs' document production in the malpractice action, but that were not included in C&B's document production in the malpractice action.

4.      Plaintiffs have now performed a more comprehensive comparison of C&B's document production with Plaintiffs' document production and have been able to identify at least two hundred forty-eight (248) communications between Plaintiffs and C&B that were exchanged during the *qui tam* litigation, but that were <u>not</u> included in C&B's document production in the underlying malpractice action.

5.      This is based on a random sampling of approximately 600 emails exchanged during the *qui tam* litigation between Plaintiffs and C&B that were included in Plaintiffs' document production in the malpractice action.

6.      Of this random sampling of approximately 600 emails, approximately forty-one percent (41%) were missing from C&B's document production.

7.      Attached as Exhibit 1 is a spreadsheet identifying these emails missing from C&B's production.

8.      Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_____/S/_____
H. David Seidman



Dated: December 16, 2013

# EXHIBIT 3

# EXHIBIT 3

Thorpe  v. Cross          JOSEPH JAY BALDWIN                    10/25/2013

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:12-cv-11632-RWZ

RULE 30(b)(6) DEPOSITION OF
JOSEPH JAY BALDWIN - October 25, 2013
Cross & Bennett, LLC

GREGORY THORPE, et al.,

Plaintiffs,

v.

KEITH F. CROSS, et al.,

Defendants.

        PURSUANT TO NOTICE, the 30(b)(6) deposition
of JOSEPH JAY BALDWIN, Cross & Bennett, LLC, was taken
on behalf of the Plaintiffs at 370 17th Street, Suite
4800, Denver, Colorado 80202, on October 25, 2013, at
9:00 a.m., before Rita DeRouen, Registered
Professional Reporter and Notary Public within
Colorado.

Thorpe  v. Cross          JOSEPH JAY BALDWIN          10/25/2013

Page 57

1    management software, client, vendor, a file, you would

2    just simply attach it for permanent storage inside the

3    Amicus software so it existed in both places

4    permanently.

5          Q.   So from the user's perspective, the user

6    opens up Amicus and they see their e-mail just as they

7    would in Outlook; in fact, they'd see all the e-mail

8    that they had in Outlook as if they had opened

9    Outlook; is that correct?

10         A.   In the Amicus comm center, that's correct.

11         Q.   And Amicus tagged every e-mail or just

12   certain e-mails?  How did it know?

13         A.   It tagged every one, including calendar

14   events.  Everything inside of the PST file that Amicus

15   could present over in the Amicus environment, it would

16   have to tag it so that it knew it was new or changed

17   or a calendar entry that needed synchronization; that

18   was just how it handled the synchronization between

19   the two.

20         Q.   And how, then, did Amicus decide which

21   e-mails or other information to then permanently store

22   as well within the Amicus program itself?

23         A.   That was a user manual function.  Amicus

24   could show you e-mails specific to a file or a contact

25   by way of its intuition and know a certain name and

Thorpe  v. Cross          JOSEPH JAY BALDWIN               10/25/2013

Page 58

1     can show you all the e-mails to and from that certain

2     name; but that was on a viewing aspect.  The permanent

3     archival or storage of it was a user function, manual

4     function.  I don't know how their software is these

5     days, if it's any smarter, but that's how it was used

6     during the time frames we're talking about.

7          Q.    Okay.  So Mr. Cross, Mr. Bennett, I

8     believe you've testified that it's your understanding

9     that they essentially used Amicus as their e-mail

10    client.  They log into Amicus, they open up the comm

11    center, they see their e-mails, they see an e-mail

12    that is important to some file they're working on, and

13    they select it to be permanently saved into Amicus?

14         A.    Correct.  File any attachments that are in

15    it, any -- anything that was in there that they felt

16    was to be saved, that was case related and pertinent,

17    save it and store it.

18         Q.    But this is a manual function?

19         A.    Yes, that's a manual function.

20         Q.    Now, December 19 of 2007 -- at the end of

21    2007 and into 2007, was Cross & Bennett using Amicus?

22         A.    I don't know.  Again, I'm not sure when

23    they stopped using Amicus.  What was the last date you

24    said there?

25         Q.    This is like the end of '07 to the

Thorpe  v. Cross         JOSEPH JAY BALDWIN              10/25/2013

Page 59

```
 1   beginning of '08.  I'm pretty sure they were using

 2   Amicus after that.

 3          A.    Yeah, you're probably right.  I'm just not

 4   sure if they were using Amicus when I returned in

 5   2009.

 6          Q.    Yeah, I'm pretty sure they're using Amicus

 7   in --

 8          A.    Yeah, I agree; and I kind of recall when

 9   we deactivated it.

10          Q.    So they're using Amicus in this December

11   19, '07 time frame; that's when Mr. Cross gets the new

12   computer with the auto archive feature turned on, and

13   after presumably 14 days, it kicks in, and everything

14   that was more than six months old got taken off the

15   server and put into the archived PST on the local

16   driver; that's essentially what you think happened,

17   right?

18          A.    Yes.

19          Q.    And that, in fact, may be part of the

20   explanation as to why that drive then had subsequent

21   problems and that, all of a sudden, it had six years

22   -- or however many years of e-mails that got dumped to

23   it from the server; is that a hypothesis that sounds

24   reasonable?

25          A.    Yes, that is reasonable, because it filled
```

Thorpe  v. Cross          JOSEPH JAY BALDWIN                10/25/2013

                                                              Page 60

1    up that C drive.  When you fill a partition, it runs

2    the risk of damaging a partition.  Yes, we can see the

3    chain of events that led to it.

4          Q.   Now, when Mr. Cross, on that 15th day,

5    logs into Amicus and pulls up his e-mail, what's

6    Amicus showing him; the PST off the server or both

7    that PST and the archived PST?

8          A.   Any PST that the MAPI user profile knows

9    about.  So, yes, both; or at the time there were --

10   there would have been three.

11         Q.   Right.  Because there's the additional one

12   you created at that point?

13         A.   Correct.  Or there may have been four

14   depending on what date we're talking about because of

15   the one Rubel made.

16         Q.   Right.

17         A.   Nonetheless, it would be looking at any

18   PST the system knew about, and the only thing that

19   would have been different is Amicus just would have

20   taken a little longer than normal to open because it

21   was researching where all those catalogued e-mails now

22   were.

23         Q.   That computer then, within the next five

24   or six months, dies, Keith's desktop, and he gets --

25   Dell fixes it, he gets a new hard drive or whatever

Thorpe  v. Cross        JOSEPH JAY BALDWIN        10/25/2013

Page 61

1    happens.  And if I understand the situation, at that

2    point, you believe that that PST was gone, I mean,

3    that the local auto archived PST was lost with the

4    drive?

5         A.   We see that substantiated in Rubel's work

6    logs, that by May 29, 2008, when that drive died, it

7    was just days prior to that the 6 gigabyte file was on

8    that drive; so yes.

9         Q.   And so after he gets -- Mr. Cross gets the

10   new computer up and running, it's fixed, you know,

11   whatever is done to fix it, and then he logs into

12   Amicus again, now it will only be showing his archived

13   PST on the server, the archived -- the PST you

14   manually created that was on the server presumably and

15   whatever had been manually saved in Amicus?

16        A.   I believe that's correct.

17        Q.   Excuse me, plus the one that Mr. Rubel

18   made?

19        A.   Had made sometime in those couple days.

20   I'm not sure exactly if he made that one, if it was

21   pre or post the computer dying.

22        Q.   Just a quick question.  So in the April

23   '08 archive that Mr. Rubel made, if I understand the

24   e-mail, that archived PST file, the oldest e-mails

25   start around April of '08, there's nothing before that

Thorpe  v. Cross          JOSEPH JAY BALDWIN          10/25/2013

Page 62

1    in that file?

2         A.   (The deponent nodded head up and down.)

3         Q.   So, again, assuming Mr. Rubel made that --

4    or I guess the logs reflect that he made that; is that

5    correct?

6         A.   I'm not sure if his logs reflect he made

7    that exact file, it's -- there's enough in the logs

8    that -- there isn't anything specific in the logs, I

9    think, that say he made that file for Keith.  I don't

10   recall.  I'm not sure.

11        Q.   Is that an auto archive file?

12        A.   Based on the -- well, first, the fact that

13   it's over on the server, it looks like it was manually

14   put there; but then the naming convention of it too

15   looks like a user specifically made it, just like I

16   manually made mine, and then they only dragged a few

17   things in there.  I think it was done for

18   demonstration purposes.

19        Q.   The live PST file, the actual live

20   environment PST file, how far back in time does that

21   go?

22        A.   I think the oldest e-mail in there is in

23   the May/June '08 time period, April/May/June,

24   somewhere around there in these time frames we're

25   talking about.

Thorpe  v. Cross           JOSEPH JAY BALDWIN              10/25/2013

Page.63

```
 1         Q.   I'm sorry, just to be specific, that's
 2    Mr. Cross's live PST file we're talking about?
 3         A.   Yes, only.  That's the only one I'm
 4    referring to.
 5         Q.   What about Mr. Bennett's live PST file?
 6         A.   When we began looking at Keith's for the
 7    gap of e-mails, we did look at Joe's to make sure he
 8    didn't have a weird gap in that time frame, I do
 9    recall doing that now.  We didn't do a full,
10    exhaustive look, but together, I looked over his
11    shoulder to make sure that he did not have the same
12    gap.  Because we were trying to figure out why in the
13    world did Keith have the gap, and they were starting
14    to figure out it was an auto archive thing.
15              And now I do recall checking Joe's to make
16    sure there was no sign of his having done such a thing
17    and made empty folders and things.  And his was pretty
18    complete.  There was a little gap somewhere, but I
19    think we later searched and found it.  And one of the
20    things that we did, when we defined that gap in
21    Keith's, we were able to go into Amicus and pull up
22    those e-mails, they were clearly all there; by all, I
23    just mean there were tons and tons of e-mails in the
24    time frame that wasn't in the PST file, and that was
25    because Keith was diligent about saving anything that
```

Thorpe  v. Cross          JOSEPH JAY BALDWIN              10/25/2013

Page 64

1    matters inside Amicus.

2              He would have never known -- he never

3    realized that those same ones wasn't even in Outlook

4    because he was able to open it in Amicus.  And each

5    time I would ask him, Oh, do you see these e-mails;

6    sure, they're right here.  Well, he was opening them

7    in Amicus.  And that's when we began to dig really

8    deep into his actual Outlook and started finding his

9    empty folders and things.

10        Q.    Just to clarify a couple of things.  I

11   mean, you weren't there standing over Mr. Cross's

12   shoulder every time he opened an e-mail to see that he

13   did, in fact, every time save it in Amicus?

14        A.    Correct.

15        Q.    And so his diligence is, I presume, based

16   upon what he has told you about what his habits were?

17        A.    Because I know there's thousands upon

18   thousands, and that takes a lot of user time; I would

19   call that diligent.

20        Q.    Now, that saving of e-mails into Amicus,

21   however, as we've discussed, is a manual process.  So

22   with respect to e-mails dated prior to about, what,

23   April-ish of '08, or maybe even May/June of '08, if

24   the e-mail -- and with the exception of the archives

25   you made, if the e-mail -- if either Mr. Cross or

Thorpe   v. Cross            JOSEPH JAY BALDWIN                10/25/2013

Page 65

1   Mr. Bennett did not manually save it into Amicus, that

2   e-mail no longer exists in Cross & Bennett's systems?

3          A.    Can you repeat that.

4          Q.    Yeah, I'm sorry.   That was a wandering

5   question.  So we've talked about various archives.

6   There is an archive file that you've created that

7   contains Mr. Cross's sent e-mails from a period

8   starting May '04 through November of '05.   And

9   actually, before we get to the final, did you -- do

10  you remember, did you just copy the entire contents of

11  his sent box into that?

12         A.    I probably told him, Hey, let's leave the

13  last year, let's leave the last six months or

14  something like that so it would be easily findable if

15  he clicked the sent items looking for something

16  instead of going to search.

17         Q.    But I'm talking about, we know that this

18  archive -- my question was perhaps unclear.   The

19  archive contains the earlier e-mails in May of '04,

20  and the last e-mail time is November of '05, according

21  to the letter.  Within that time period, you moved

22  everything; you didn't pick and choose, well, this

23  e-mail we're going to put in the archive but this one

24  we're not?

25         A.    I'm sure I moved it by way of a group

Thorpe  v. Cross          JOSEPH JAY BALDWIN          10/25/2013

Page 66

1    selection; however, I don't know what that criteria

2    was and I'm not sure that those dates are -- I don't

3    know that that's entirely accurate without looking in

4    there again to see what the oldest e-mail was.  But,

5    nonetheless, if that's what we're talking about, maybe

6    I grabbed them, you know from a certain date all the

7    way down.

8          Q.    That's what I'm asking.

9          A.    That would have probably been the goal.

10         Q.    Yeah, that's what I'm --

11         A.    But I don't know what the date was.

12         Q.    So to get back to where we were headed

13   before that digression, there's an archive that you

14   create that is sent e-mails from Mr. Cross May of '04

15   to November of '05, according to the letter.  There is

16   an archive Mr. Rubel creates, which has e-mails, at

17   least some number of e-mails, in the April of '08 time

18   frame.  The live PST file for Mr. Cross goes back to

19   May/June of '08.

20                And then, of course, there's Amicus, and

21   Amicus contains whatever Mr. -- in terms of

22   Mr. Cross's e-mails, whatever Mr. Cross manually saved

23   into that program.  So is that correct, what I've just

24   recounted, that we've established at this point?

25         A.    Fundamentally it sounds correct, I'm just

Thorpe  v. Cross          JOSEPH JAY BALDWIN                10/25/2013

Page 67

1    not certain of the exact dates of everything.

2         Q.    Other than what is contained in those

3    archives, and particularly the one you created and the

4    one Mr. Rubel created for the April '08 time frame,

5    the live environment starts May/June of '08.  Any

6    e-mails prior to May/June of '08 that aren't in one of

7    those two other archives and that Mr. Cross did not

8    manually save into Amicus are gone --

9         A.    On the --

10        Q.    -- from Cross & Bennett's systems?

11        A.    Unless they've manually saved them

12   somewhere else.  But inside Amicus, the list would --

13   if you were to resynchronize Amicus in its entirety,

14   the list would now show, like you said, just what they

15   manually saved and just the contents of the respective

16   PST files that Keith's computer is attached to.

17        Q.    Right.  But -- all right.  Let me give you

18   a hypothetical.  An e-mail Keith sends or receives in

19   2003 that for whatever reason he did not save manually

20   into Amicus does not exist any longer?

21              MR. TABB:  Objection -- were you finished?

22        Q.    (BY MR. BASILEVSKY)  Well, to your

23   knowledge?

24              MR. TABB:  Objection.  You can answer the

25   question.

Thorpe  v. Cross        JOSEPH JAY BALDWIN           10/25/2013

Page 68

1          A.   I don't think so, that it would exist

2     anywhere else, but I'm not certain that it wouldn't

3     present itself in the comm center of Amicus.  It still

4     may show some things in there that go back further but

5     that aren't usable.

6          Q.   Well, has there been any examination of

7     Amicus to see if there are any documents like that?

8          A.   I don't know.

9          Q.   You've not done such a search?

10         A.   I don't know the dates of which we've

11    done.  But as I had said before, we've gone into comm

12    center, double-clicked on e-mails that are definitely

13    not in Outlook visibly, and that present themselves in

14    Amicus.  And maybe we've found some that, when you

15    double-click on them, they just don't present

16    themselves; but I don't know that and I don't know

17    what the time line is.

18         Q.   Well, forgetting the time line for a

19    second, have you personally witnessed, you know,

20    opened up Amicus or watched as someone opened up

21    Amicus, double-clicked on an e-mail that's listed and

22    it doesn't give it to you?

23         A.   I'm not sure.  I -- I don't know.

24         Q.   So to the best of your knowledge, then, an

25    e-mail from '03, which, therefore, would not be

Thorpe   v. Cross          JOSEPH JAY BALDWIN                10/25/2013

Page 69

 1    included in any of these archived files that we've

 2    talked about that wasn't manually saved into Amicus

 3    would not be recoverable from Cross & Bennett's

 4    systems at this point?

 5         A.    If it were from that time period you're

 6    referring to and it were inside Keith's PST file, then

 7    that's correct.

 8         Q.    Are you aware or have you been made aware

 9    of any e-mails that have been produced by people with

10    whom Mr. Cross or Mr. Bennett were interacting that

11    you have not been able or -- have not been able to

12    locate in Cross & Bennett's systems?

13              MR. TABB:   Objection.

14         Q.    (BY MR. BASILEVSKY)   You can answer.

15         A.    Ask me that one more time, please.

16         Q.    Has anybody ever shown you an e-mail and

17    said, Do we have this in Cross & Bennett's e-mails or

18    Mr. Cross's e-mails and the answer has been no?

19         A.    Like a printed e-mail or something?

20         Q.    Well, printed, scanned, whatever.

21         A.    I don't think so, no.

22         Q.    So when Mr. Cross and Mr. Bennett opened

23    up an e-mail in Amicus when they were using it and

24    they do manually save it into the Amicus program,

25    what, if any, meta data does Amicus capture out of the

scheduling@huntergeist.com  HUNTER + GEIST, INC. 303.832.5966 / 800.525.8490

# EXHIBIT 4

# EXHIBIT 4

1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

GREGORY THORPE, ET AL.,   .  Case No. 1:13-MC-00405
                       .  (JEB/DAR)
         Movant,     .
                       .
   v.               .  Washington, D.C.
                       .  August 9, 2013
KEITH F. CROSS, ET AL.,   .
                       .
       Respondent.   .
.  .  .  .  .  .  .  .  .  .  .  .  .  .

MOTION HEARING RE: THIRD PARTY SUBPOENA
TO PRODUCE DOCUMENTS
BEFORE THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Movants:       Phillips & Cohen, LLP
                     By:  STEPHEN HASEQAWA, ESQ.
                     100 The Embarcadero
                     Suite 300
                     San Francisco, CA 94105

For the Respondents:   Obermayer, Rebmann, Maxwell
                     & Hippel, LLP
                     By:  H. DAVID SEIDMAN, ESQ.
                     1617 John F. Kennedy Boulevard
                     One Penn Center - 19th Floor
                     Philadelphia, PA 19103-1895

1          THE COURT:  The Court -- I will interrupt

2     only to thank both of you and your respective clients

3     for your willingness to attempt the narrow the issues

4     in dispute.

5          MR. HASEQAWA:  Well, thank you, Your Honor.

6     It was, I think, in both of our interests.  We actually

7     continued to narrow those issues after the opposition

8     was filed by Mr. Thorpe and Mr. Hamrick, and we reached

9     agreement on certain matters, in lieu of requests --

10    Modified Requests 6 through 9.

11         And so, I believe that the only things that

12    are remaining at issue are Modified Requests 1 through

13    5, and 10 and 11, as defined on pages 15 through 16 of

14    the opposition, because we've resolved everything that

15    was not in the modified requests, and as to Requests 6

16    through 9.

17         The agreement was that Phillips & Cohen would

18    provide certain information, and we did provide that

19    information, and also that the parties would submit a

20    motion for a protective order, protecting certain

21    confidential information to the Court in the District

22    of Massachusetts.  I don't believe that's been -- Well,

23    I'm certain that that has not yet been filed.  I think

24    that there is a draft that has gone to both Thorpe &

25    Hamrick, and also to counsel for the defendants in the

1    Massachusetts case, Cross & Bennett.

2            I don't know that there are any philosophical

3    issues with respect to that.  It just hasn't been

4    executed yet.  I haven't heard about any changes that

5    anybody has, and eventually that will be submitted.

6            THE COURT:  So am I correct in my impression

7    that there is no change in the status of the case

8    pending in Massachusetts, that would have any bearing

9    on what we are doing here?

10           MR. HASEQAWA:  I will have to defer to Mr.

11   Seidman on that because I'm not a party in that case

12   and don't really know what's going on in that case.

13           THE COURT:  Very well.

14           Is there any other background that you

15   believe that you'd like to address before we proceed?

16           MR. HASEQAWA:  I don't think that there's any

17   other background that's necessary for this hearing.

18           THE COURT:  Very well.  Thank you very much,

19   Mr. Haseqawa.

20           Mr. Seidman, good morning.

21           MR. SEIDMAN:  Yes, Your Honor, good morning.

22           THE COURT:  I will also hear your discussion

23   with respect to the background and, of course, to the

24   extent that there has been any change in the status of

25   the matter pending in the District of Massachusetts,

1            THE COURT:  And, of course, --

2            MR. SEIDMAN:  -- he believes it's

3    duplicative.

4            THE COURT:  -- cumulative --

5            MR. SEIDMAN:  He believes it's unduly

6    burdensome because we can get it from a party to the

7    case.

8            THE COURT:  That was not the only reason he

9    asserted, was it?  Didn't he also state that there is

10   no IT professional dedicated to this type of search,

11   that the records, to the extent that they still exist,

12   are likely voluminous, that the firm is small, and that

13   -- relatively small, and that a number of resources

14   would have to be diverted from other firm activity in

15   order to search the records for those which would be

16   responsive?

17           MR. SEIDMAN:  It's not true, Your Honor.

18           First, the cases have been -- has not been

19   over for years, and I believe there was some lingering

20   state claims that just concluded, maybe two or three

21   months ago.  So the case has not been, you know, closed

22   years ago, as Mr. Haseqawa suggested.  They've been

23   ongoing, with the exception of a couple months ago, but

24   we're looking for one custodian, and that's Erika

25   Kelton for Phillips & Cohen.  She, I believe, was the

54

1   only lawyer that was communicating with the Defendants

2   in this case, and she was communicating with only one

3   attorney of the Defendants.  We're talking two email

4   addresses go to one custodian, and you search for

5   crossbenett.com and you'll get the results of that

6   search.  In two minutes you'll be able to pull all of

7   those emails up.

8          And the way that I'd litigate, and the way I

9   receive emails, when I get a -- when I have a case,

10  everything is segregated in individual email folder.

11  I'm sure that Ms. Erickson Kelton keeps some

12  organization of her emails, that she could run a simple

13  Outlook search and pull up all of the emails that have

14  Cross & Bennett's email address, just one custodian.

15  We're not talking about searching ten custodians, we're

16  talking one custodian.  That's it.

17         And they're not privileged.  They don't have

18  to review these for privilege.  They're, by definition,

19  communications with Cross & Bennett, so there's no

20  burden in having to log them.

21         And let me correct a statement that Mr.

22  Hasegawa said.  He has said that it would be overly

23  burdensome to have to log the work product that we're

24  asking him to produce.  It's not true.  We specifically

25  say in our response, "You don't have to log anything.

1          MR. SEIDMAN:  And I think, as we demonstrated

2     in our response, that 26(b)(3) doesn't apply, Hickman

3     doesn't apply, and his argument that the document

4     should be protected because Phillips & Cohen is

5     concerned about being sued, that there is no case

6     support for that position.

7          Furthermore, --

8          THE COURT:  Do you acknowledge that the

9     materials -- the arguments, the proffers, the arguments

10    that you include in the opposition to the motion,

11    suggests that that is a reasonable expectation or

12    reasonable inference?

13         MR. SEIDMAN:  Your Honor, we've taken the

14    position that if they've used confidential information

15    used by my clients, and they used it to formulate a

16    competing Complaint, that that would be actionable.

17         Now, that issue is now moot because those

18    documents have been produced, or we've come to an

19    understanding as to -- there was a series of document

20    requests that asked for whether or not Phillips & Cohen

21    used my client's confidential information when he first

22    had his case evaluated by Phillips & Cohen.  That's the

23    basis of Phillips & Cohen's fear that they're going to

24    be sued, is the claim that they used confidential

25    information by a prospective client, to then get a new

1    client.  That issue has been resolved because those
2    documents were produced.  So nothing new that Phillips
3    is going to produce, has anything to do with a fear of
4    litigation.
5              THE COURT:  Haven't you -- Didn't you say
6    earlier this afternoon, that Phillips & Cohen,
7    "Benefitted from the alleged malpractice," that that
8    would appear to be a different theory with respect to a
9    cause of action --
10             MR. SEIDMAN:  They --
11             THE COURT:  -- than the one you just
12   articulated?
13             MR. SEIDMAN:  They benefitted from the legal
14   malpractice, but I don't think that in benefitting,
15   that they --
16             THE COURT:  I'm not attempting to create
17   causes of action.  I just asked because the argument
18   has been raised, it was raised by Mr. Haseqawa and you
19   responded to it.
20             MR. SEIDMAN:  I don't think that there is
21   anything improper with Phillips & Cohen becoming a
22   second filer and then entering into a sharing
23   agreement, and they were the beneficiary of a lawyer's
24   malpractice.  They didn't commit the malpractice,
25   Phillips & Cohen.  They were the beneficiary because

1    we don't think that's true, we think Phillips & Cohen

2    read the protective order like Cross & Bennett should

3    have, and that we'll see in the communications with the

4    Government, that it wasn't ever attorneys' eyes only,

5    and there's -- it's implausible to think, you know,

6    based on those documents, that Cross & Bennett was of

7    the view that it was going to be attorneys' eyes only.

8              THE COURT:  Very well.  You may continue.

9              MR. SEIDMAN:  Number 10, and I apologize, we

10   are jumping a little bit from Bucket 2 back to Bucket

11   1.  My apologies, but Number 10 was under Bucket Number

12   1, and that's -- all agreements or purposed agreements

13   relating to any business, or commercial relationship,

14   or potential relationship between Phillips & Cohen and

15   Cross & Bennett, other than the GSK lawsuit, and that's

16   through 2001 through the present.

17             We claim that not only did Cross & Bennett

18   have an issue with respect to the malpractice that they

19   committed, but there was also a conflict of interest

20   because Cross & Bennett was doing business with

21   Phillips & Cohen.  In fact, Cross & Bennett has

22   admitted that they entered into local counsel

23   agreements with Phillips & Cohen working as their local

24   counsel, in 2004, and I think two times, one in 2008

25   and one in 2009, and we believe there's more.  We

1   believe that there's a more significant relationship

2   there, and that Cross & Bennett have a divided loyalty

3   to their clients, and then divided by the hope of

4   future work in partnership with Phillips & Cohen, the

5   biggest and best False Claims Act qui tam lawyers,

6   according to their web site, and Mr. Haseqawa said,

7   "Well, I'm not entitled to that, and my clients are not

8   entitled to that because we should be able to get it

9   from Phillips and from Cross & Bennett."

10       Well, I have a letter that I received

11   recently, within the last couple of days, it was August

12   2nd, from counsel for the Defendant, saying that one of

13   the agreements doesn't exist.

14       So we know we have a letter.  They were able

15   to -- They've acknowledged three relationships.  They

16   said we had one in 2004 and we had one in 2008 and

17   2009.  They only have two of the agreements.  They say

18   that the other one doesn't exist, so we'd like to get

19   the one that doesn't exist, from Phillips & Cohen.

20       We'd like really, and we're not asking

21   Phillips & Cohen to break any seal, these agreements

22   can be redacted out, we really just want to know how

23   -- the number of engagements they had.  We don't

24   necessarily -- We don't need to know the names of the

25   parties.  We're just really looking for the dates of

1   the engagements, and we'd like to understand the

2   payment terms of the engagements, and how many of them

3   they entered into.  We know of at least three, from

4   emails and correspondence.  We believe that there's

5   more, and we demonstrated here, that they don't have

6   one, so we're coming to Phillips & Cohen, we're saying,

7   "Okay, we need the other one, and we need to know all

8   of them,  because there is questions as to the record

9   keeping of Cross & Bennett, as demonstrated, again, by

10  the fact that they don't have one of the three local

11  counsel agreements that they say exist.  One no longer

12  exists.

13          And this is not argued in the response

14  because at the time I didn't have this information,

15  Your Honor, this August 2nd letter.

16          And also, I just want to also point out that

17  my analysis, and I'm happy to provide a copy to the

18  Court, I have an Excel spreadsheet that shows, I guess,

19  the number of emails, demonstrating how little emails

20  we have for certain periods of time.  We didn't have

21  that information at the time of the response, so it's

22  not part of the brief.

23          THE COURT:  Well, I believe that the Court

24  can accept, as part of your argument, your proffer

25  regarding --

1   with the duty of care, but that's clearly relevant, a

2   Doctor, you know, who has observed it, who's commenting

3   on it, and that's the case here, is Phillips & Cohen

4   lived with this case.  No one knows this case better

5   than Phillips & Cohen and Cross & Bennett.  Probably

6   Phillips & Cohen knows it better than anyone because

7   they were doing all the work.

8          Cross & Bennett was riding their coattails,

9   but Cross & Bennett was in there.  They would be in the

10  best position to see all of the things that Cross &

11  Bennett did wrong, and when they report those things,

12  you can't say that that stuff is not relevant.  It's

13  irrelevant.  You can't say, "No clients, you need to go

14  get an expert, try to recreate everything, and figure

15  it out on your own.  You're not allowed to talk to

16  witnesses that were there at the time, who observed the

17  things that weren't done correctly."  It's relevant.

18         Now, I do need to make one correction to the

19  modified requests.

20         THE COURT:  Of course.

21         MR. SEIDMAN:  And, in my efforts to, I guess,

22  resolve as many disputes as possible, I overly narrowed

23  the time frame for one of my requests.

24         THE COURT:  Which one is that?

25         MR. SEIDMAN:  And that is for Request Number

1  3.  I had that limited to July 1st, 2003 through

2  February 29, 2004.

3          Now, I'd like to -- and it was originally

4  from, I think, July 1st to the present.  I pulled it

5  back to February 29, 2004.

6          Now, Exhibit B to the response, was the

7  letter from Phillips & Cohen to the Department of

8  Justice, and that's dated, I believe it's June of 2012.

9          So we want documents like Exhibit G.  Exhibit

10  G, I think, is a good example of what we expect to find

11  more of and, in fact, in the very first paragraph of

12  Exhibit G, Phillips & Cohen tells the Government,

13  "We're going to write you a more detailed letter, going

14  really through all of the reasons why our Complaint was

15  better than Cross & Bennett." .

16          So we believe we're entitled to that follow-

17  up letter.

18          So, Your Honor, I would like to add to

19  Modified Request 3, to include any documents that

20  reference or relate to this June 6, 2012 letter,

21  including the follow-up letter that specifically

22  identified, in Exhibit G, the June 6, 2012 letter.

23          And I think, Your Honor, if Your Honor agrees

24  with Plaintiffs, that we're entitled to Modified

25  Request 3 information, it doesn't really change the

1  analysis because of expanding for this one set of

2  letters.   The issue is still the same, based on this.

3           THE COURT:  Very well.  Thank you, Mr.

4  Seidman.

5           We are going to take a very brief recess

6  before I hear your reply, Mr. Hasegawa, but before we

7  do, I have, I believe, two questions, just to make sure

8  that the record is clear.

9           You indicated that, in response to an earlier

10  question, that the documents which are the subject of

11  the modified requests, and when I say "the modified

12  requests", I mean the ones that remain, 1 through 5,

13  and 10 and 11 --

14           MR. SEIDMAN:  Uh-huh.

15           THE COURT:  -- were requested in discovery in

16  the case pending in Massachusetts.  And when I say

17  "requested in discovery", I mean the subject of request

18  for production of documents served on the defendants in

19  that case, --

20           MR. SEIDMAN:  Well, I'd think it's only --

21           THE COURT:  -- Cross & Bennett, the firm, and

22  the individuals.

23           MR. SEIDMAN:  I think Modified Request 1 is

24  the only request that would have been duplicated in the

25  request going to the Defendants in this case because

# EXHIBIT 5

# EXHIBIT 5

GREENE

One Liberty Square, Suite 1200
Boston, Massachusetts 02109
(617) 261-0040

August 2, 2013

**Via Electronic and First-Class Mail**

H. David Seidman, Esq.
Obermayer Rebmann Maxwell & Hippel L.L.P.
One Penn Center, 19th Fl.
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103- 1895

RE:   **Cross & Bennett L.L.C. v. Thorpe**, No. 12-cv-11632-RWZ, **United States District Court, District of Massachusetts; Letters of July 31, 2013**

Dear David:

We are in receipt of your letters dated July 31, 2013 concerning local counsel agreements between Mr. Cross and Phillips & Cohen, and written communications between Alex Rothrock and Cross & Bennett.

With regard to local counsel agreements, Mr. Cross has only acted as local counsel for Phillips & Cohen on three occasions.  For one of those occasions, no written local counsel agreement exists.  Our production was complete.

With regard to written communications between Mr. Rothrock and Cross & Bennett concerning Cross & Bennett's representation of Mr. Thorpe and Mr. Hamrick, we have discovered additional documents relating to such communications.  We inadvertently failed to list them in our original privilege log.  They are listed below.

| Date | Author | Recipient | Copies | Subject | Pages | File Name |
|------|--------|-----------|--------|---------|-------|-----------|
| 3/20/08 | Alec Rothrock | Keith Cross | | [Untitled-Case law on ethical issue] | 2 | Research |
| 3/21/08 | Keith Cross | Joe Bennett | | Meeting | 1 | |
| 4/17/08 | Alec Rothrock | Keith Cross; Joe Bennett | Merc Pittinos | Melat Pressman | 1 | |
| 4/17/08 | Keith Cross | Alec Rothrock | Joe Bennett | Melat Pressman | 1 | |
| 4/17/08 | Alec Rothrock | Keith Cross | Joe Benett; Merc Pittinos | Melat Pressman | 1 | |

H. David Seidman, Esq.
RE: <u>Cross & Bennett L.L.C. v. Thorpe</u>, No. 12-cv-11632-RWZ, United States District
    Court, District of Massachusetts; Letters of July 31, 2013
August 2, 2013
Page 2

For your information, Mr. Pittinos is an attorney at Mr. Rothrock's firm, Burns Figa &
Will P.C.

You were correct that the "Memorandum of Financial Terms – Ethics Consultation" was
accompanied by a written communication, although we disagree that the document
was responsive to the Thorpe and Hamrick document request.  It was attached to a
cover email from Mr. Rothrock's secretary.  A copy of the communication is enclosed.

Sincerely yours,

Michael Tabb

Enclosure

cc:    George A. Berman
       Alan K. Tannenwald
       Keith Cross

# EXHIBIT 6

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al. ex rel. THOMAS GERAHTY<br><br>            Plaintiffs,<br><br>            v.<br><br>GLAXOSMITHKLINE PLC, and, SMITHKLINE BEECHAM CORP. d/b/a/ GLAXOSMITHKLINE<br>            Defendants. | C.A. No. 03-CV-10641-NG<br><br>**FILED UNDER SEAL** |

~~PROPOSED~~ ORDER

Upon consideration of the United States' ex parte motion for a protective order, good cause having been shown, it is hereby ORDERED:

That the United States, at its discretion, may permit access to documents produced in connection with its investigation of the Defendants' sale and marketing of its drugs, including computerized documents and documents designated as containing Trade Secret and/or Confidential Commercial Information, to the the Relators, in this matter and in the action *United States ex rel Thorpe and Hamrick*, C.A. 03 D 0008, in Colorado, and these Relators' counsel and supporting legal teams;

And it is FURTHER ORDERED that any of the persons to whom access is permitted pursuant to this Order shall keep such documents and all information contained therein strictly confidential and shall not disclose it to any person other than

the government attorneys and investigators who are reviewing and evaluating the allegations of the complaint in this matter, or the other persons permitted access under the Order with the approval of the government's attorneys, and such information shall be used by them only for the purposes of this investigation and litigation by the United States of the above-referenced action.

   And it is FURTHER ORDERED that any of the persons to whom access is permitted pursuant to this Order shall, if they have any such documents, including such notes, summaries, or other documents containing information gleaned from these documents, shall immediately return such documents to the United States upon a request to do so by the United States, or destroy them if so instructed by the United States.

_____
UNITED STATES DISTRICT JUDGE

Dated: ___3/28/08___

2

Thorpe-Hamrick0142272

# EXHIBIT 7

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | |
| | NO.  1:13-mc-00405-JEB-DAR |
| GREGORY THORPE, *et al.* | |
| Plaintiffs | |
| vs. | NO.  1:12-cv-11632-RWZ |
| | Pending in District of Massachusetts |
| KEITH F. CROSS, *et al.* | |
| Defendants | |

**ORDER**

AND NOW, this _____ day of _____, 2013, upon consideration of

Plaintiff's Objection to Magistrate Judge Deborah A. Robinson's Memorandum Order (Dkt. 17)

Granting the Motion to Quash or, in the Alternative, for Protective Order filed by Phillips and

Cohen, LLP (the "Motion"), and any response thereto, it is hereby **ORDERED** that the

Memorandum Order is **VACATED** and the Motion is **DENIED**.

**BY THE COURT:**

_____
                                                                    J.

4766410.6